# United States Court of Appeals

*for the*

# Seventh Circuit

Case No. 26-1210

VILLAGE OF HOBART, WISCONSIN,

*Plaintiff-Appellant,*

– v. –

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

*Defendants-Appellees,*

– and –

ONEIDA NATION,

*Intervening Defendant-Appellee.*

ON APPEAL FROM AN ORDER ENTERED IN
THE EASTERN DISTRICT OF WISCONSIN IN NO. 1:23-CV-01511-WCG,
HONORABLE WILLIAM C. GRIESBACH, DISTRICT COURT JUDGE

## APPELLANT'S BRIEF AND APPENDIX

FRANK W. KOWALKOWSKI
VON BRIESEN & ROPER, S.C.
300 North Broadway, Suite 2B
Green Bay, Wisconsin 54303
(920) 713-7810

DEREK J. WATERSTREET
VON BRIESEN & ROPER, S.C.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, Wisconsin 53202
(414) 287-1519

*Attorneys for Plaintiff-Appellant*

CP COUNSEL PRESS    (800) 4-APPEAL • (625163)

**Save As**  **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1210

Short Caption: Village of Hobart WI v. United States Department of the Interior et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Village of Hobart, Wisconsin

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 von Briesen & Roper, s.c.

(3)   If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature:  /s Derek J. Waterstreet                                    Date:  02/25/2026

Attorney's Printed Name:  Derek J. Waterstreet

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address:  411 East Wisconsin Avenue, Suite 1000

 Milwaukee, WI 53202

Phone Number: 414-287-1519                          Fax Number:  414-238-6434

E-Mail Address: derek.waterstreet@vonbriesen.com

rev. 12/19 AK

i

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1210</u>

Short Caption: <u>Village of Hobart WI v. United States Department of the Interior et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   <u>Village of Hobart, Wisconsin</u>

   _____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   <u>von Briesen & Roper, s.c.</u>

   _____

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

           _____

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

           _____

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   _____

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   _____

Attorney's Signature: <u>/s Frank W. Kowalkowski</u>     Date: <u>04/28/2026</u>

Attorney's Printed Name:  <u>Frank W. Kowalkowski</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address:  <u>300 N. Broadway, Suite 2B</u>

         <u>Green Bay, WI 54303</u>

Phone Number: <u>920-713-7810</u>          Fax Number: <u>920-232-4899</u>

E-Mail Address: <u>Frank.Kowalkowski@vonbriesen.com</u>

rev. 12/19 AK

ii

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... vi

JURISDICTIONAL STATEMENT ............................................................................ 1

    I.      District Court's Jurisdiction ...................................................................... 1

    II.     Court of Appeals' Jurisdiction ................................................................. 2

STATEMENT OF THE ISSUES ................................................................................. 3

STATEMENT OF THE CASE .................................................................................... 3

    I.      Nature of the Case and Agency Proceedings ......................................... 3

    II.     District Court's Disposition ...................................................................... 5

    III.    Statement of Facts In the Administrative Record (Dkt. 32-1)
          ("Record") .................................................................................................. 5

          A.      The Tribe's Fee-to-Trust Applications ....................................... 5

          B.      The MOU ......................................................................................... 6

          C.      The GAO's and Inspector General's Findings Concerning
                the MOU ......................................................................................... 8

SUMMARY OF THE ARGUMENT ......................................................................... 10

ARGUMENT ............................................................................................................. 12

    I.      Section 5 of the IRA Is Unconstitutional ............................................. 12

          A.      Standard of Review ...................................................................... 12

          B.      Section 5 Exceeds Congress's Power Under the Indian
                Commerce Clause ........................................................................ 12

                1.      *Haaland v. Brackeen*, 599 U.S. 255 (2023) confirms
                        Congress's power over Indian affairs has limits .................... 13

                2.      Section 5 is fundamentally different—and far more
                        intrusive—than any prior exercise of federal
                        authority ....................................................................................... 16

C. Section 5 Violates the Nondelegation Doctrine Because It Gives the Secretary Unbounded Discretion ........................................19

1. Supreme Court precedent establishes the lack of any intelligible principle ..........................................................20

2. The Eighth Circuit's highlight of the IRA's absurdity and the flaw in subsequent Circuits' holdings ........................................................................24

3. The breadth of the power conferred by Section 5 heightens the constitutional concern ........................................29

4. The Secretary's use of Section 5 confirms the lack of a limiting intelligible principle ................................................30

II. The Department's Biased Decision Violated the APA Because It Was Arbitrary, Capricious, or Otherwise Not in Accordance with Law ........................................................................................32

A. Standard of Review ........................................................................32

B. Argument ........................................................................................33

1. The Department's decision was arbitrary and capricious given the biased processing under the MOU ........................................................................................33

i. The Department arbitrarily disregarded the MOU's terms and failed to confront the resulting bias ................................................................34

ii. The arbitrary rebuff of the RD's biased involvement and purported "independent" review ........................................................................36

iii. The RD's incomplete review of the IG Report............40

iv. The IBIA ignored compelling evidence of prejudgment in the Record ........................................44

2. The Department's decision was not in accordance with the law ........................................................................49

i. The IRA does not authorize acquisition under the MOU ..........................................................49

iv

ii. The MOU leads to rubber-stamping of the
Section 151.10 criteria ......................................................50

III. The District Court Abused Its Discretion By Denying Extra-
Record Discovery .........................................................................52

A. Standard of Review................................................................52

B. Argument .............................................................................52

CONCLUSION ................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ................................................................................. 20, 21-22, 32

*Alaska v. Native Village of Venetie Tribal Gov't,*
522 U.S. 520 (1998) ....................................................................................... 16

*American Power & Light Co. v. SEC,*
329 U.S. 90 (1946) ..................................................................................... 22, 23

*Amos Treat & Co. v. S.E.C.,*
306 F.2d 260 (D.C. Cir. 1962) ......................................................................... 48

*Butte Cnty, Cal. v. Hogen,*
613 F.3d 190 (D.C. Cir. 2010) ......................................................................... 43

*Carcieri v. Kempthorne,*
497 F.3d 15 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 379 (2009) ........................... 26

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ....................................................................................... 27

*Citizens for Appropriate Rural Roads v. Foxx,*
815 F.3d 1068 (7th Cir. 2016) ....................................................................... 52, 53

*City of Chicago v. Barr,*
961 F.3d 882 (7th Cir. 2020) ......................................................................... 28, 29

*City of Sherrill, N.Y. v. Oneida Indian Nation of New York,*
544 U.S. 197 (2005) ....................................................................................... 29

*Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior,*
228 F.3d 82 (2d Cir. 2000) ............................................................................. 17

*Cook Cnty., Ill. v. Wolf,*
461 F. Supp. 3d 779 (N.D. Ill. 2020) ......................................................... 53, 54, 55, 56

*Cotton Petroleum Corp. v. New Mexico,*
490 U.S. 163 (1989) ....................................................................................... 15

*Daviess Cnty. Hosp. v. Bowen,*
811 F.2d 338 (7th Cir. 1987) ........................................................................... 32

*Del Vecchio v. Ill. Dep't of Corr.,*
31 F.3d 1363 (7th Cir. 1994) ........................................................................... 39

*Dep't of Commerce v. New York,*
588 U.S. 752 (2019) ................................................................................... *passim*

*Dep't of Interior v. South Dakota,*
519 U.S. 919 (1996) ........................................................................................ 25

*Dopico v. Goldschmidt,*
687 F.2d 644 (2d Cir. 1982) ............................................................................ 56

*Elec. Pwr. Supply Ass'n v. F.E.R.C.,*
391 F.3d 1255 (D.C. Cir. 2004) ...................................................................... 46

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ........................................................................................ 24

*Fed. Commc'n Comm'n v. Consumers' Research,*
606 U.S. 656 (2025) ................................................................................... *passim*

*Foster v. Mabus,*
103 F. Supp. 3d 95 (D.D.C. 2015) ................................................................. 39

*Grill v. Quinn,*
No. 10 CV 0757, 2012 WL 174873 (E.D. Cal. Jan. 20, 2012) ................... 55, 56

*Gundy v. United States,*
588 U.S. 128 (2019) ........................................................................ 19, 23, 27-28

*Haaland v. Brackeen,*
599 U.S. 255 (2023) ........................................................... 13, 14, 15, 18

*Hummel v. Heckler,*
736 F.2d 91 (3d Cir. 1984) .............................................................................. 38

*In re Murchison,*
349 U.S. 133 (1955) ........................................................................................ 48

*Int'l Snowmobile Mfrs. Ass'n v. Norton,*
340 F. Supp. 2d 1249 (D. Wyo. 2004) ........................................................... 48

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ........................................................................................ 27

*Manker v. Spencer,*
No. 3:18-CV-372, 2019 WL 5846828 (D. Conn. Nov. 7, 2019) ................... 55

*Michigan Gambling Opposition v. Kempthorne*,
525 F.3d 23 (D.C. Cir. 2008) ......................................................................26-27

*Mistretta v. United States*,
488 U.S. 361 (1989) ...................................................................................... 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ................................................................................. 33, 40

*New Mexico v. Mescalero Apache Tribe*,
462 U.S. 324 (1983) ...................................................................................... 16

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ................................................................................. 16, 18

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) ................................................................... 20, 21, 22, 32

*Porter v. Califano*,
592 F.2d 770 (5th Cir. 1979) ................................................................. 54, 55

*Printz v. United States*,
521 U.S. 898 (1997) ...................................................................................... 14

*Sanchez ex rel. Sanchez v. Barnhart*,
No. 03-C-537-C, 2005 WL 752220 (W.D. Wis. Mar. 30, 2005), *aff'd sub nom.*
*Sanchez v. Barnhart*, 467 F.3d 1081 (7th Cir. 2006)............................... 39

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) ................................................................................. 13, 14

*Small v. Sullivan*,
820 F. Supp. 1098 (S.D. Ill. 1992) ............................................................ 38

*South Dakota v. U.S. Dep't of Interior*,
423 F.3d 790 (8th Cir. 2005) ............................................................... 26, 27

*South Dakota v. U.S. Dep't of Interior*,
69 F.3d 878 (8th Cir. 1995) *("South Dakota I"), mandate recalled and vacated*,
106 F.3d 247 (8th Cir. 1996) ................................................... 24, 25, 26, 32

*Stand Up for Cal.! v. U.S. Dep't of the Interior*,
204 F. Supp. 3d 212 (D.D.C. 2016) ...................................................... 35, 36

*State v. Becerra*,
544 F. Supp. 3d 1241 (M.D. Fla. 2021) ................................................ 28, 29

*United States v. Kagama,*
118 U.S. 375 (1886) .................................................................................. 14-15

*United States v. Lara,*
541 U.S. 193 (2004) ....................................................................................... 13

*United States v. Lopez,*
514 U.S. 549 (1995) ............................................................... 14, 15-16, 18

*United States v. Morrison,*
529 U.S. 598 (2000) ................................................................................ 16, 18

*United States v. Roberts,*
185 F.3d 1125 (10th Cir. 1999) ................................................................ 26

*Upstate Citizens for Equality, Inc. v. United States,*
140 S. Ct. 2587 (2017) ....................................................... 14, 17, 29

*Village of Hobart, Wisconsin v.*
*Acting Midwest Regional Director, Bureau of Indian Affairs,*
69 IBIA 84 (2023) ........................................................................... *passim*

*Village of Hobart, Wisconsin v. Acting Midwest Regional Director, BIA,*
57 IBIA 4 (2013) ................................................................... 4, 5, 41, 45

*Weinberg v. City of Chicago,*
310 F.3d 1029 (7th Cir. 2002) ..................................................... 12, 28, 32

*Whitman v. Am. Trucking Associations,*
531 U.S. 457 (2001) ............................................................................... 19, 24

*Williams v. Pennsylvania,*
579 U.S. 1 (2016) ........................................................................................ 39

*Withrow v. Larkin,*
421 U.S. 35 (1975) ................................................................................ 48, 49

## Statutes & Other Authorities:

Article I § 1 of the U.S. Constitution.................................................. 3, 19

Article I § 8, Clause 3 of the U.S. Constitution.................... 2, 3, 13, 14

5 U.S.C. § 701 ......................................................................................... 2

5 U.S.C. § 706(2)(A) ........................................................................... 33

25 U.S.C. § 1321(a) ........................................................................................................ 17

25 U.S.C. § 1322(a) ........................................................................................................ 17

25 U.S.C. § 5108 ......................................................................................... 2, 17, 20, 49

28 U.S.C. § 1291 .............................................................................................................. 2

28 U.S.C. § 1331 .............................................................................................................. 1

42 U.S.C. § 264(a) ......................................................................................................... 28

25 C.F.R. § 1.4(a) ........................................................................................................... 17

25 C.F.R. § 151 ........................................................................................................... 7, 35

25 C.F.R. § 151.10 .................................................................................................. *passim*

25 C.F.R. § 151.10(c) .................................................................................................... 32

25 C.F.R. § 151.10(e) ................................................................................................. 4, 50

25 C.F.R. § 151.10(f) ....................................................................................................... 4

25 C.F.R. § 151.10(h) ..................................................................................................... 4

Indian Reorganization Act of 1934, 48 Stat. 984 (June 18, 1934) .................................. *passim*

Kelsey J. Waples, *Extreme Rubber-Stamping: The Fee-to-Trust Process of the Indian Reorganization Act of 1934*, 40 Pepp. L. Rev. 251 (2012) .............................................. 30, 51

U.S. Gov't Accountability Office, *Bureau of Indian Affairs Should Take Additional Steps to Improve Timely Delivery of Real Estate Services*, GAO-24-105875 (Oct. 2023) ..................................................................................................................... 18

# JURISDICTIONAL STATEMENT

## I. District Court's Jurisdiction.

The United States District Court for the Eastern District of Wisconsin had subject matter jurisdiction under 28 U.S.C. § 1331. Plaintiff-Appellant, Village of Hobart, Wisconsin ("Village"), is an incorporated municipality in Brown County, Wisconsin. Defendants-Appellees are the U.S. Department of the Interior; Deb Haaland, in her official capacity as Secretary of the Interior; Bureau of Indian Affairs ("BIA"); Tammie Poitra, in her official capacity as Midwest Regional Director, BIA ("RD"); and the Interior Board of Indian Appeals ("IBIA") (collectively, "Department"). The intervening Oneida Nation ("Tribe") is a federally recognized Indian Tribe.

The Village challenges the Department's decision to take land, located within the Village, into trust for the Tribe. Specifically, the Village sought judicial review of the IBIA's September 21, 2023 decision, *Village of Hobart, Wisconsin v. Acting Midwest Regional Director, Bureau of Indian Affairs*, 69 IBIA 84 (2023) ("*Hobart II*") (Appendix ("A") 42-92), which arose from the Village's appeal of the RD's decision dated January 19, 2017 ("Remand Decision"). The Village requested the District Court vacate the Department's decision because: (1) Section 5 of the IRA is unconstitutional; and (2) the decision was arbitrary and capricious, or otherwise not supported by law in violation of the APA, due in part, because of the Department's biased decision-making under a Memorandum of Understanding between the Tribe and BIA ("MOU").

The dispute arises under Article I, § 1 and Article I, § 8, cl. 3 of the U.S. Constitution; the Indian Reorganization Act of 1934, 48 Stat. 985 (June 18, 1934), 25 U.S.C. § 5108 ("IRA"); the IRA's implementing regulations, 25 C.F.R. § 151.10 (2023); the Administrative Procedure Act, 5 U.S.C. § 701, *et. seq* ("APA"); and Federal Common Law.

## II.     Court of Appeals' Jurisdiction.

This Court has jurisdiction under 28 U.S.C. § 1291. The Village filed a notice of appeal on January 30, 2026, (Dkt. 79), from the final Decision and Order of the District Court dated December 2, 2025 and the final judgment entered on December 2, 2025 (A1; A2-A31). The District Court affirmed the IBIA's decision in *Hobart II*, and dismissed the Village's claims that the IRA is unconstitutional. The Village did not have a claim against the Tribe. Accordingly, the Village's claims were disposed of in their entirety by the final judgment, and there remain no other claims or parties subject to disposition at the District Court.

**STATEMENT OF THE ISSUES**

**Issue 1:**  Whether Section 5 of the IRA is unconstitutional because it:

(a)  exceeds Congress's authority under the Indian Commerce Clause, Article I, Section 8, Clause 3 of the U.S. Constitution, and

(b)  constitutes an unlawful delegation of legislative power in violation of Article I, Section 1 of the U.S. Constitution?

**Issue 2:**  Whether the Department's decision to take land into trust violated the APA because it resulted from a biased decision-making process pursuant to a Memorandum of Understanding (MOU) between BIA and the Tribe?

**Issue 3:**  Whether the District Court abused its discretion by not permitting extra-record discovery into the Department's activities and decision-making conducted under the MOU?

**STATEMENT OF THE CASE**

## I.  Nature of the Case and Agency Proceedings.

The Village requests judicial review of the Department's decision to take land into trust, pursuant to Section 5 of the IRA (A94) and its implementing regulations, 25 C.F.R. § 151.10 (2023). In the agency proceedings, the IBIA affirmed in *Hobart II* the RD's Remand Decision to take land into trust for the Tribe. (A45.) The land, which is within the Village, consists of twenty-one parcels and 499.022 acres (the "Properties"). (Dkt. 1

3

¶ 2; *see also* Dkt. 32-4 at 29.) A Division of BIA employees, whose salaries were funded by the Tribe, processed and approved the Tribe's applications pursuant to the MOU. (Dkt. 1-3.)

The final agency decision in *Hobart II* stems from the IBIA's decision in 2013, *Village of Hobart, Wisconsin v. Acting Midwest Regional Director, BIA*, 57 IBIA 4 (2013) ("*Hobart I*"). In *Hobart I*, the IBIA reviewed six notices of decision ("NODs") issued by the RD in 2010 (Dkt. 32-4 at 29) that initially approved the fee-to-trust applications for the Properties. *Hobart I* at 4-8. After the Village appealed the NODs and the appeals were consolidated, the IBIA affirmed in part, vacated in part, and remanded. *Id.* at 4-5. Specifically, the IBIA vacated and remanded to the RD to address the Village's bias claim regarding the MOU and address the Village's comments under 25 C.F.R. § 151.10(e), (f), and (h) concerning tax loss, land use conflicts, jurisdictional problems, and environmental concerns. *Id.* at 5.

In January 2017, the RD issued her Remand Decision, again taking the Properties into trust. (Dkt. 32-4 at 28-59.) The Village appealed to the IBIA. (Dkt. 32-4 at 9-21.) In 2023, the IBIA issued *Hobart II*. (A42–92.) In *Hobart II*, the IBIA concluded the MOU did not create an unlawful structural bias and asserted the Village had failed to identify any evidence that demonstrated the RD prejudged the applications. (A62-64.) The IBIA further rejected the Village's other arguments, including those surrounding the sufficiency of the RD's order on remand relating to the RD's failure to consider an

4

Inspector General Report ("IG Report") condemning the MOU as well as the RD's failure to properly consider the criteria in 25 C.F.R. § 151.10. (A64-90.)

## II. District Court's Disposition.

Upon judicial review of *Hobart II*, the District Court entered judgment for the Department, affirming the Department's decision to take the Properties into trust. (A1; A31.) The District Court concluded Section 5 of the IRA was constitutional for two reasons: (1) the District Court disagreed that Section 5 exceeded the limits of the Indian Commerce Clause, and instead, held it was constitutional under Congress's "plenary" power (A26); and (2) Section 5 did not violate the nondelegation doctrine. (A30.) Finally, the District Court held the Department's decision to take land into trust did not violate the APA. (A17-24.)

## III. Statement of Facts In the Administrative Record (Dkt. 32-1) ("Record").

### A. The Tribe's Fee-to-Trust Applications.

In 2007, the Tribe submitted a total of 56 applications requesting 133 parcels totaling 2,673 acres in the Village be transferred into trust. (A4; Dkt. 57 at 9.) The Properties were part of those 133 parcels. (Dkt. 57 at 9; *Hobart I* at 4, n.4.) Since then, the Tribe's land holdings have grown. As of 2017, the Tribe owned 40.9% of its original Reservation in either fee or trust. (Dkt. 35-8 at 155.) As of the end of 2024, that grew to 45%, or the equivalent of 29,406.79 acres. (Dkt. 57 at 9, n.4.)

**B.    The MOU.**

Since 2005, BIA and the Tribe have processed fee-to-trust applications under the MOU. (Dkt. 1-3.)[1] "Through funds provided by Participating Tribes," BIA Midwest "hire[s] employees/contract staff whose sole duties and responsibilities will be to process Fee-to-Trust applications," from those tribes. (*Id.* at 2.) The stated purpose— getting land "accepted into trust" through "facilitating the expeditious processing of [those] fee-to-trust applications." (*Id.*)

Per its terms, the MOU was created because "[t]he need for increased land base is imperative," and there is an unacceptable "gap" that is "widening" between applications and land being "accepted into trust." (*Id.*) To accomplish its objectives a "Division," defined to include "[t]he Midwest Region[al] Director and group of staff assigned to work on trust acquisition cases," was formed. (*Id.* at 3.) An "Oversight Advisory Council," which is "composed of the MWRO Regional Director and one representative of each Participating Tribe" was also formed. (*Id.* at 3, 5.) This Council, who "shall meet at least twice a year in a manner determined by the Participating tribes," has "[o]versight" over the Division. (*Id.* at 5.) "Decision making . . . shall be by consensus vote of the attending Participating Tribes[.]" (*Id.*) An Executive Committee,

---

[1] The Village cites to the FY2014-FY2017 MOU (Dkt. 1-3 at 2-9), which was in effect when the Remand Decision was issued. The IBIA referred to the FY2008-FY2010 MOU (Dkt. 1-3 at 17-23), but noted the terms "do not differ materially" and it would reach the same conclusions. (A59, n.19.)

which is also comprised of "both tribal and federal members" may also be formed for "providing more timely input to the Regional Director." (*Id.*)

Division employees "necessary to achieve the goals of th[e] Project," are "governed" by the MOU and "report directly to the Regional Director's office." (*Id.* at 4-5.) The "specific number and positions" of employees are determined by the Midwest Regional Office and the Advisory Council through a "mutually agreed upon process." (*Id.* at 4.) Among other duties, the Division's employees—who are paid by the tribes—are "responsible for assuring" that each "acquisition" complies with administrative requirements of 25 C.F.R. Part 151. (*Id.* at 5.) These same employees—not the RD—are responsible for "preparing the Notice of Decision on a requested parcel" and "preparing the record for appeal[.]" (*Id.* at 6.) The MOU even requires employees to assist the tribes in "developing responses to comments" received from local governments and "eliminating or mitigating any of the Solicitor's objections" to the application. (*Id.*)

To receive preferential treatment, a tribe must pay. (*Id.* at 4.) As of 2007—when the applications for the Properties were submitted—the minimum contribution was $215,000 per year per tribe. (Dkt. 35-11 at 111.) Per the Tribe, the MOU has "resulted in a more responsive trust application process" and "continued participation is in [the Tribe's] best interests." (Dkt. 35-11 at 114.)

**C.      The GAO's and Inspector General's Findings Concerning the MOU.**

Between the time of the Tribe's submissions in 2007 and the MOU's

implementation in 2005, the Government Accountability Office ("GAO") in 2006

examined these agreements to process and decide fee-to-trust applications. (Dkt. 35-8 at

184-234, Dkt. 35-9 at 1-10 ("GAO Report").) Critically, the GAO Report found that BIA's

criteria for considering fee-to-trust applications are "not specific" and "do not offer

clear guidelines" for how BIA should apply them. (Dkt. 35-8 at 192, 202, 223.) The GAO

Report concluded in part there is a need for transparency for State and local

governments, including "information on how BIA reaches its decisions." (*Id.* at 223.)

The GAO Report further revealed, in late 2005 the Interior Office of Inspector General

("IG") was also investigating the MOU agreements given concerns about their legality

and funding. (*Id.* at 207.)

The IG's investigation was initiated after it received a similar MOU between the

Pacific Region BIA and several California tribes. (Dkt. 1-5, *see also* Dkt. 35-9 at 106-129

("IG Report").) In the synopsis of the IG Report, the IG reported:

> The MOU describes a process by which the BIA-PRO "re-
> programs" Tribal Priority Allocation (TPA) funds back to BIA-PRO
> to hire federal employees dedicated solely to processing
> Consortium members' fee-to-trust (FTT) applications.
>
> . . . [T]he funding structure of the MOU . . . creates a situation
> where the tribes are literally paying the salaries of federal
> employees. The ability of an all-tribal body to influence the
> selection, performance awards, and duties and responsibilities of
> the federal consortium staff—coupled with the fact that the tribes

> control the purse strings from which the consortium staff's salaries are dependent results in a patent perception of a conflict of interest. This investigation has found this appearance of a conflict of interest to be, in fact, real. . . .
>
> Regarding the legality of the consortiums, a recent legal opinion rendered by the Office of the Solicitor (SOL) . . . recommended that BIA discontinue the fee-to-trust consortiums, as they are currently structured.

(Dkt. 1-5 at 2.)

The IG Report contains 19 attachments including interviews, a Solicitor's review of the Midwest MOU and a Solicitor's legal opinion. (Dkt. 1-5 at 14.) It revealed several employee concerns, including that "tribes who donate large amounts of TPA funds . . . receive better treatment than tribes who donate less money to the program"; "if the tribes stopped donating TPA funds . . . consortium employees would be subject to a Reduction in Force" which caused a "substantial amount of stress and anxiety"; and that staff are "work[ing] for the tribes" and "pay [their] salaries and expect results." (*Id.* at 7-10.) Critically, it found the "'*whole purpose*' *is to ensure these applications receive a favorable recommendation*" (i.e., trust acquisition). (*Id.* at 3-4) (emphasis added).

As it relates to the Midwest MOU, the IG Report also included interviews from employees (whose identities were redacted). (*Id.* at 26-29, 42-43.) One interview noted the MOU was established because tribes thought BIA was not processing their applications fast enough. (*Id.* at 42.) This employee is the one who proposed the MOU be implemented. (*Id.*) "Similar to the BIA-PRO's MOU, under the BIA-MRO's MOU, the

9

salaries . . . are dependent upon TPA funding" and these "positions would also similarly be subject to a RIF if the TPA funding for the MOU were to cease." (*Id.* at 12.)

In closing the IG Report noted the Solicitor's legal opinion that the MOU creates "the patent appearance of a conflict of interest," an "insufficient separation of organizational functions," and "the possibility of the appearance of unfairness of the fee-to-trust application process." (*Id.*) The Solicitor found: (1) the "appearance of unfairness also extends to the approval process itself," because "the functions that would have been performed by the tribes are now performed by BIA employees[,]" and (2) Division employees performing work under the MOU "*raises serious questions about the independence of judgment*" as "fee-to-trust applications are frequently controversial and their review and processing requires the exercise of substantial independent judgment." (*Id.* at 13) (emphasis added). The Solicitor did "*not believe BIA can assure that the final decisions on the consortium fee-to-trust applications are fair and unbiased*" and "*the absence of sufficient internal controls creates a potential for bias or the perception of bias.*" (*Id.*) (emphasis added). For these reasons, among others, the IG Report concluded and the Solicitor recommended "that BIA discontinue the fee-to-trust consortiums[.]" (*Id.* at 13.)

## SUMMARY OF THE ARGUMENT

This case presents a fundamental separation-of-powers violation and administrative law failure. The Department's decision to take land into trust for the Tribe—affirmed by the District Court—rests on an unconstitutional statute, a biased

decision-making process under the MOU, and a record shielded from meaningful scrutiny.

First, Section 5 exceeds Congress's authority under the Indian Commerce Clause. In effect, the statute allows the federal government to erode state sovereignty parcel-by-parcel. This sweeping intrusion into the federal-state balance lacks any limiting principle and cannot be reconciled with the Constitution's enumerated powers.

Second, Section 5 violates the nondelegation doctrine because it delegates boundless authority to the Secretary of the Interior. The statute allows the Secretary to acquire "any interest in lands" for Indians without specifying when, why, how much, or under what constraints. Supreme Court precedent requires an intelligible principle in the statutory text. Section 5 has none.

Third, the Department's decision was arbitrary and capricious, and not in accordance of the law under the APA. It resulted from a biased process created by the MOU, pursuant to which tribes fund the salaries of the very officials responsible for drafting decisions and compiling the administrative record on which those decisions are purportedly based. The agency ignored substantial evidence of bias, including findings by the Inspector General that the MOU creates both the appearance and reality of a conflict of interest and should be discontinued.

Finally, the District Court erred in denying limited discovery on the RD's decision-making under the MOU despite a strong showing of bias and incomplete

11

record evidence.

The Village requests this Court reverse the District Court, hold Section 5 of the IRA is unconstitutional, and vacate the Department's decision to take land into trust. Alternatively, this Court should vacate the Department's decision, thereby reversing the District Court, and remand to an independent decision-maker to consider the Tribe's applications without the MOU's influence. As a final alternative, this Court should vacate the District Court's Judgment and Decision, and remand with an order that permits the Village to engage in limited extra-record discovery as to the activities and decision-making conducted under the MOU.

## ARGUMENT

### I. Section 5 of the IRA Is Unconstitutional.

#### A. Standard of Review.

This Court reviews questions of constitutional law under a *de novo* standard. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1035 (7th Cir. 2002).

#### B. Section 5 Exceeds Congress's Power Under the Indian Commerce Clause.

The District Court's decision that Section 5 of the IRA is constitutional pursuant to Congress's supposed "plenary" power was erroneous. (A25.) While the Constitution grants Congress significant authority over Indian affairs, that authority is not limitless. Because Section 5 exceeds those limits, it is unconstitutional.

12

### 1.    *Haaland v. Brackeen*, 599 U.S. 255 (2023) confirms Congress's power over Indian affairs has limits.

The Indian Commerce Clause under Article I, states Congress has the power to "regulate Commerce . . . with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. Recently, the Supreme Court made unmistakably clear that Congress's authority over Indian affairs is not limitless. In *Haaland v. Brackeen*, the Court reaffirmed Congress's power over Indians "is not absolute" and "is not unbounded." 599 U.S. 255, 276 (2023). Even where that authority is described as "plenary," the Court emphasized it exists only "within its sphere," and "even a sizeable sphere has borders." *Id.* This is because Article I of the Constitution "gives Congress a series of enumerated powers, not a series of blank checks." *Id.*

The Supreme Court's statements in *Brackeen* did not arise in a vacuum. They reflect longstanding constitutional concerns about the scope of the Clause. Judge Alito further observed, in his dissenting opinion in *Brackeen*, Congress's power to regulate Indian affairs must be limited if it "'*interfere[s] with the power or authority of any State.*'" *Id.* at 376 (quoting *United States v. Lara*, 541 U.S. 193, 205 (2004)) (emphasis added). That is because "[f]oundational constitutional principles like state sovereign immunity . . . are 'not so ephemeral as to dissipate when the subject of the suit is [in] an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government.'" *Brackeen*, 599 U.S. at 376 (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996)). More specifically, Congress's power is limited by "the background

13

principle of state sovereign immunity embodied in the Eleventh Amendment."

*Brackeen*, 599 U.S. at 376 (citing *Seminole Tribe*, 517 U.S. at 72). That is, the powers

retained by the States constitute "residuary and inviolable sovereignty" upon which the

federal government cannot intrude. *Printz v. United States*, 521 U.S. 898, 919 (1997).

Congress's limits under Article I with respect to the federal-state balance are also

highlighted by Justice Gorsuch's concurrence in *Brackeen*. He noted:

> [T]he Commerce Clause vests in Congress the power to "regulate
> Commerce with foreign Nations," "among the several States," and
> "with the Indian Tribes," Art. I, § 8, cl. 3—conferrals of authority
> with respect to three separate sorts of sovereign entities that *do not
> entail the power to eliminate any of them.*

*Brackeen*, 599 U.S. at 310 (emphasis added).

Although Supreme Court precedent, including *Brackeen*, has interpreted the

Indian Commerce Clause to encompass more than strictly trade, the Supreme Court

and individual Justices have cautioned against reading the Clause as a source of general

authority untethered from commerce. Justice Gorsuch in *Brackeen* stated "Congress's

actions must still bear a valid 'nexus' to Indian Commerce to withstand constitutional

challenge." 599 U.S. at 325 (quoting *United States v. Lopez*, 514 U.S. 549, 562 (1995)).

Justice Thomas also previously explained in *Upstate Citizens for Equality, Inc. v. United*

*States*, "[n]either the text nor the original understanding of the [Indian Commerce]

Clause supports Congress's claim to such 'plenary' power." 140 S. Ct. 2587, 2588 (2017)

(Thomas, J., dissenting from denial of certiorari) (citations omitted). *See also United States*

14

*v. Kagama*, 118 U.S. 375, 378-79 (1886) ("[I]t would be a very strained construction of this clause that a system of criminal laws for Indians . . . without any reference to their relation to any kind of commerce, was authorized by the grant of power to regulate commerce with the Indian tribes.").

The District Court acknowledged *Brackeen*'s warning about Congressional overreach but declined to enforce it. Instead, in one paragraph, the court concluded Section 5 is constitutional based on a generalized notion of congressional "plenary" authority. (A26.) It relied upon *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) for its conclusion. In doing so, the court treats Congress's power under the Clause as limitless. *Cotton*, however, does not provide this limitless authority—as *Brackeen* confirms. The one time the word "plenary" is used in *Cotton* provides an important distinction—the States have a "unique role" in the constitutional system, and the "fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce 'among' States with mutually exclusive territorial jurisdiction to trade 'with' Indian tribes." *Id.*

The District Court's holding and overreliance on dicta from *Cotton* cannot be reconciled with *Brackeen*, the Constitution's text, or basic principles of federalism. As the Supreme Court has repeatedly held, Congress's Commerce Clause power must be tied to a limiting principle and cannot be converted into a general police power. *Lopez*, 514

15

U.S. at 564-68; *United States v. Morrison*, 529 U.S. 598, 617-19 (2000). Nor may Congress invoke its enumerated powers to fundamentally restructure the federal-state balance. *NFIB v. Sebelius*, 567 U.S. 519, 552–58 (2012).

### 2. Section 5 is fundamentally different—and far more intrusive—than any prior exercise of federal authority.

This case is not merely another dispute over the scope of federal power in Indian affairs. It presents a qualitatively different and far more dangerous assertion of authority. Section 5 is uniquely destructive. It does not regulate commerce, facilitate trade, or manage federal-tribal interactions. Instead, it authorizes the systematic erosion of states and local governments through mechanisms far removed from any enumerated power.

Section 5 is most often used, as is the case here, when the Tribe already owns the land. The federal government does not purchase, relinquish, gift, exchange, assign, or, for that matter, meaningfully acquire anything. Instead, the Secretary merely modifies title by holding the land "in trust" for the tribe, without altering the beneficial and substantive ownership of the tribe.

Yet, the consequence is not just the mere changing of title. When land is taken into trust for Indians, it precludes States from asserting fundamental aspects of their sovereignty over that land, which becomes Indian Country. *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983). "Land held in trust is generally not subject to (1) state or local

16

taxation, *see* 25 U.S.C. § [5108]; (2) local zoning and regulatory requirements, *see* 25 C.F.R. § 1.4(a);[2] or, (3) state criminal and civil jurisdiction" absent tribal consent, *see* 25 U.S.C. §§ 1321(a), 1322(a). *Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*, 228 F.3d 82, 85-86 (2d Cir. 2000). The result is not a modest adjustment of authority but instead a wholesale removal of territory from the State's sovereign domain. And, as written, Section 5 is not limited to land previously or currently in or near a reservation. It is not even limited to land for which there is some evidence of prior occupation or use by Indians. Section 5 allows *any* land to be stripped from the State and local governments.

No prior case has upheld such a mechanism that carries consequences of this magnitude. The implications of the District Court's ruling that Section 5 falls within a "plenary" authority are profound. If Congress may rely on the Indian Commerce Clause to justify Section 5, then it possesses the power to remove all land from a State— without any meaningful limiting principle. In this sense, Congress could "reduce a State to near nonexistence by taking all land within its borders and declaring it sovereign Indian territory." *Upstate Citizens*, 140 S. Ct. at 2588 (Thomas, J., dissenting). It amounts to giving Congress the "power to manage relations with a party . . . for annihilating the

---

[2] "[N]one of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property . . . held in trust by the United States[.]" 25 C.F.R. § 1.4(a).

political existence of" another party. *Brackeen*, 599 U.S. at 325 (Gorsuch, J., concurring) (internal quotations omitted).

The Supreme Court has repeatedly rejected interpretations of federal power that lack a limiting principle or allows Congress to fundamentally reshape the federal-state balance. *See Lopez*, 514 U.S. at 564; *Morrison*, 529 U.S. at 615; *NFIB*, 567 U.S. at 557. The Framers established a federal government of enumerated powers—"not a series of blank checks," *Brackeen*, 599 U.S. at 276, that are then unconstitutionally handed over to policy driven agencies.

This concern is not theoretical. According to a GAO report, the United States currently holds 57 million acres of land in trust for tribes and an additional 10 million acres for individual Indians—roughly 67 million acres removed from state jurisdiction. U.S. Gov't Accountability Office, *Bureau of Indian Affairs Should Take Additional Steps to Improve Timely Delivery of Real Estate Services*, GAO-24-105875, at 6 (Oct. 2023).[3] Nor is the pace of this expansion slowing. Modern tribal revenues—particularly from gaming—have enabled the large-scale acquisition of additional lands for trust conversion. As early as 2017, the Tribe publicly reported dedicating $10 million annually solely for land purchases. (Dkt. 35-13 at 1092-99; Dkt. 57 at 479, n.18.) Its 2026

---

[3] https://www.gao.gov/assets/gao-24-105875.pdf (last accessed April 28, 2026).

Annual Report confirms the ongoing objectives of buying at least 1,200 acres every

year.[4] The Village's very existence is at stake. (*See* Dkt. 34-8 at 86-105.)

If the Constitution does not impose a boundary here—where federal action

directly strips States and local governments of their authority—then it is difficult to see

where such a boundary would ever be drawn. The judgment of the District Court

should be reversed.

### C. Section 5 Violates the Nondelegation Doctrine Because It Gives the Secretary Unbounded Discretion.

The District Court erred when it concluded Section 5 does not violate the

nondelegation doctrine. It provides no intelligible principle pursuant to which the

Secretary must exercise its discretion.

Congress is vested with "[a]ll legislative Powers." U.S. Const. Art. I, § 1. The

Constitution permits delegation of those powers only when Congress supplies an

"intelligible principle" to guide the exercise of its delegated authority. *Whitman v. Am.

Trucking Associations*, 531 U.S. 457, 472 (2001) (Congress must "lay down by legislative

act an intelligible principle to which the person or body authorized to [act] is directed to

conform") (citations omitted). The question then is whether Congress has meaningfully

constrained the decisionmaker's discretion—what authority is delegated and what

limits govern its exercise. *Gundy v. United States*, 588 U.S. 128, 135-36 (2019).

---

[4] https://oneida-nsn.gov/wp-content/uploads/2025/12/2026-Annual-Report.pdf (last accessed April 28, 2026).

Section 5 provides: "The Secretary . . . is authorized, in his discretion, to acquire . . . any interest in lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108. (A93-97.) This vague delegation provides no meaningful limitation on the Secretary's discretion. It does not specify: (1) when, if ever, land should be acquired, (2) what land should be acquired, (3) why land should be acquired, (4) what factors must be considered, or (5) what limits exist. It imposes no requirement that the Secretary make findings and no direction as to how competing interests—such as those of States and local governments—are to be weighed.

### 1. Supreme Court precedent establishes the lack of any intelligible principle.

As the Supreme Court recently reaffirmed in *Consumers' Research*, its prior decisions in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) establish the governing boundary. *Fed. Commc'n Comm'n v. Consumers' Research*, 606 U.S. 656, 683 (2025). Those cases "offer object lessons about the amount of latitude Congress can confer." *Id.*

In *Panama Refining*, Congress authorized the President to prohibit the interstate transportation of petroleum. Critically, the President could act only if the petroleum at issue was produced in excess of limits imposed by state law—an express restriction on when the delegated authority could be exercised. 293 U.S. at 405, 408. The President's discretion to act was further limited by the Act's extensive Declaration of Policy. *Id.* at 416-17. Despite these limitations, the Court held the statute unconstitutional because it

20

"does not state whether or in what circumstances or under what conditions the President is to prohibit the transportation," "establishes no criterion to govern the President's course," and "gives to the President an unlimited authority to determine the policy." *Id.* at 415.

In *Schechter Poultry*, Congress permitted the President to approve "codes of fair competition," subject to multiple conditions and policy objectives found in the Act itself. 295 U.S. at 531-34. The President's role in creating the codes was further conditional on a finding they "will tend to effectuate the policy of this title," which contained an extensive Declaration of Policy. *Id.* at 535-36. Even with those limitations, the Court held the statute invalid because: "It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact . . . aside from the statement of the general aims of rehabilitation, correction, and expansion[.]" *Id.* at 541. The Court concluded the President's discretion is "virtually unfettered." *Id.* at 542.

Analyzing these two cases, the Court in *Consumers' Research* first observed that the Act at issue in *Panama Refining* gave the President discretion to act without establishing "whether, when, or how he should do so." 606 U.S. at 683. Additionally, the Court noted the Act in *Schechter Poultry* was "even worse" as it allowed the President to act with little more than a "'statement of the general aims of rehabilitat[ing], correct[ing,] and expand[ing]' the economy." *Id.* (quoting *Schechter*

21

*Poultry Corp.*, 295 U.S. at 541). The Court continued that "in examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear *both* 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Consumers' Research*, 606 U.S. at 673 (citing *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)) (emphasis added). Section 5 does neither.

Compared to *Panama Refining* and *Schechter Poultry*, Section 5 provides substantially less guidance. In those case, the statutes included detailed Policy Declarations, conditions, and structural limitations, yet were still found unconstitutional because they lacked operative standards. 293 U.S. at 430; 295 U.S. at 541-42. Section 5 lacks even those minimal constraints. If the statutes reviewed in *Panama Refining* and *Schechter Poultry* failed the intelligible principle test, Section 5 necessarily fails as well.

Nor can the deficiency be cured by resorting to legislative history or generalized statutory purpose. Although the Supreme Court previously considered, when evaluating other Acts of Congress, the purpose of those Acts, their statutory context, and legislative history, it has always done so only after first finding the text of the Act in question itself provided the intelligible principle needed to survive a nondelegation challenge. In *American Power & Light Co.*, the Court found standards in the challenged Public Utility Holding Company Act itself were sufficient, and only thereafter stated "these standards need not be tested in isolation" looking at factual background and

statutory context. 329 U.S. at 104. But even then, when testing the standards it already found in that Act, the Court went to other numerous subsections within the Act itself to consider the statutory context rather than sources outside of the Act. *Id.*

Similarly, in *Gundy*, the Supreme Court found the Sex Offender Registration and Notification Act—itself—survived a nondelegation doctrine because of its wording. 588 U.S. at 143. The Court then simply noted the Act's legislative history "backs up everything said above[.]" *Id.*

Likewise, in *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989), the Court looked at the Sentencing Reform Act—itself, the purpose set forth in the Act—itself, and nearly a dozen other provisions within the Act to conclude it did not violate the nondelegation doctrine. Only in a footnote did the Court reference legislative history simply saying it "provides additional guidance." *Id.* at 376, n.10.

Most recently, the Court indicated the phrase at issue need not be viewed in "isolation" and noted courts have "looked to the broader statutory contexts, which informed their interpretation and supplied the context necessary to satisfy the intelligible-principle test." *Consumers' Research*, 606 U.S. at 684. Most critically, the Court then went directly to the statute—itself—to find that statutory context. It examined and cited at least nine provisions of the challenged Act, which provided limits to the FCC's discretion. *Id.* at 684-85. The only history the Court mentions was that "the new statute,

as compared with the old, holds the FCC to more specific requirements." *Id*. at 685. In other words, legislative history did not find its way into the decision.

Never has the Supreme Court relied primarily or even significantly on words found outside the challenged Act—itself—to conclude a statute did not violate the nondelegation doctrine. Here, by contrast, the District Court relied almost exclusively on legislative history and generalized purpose to supply limits, neither of which appear in the text of Section 5. (A28-29; A94.) That inversion of the Supreme Court's approach is impermissible. The intelligible principle must come from Congress's enacted words, not from post hoc reconstruction. When the statutory text provides no meaningful constraints—as is the case with the IRA—legislative history cannot cure the defect. The Supreme Court has made clear the intelligible principle must be supplied "by legislative act," not legislative history. *Whitman*, 531 U.S. at 472. It is well settled "legislative history is not the law" and therefore cannot impose enforceable limits on discretion. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). A "principle" the Secretary may consider if she wishes, but ignore if she chooses, is no principle at all.

### 2. The Eighth Circuit's highlight of the IRA's absurdity and the flaw in subsequent Circuits' holdings.

The Eighth Circuit noted in *South Dakota v. U.S. Dep't of Interior*, 69 F.3d 878, 882 (8th Cir. 1995) (*"South Dakota I"*), *mandate recalled and vacated*, 106 F.3d 247 (8th Cir. 1996), "[b]y its literal terms, [Section 5] permits the Secretary to purchase a factory, an office building, a residential subdivision, or a golf course in trust for an Indian tribe,

24

thereby removing these properties from state and local tax rolls." To highlight Section 5's absurdity, the Eighth Circuit stated "[i]ndeed, it would permit the Secretary to purchase the Empire State Building in trust for a tribal chieftain as a wedding present." *South Dakota I* at 882. This is possible, thanks to Section 5's lack of "perceptible boundaries" and "intelligible principles" "within the four corners of the statutory language," and its delegation of "unrestricted power to acquire land from private citizens for the private use and benefit of Indian tribes or individual Indians." *Id.* The result, the Eighth Circuit correctly noted, is an "agency fiefdom whose boundaries were never established by Congress," and thus, held the statute to be unconstitutional under the nondelegation doctrine. *Id.* at 885.

Prior to its mandate and recall, the Supreme Court granted a petition for writ of certiorari of *South Dakota I.* To evade review, however, the United States reversed its position on the meaning of Section 5. The United States next requested the Supreme Court not hear the case but instead remand to the Secretary for reconsideration. *See U.S. Dep't of Interior v. South Dakota*, 519 U.S. 919 (1996). That led Justice Scalia, joined by Justices O'Connor and Thomas, to declare that "[t]he decision today-to grant, vacate, and remand in light of the Government's changed position-is both unprecedented and inexplicable." *Id.* at 921. He went on to state: "[W]e have never before GVR'd simply because the Government, having *lost* below, wishes to try out a new legal position." *Id.*

After the Eighth Circuit's holding that Section 5 was unconstitutional, and a punt by the Supreme Court, the federal circuits began scrambling to save Section 5. In *United States v. Roberts*, 185 F.3d 1125, 1137 (10th Cir. 1999), the court relied almost exclusively upon Judge Murphy's dissent in *South Dakota I*, which relied almost exclusively on the legislative history of the IRA, to find an intelligible principle—which, of course, did not make its way into the statutory text of Section 5 or any other section of the IRA.[5]

The District Court's reliance on *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790 (8th Cir. 2005) (*"South Dakota II"*) was similarly inappropriate because *South Dakota II* was based upon its adoption of Judge Murphy's dissent in *South Dakota I*. (A29.) That dissent and *South Dakota II*'s adoption of its reasoning was flawed for another reason. According to Judge Murphy an additional limit on the Secretary's discretion was the fact "[Section 5] authorizes the appropriation of a limited amount of funds with which land could be acquired[.]" *South Dakota I* at 887. However, as the passage of time has confirmed, the $2,000,000 appropriation limitation in Section 5 purportedly placed on the Secretary, in exercising her discretion in acquiring land for Indians, is illusory.

Other courts, as the District Court confirmed, reached the same conclusion as *South Dakota II* and *Roberts*, including the First and D.C. Circuits. *Carcieri v. Kempthorne*, 497 F.3d 15 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 379 (2009); *Michigan Gambling*

---

[5] The Tenth Circuit's decision in *Roberts* is conclusory, at best. It spends a mere two paragraphs disposing of the issue and completely disregards the majority's reasoning in *South Dakota I*, considering it to be irrelevant given the Supreme Court's use of a "GVR." 185 F.3d at 1137.

*Opposition v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008).[6] But those courts committed the same error as *Roberts*—relying almost exclusively on legislative history and generalized purpose, rather than identifying binding limits in the statutory text itself. Additionally, those decisions acknowledge that the phrase "for the purpose of providing land for Indians" supplies an intelligible principle but only when "viewed in the statutory and historical context of the IRA." *South Dakota II* at 799. Consequently, the Eighth Circuit and the Circuits which rely upon its reasoning concede the defect: absent legislative history, Section 5 is, by its own terms, standardless.

Legislative history cannot cure the absence of meaningful limits. Section 5 vests the Secretary with authority to act—or not act—as she sees fit, and nothing in the text of Section 5 or any other Section of the IRA limits that discretion. (A93-97.) The nondelegation doctrine does not ask whether a court can infer limits; it asks whether Congress enacted them.

Section 5's contrast with statutes the Supreme Court has upheld is instructive. In *Consumers' Research*, the Court emphasized the statute—itself—provided "determinate standards" through multiple subsections the agency "shall base" its decisions on. 606 U.S. at 684, 687. Likewise, in *Gundy*, the Court identified multiple provisions within the

---

[6] The D.C. Circuit in *Michigan* rested its decision, in part, on the Supreme Court previously endorsing "interstitial lawmaking authority" by executive agencies, and relied on *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). 525 F.3d at 33. Of course, that rationale no longer holds water—*Chevron* has been overruled by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

statute—itself—that constrained the Attorney General's discretion and required implementation of the Sex Offender Registration and Notification Act; noting it would face a nondelegation problem if Congress had "grant[ed] the Attorney General plenary power to determine [the statute's] applicability . . . as she sees fit[.]" 588 U.S. at 136.

This is the same type of inadequate "guidance" the Seventh Circuit stated would face a nondelegation question. In *City of Chicago v. Barr*, 961 F.3d 882, 907 (7th Cir. 2020), the Seventh Circuit noted the dissent and the plurality in *Gundy*, and acknowledged that if the Act in question did allow the Attorney General as much authority as claimed, there would be a nondelegation question.[7] The Seventh Circuit then stated:

> [T]he Attorney General's interpretation of the "other applicable Federal law" language would grant the type of unfettered discretion to determine *whether* a particular federal law will be a precondition of the grant that seven Justices of the *Gundy* court recognized presents a constitutional nondelegation issue. Accordingly, the language of the statute, if read as delegating the authority to the Attorney General to choose which federal laws

---

[7] Likewise, in *State v. Becerra*, 544 F. Supp. 3d 1241 (M.D. Fla. 2021) Florida challenged the CDC's "no sail" orders, which halted the cruise industries operations in 2020 purportedly under the authority granted to the CDC in 42 U.S.C. § 264(a). After conducting an exhaustive review of nondelegation doctrine case law, the court granted Florida's request for a preliminary injunction holding:

> Section 264(a) likely constitutes an unconstitutional delegation of legislative power to CDC because the delegation fails to convey any "intelligible principle" to guide CDC's exercise of authority and (2) . . . the Supreme Court seems likely to impose soon a more demanding standard, which Section 264(a) . . . is even more likely to fail.

*Id.* at 1304-05.

> would constitute conditions of the grant, would raise grave constitutional concerns.[8]

*Id.* at 907 (emphasis in original).

Under Section 5, the Secretary has complete discretion, "as she sees fit," to determine "whether" the Act should be implemented. That alone violates the nondelegation doctrine.

### 3. The breadth of the power conferred by Section 5 heightens the constitutional concern.

As Justice Kagan explained in *Consumers' Research,* "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." 606 U.S. at 673. Here, the consequences of the Secretary's power are significant. Justice Thomas observed this authority to place land into trust can "strip the State of almost all sovereign power" and could, in theory, "reduce a State to near nonexistence" and "destroy the State's territorial integrity." *Upstate Citizens*, 140 S. Ct. at 2587-88. The Supreme Court has recognized the reestablishment of Indian sovereign control will "seriously burde[n] the administration of state and local governments" and will "adversely affect landowners neighboring the tribal patches*." City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 220 (2005). The District Court acknowledged the Village's "legitimate concerns that it will suffer significant

---

[8] Ultimately the Seventh Circuit did not rule on the nondelegation issue; instead finding the Attorney General exceeded authority delegated by Congress in the statute. *Barr*, 961 F.3d at 931.

consequences if land within its boundaries continues to be accepted into trust for the

benefit of the [Tribe] under Section 5 of the IRA[.]" (A30.)[9]

Section 5 is a delegation of power over core sovereign functions, not ordinary

administrative detail. When a statute authorizes the executive to alter the federal-state

balance, the need for clear congressional guidance is at its apex. Section 5 provides no,

let alone any heightened directives.

### 4. The Secretary's use of Section 5 confirms the lack of a limiting intelligible principle.

Here, "[t]he proof is in the pudding." *Consumers' Research*, 606 U.S. at 686.[10] The

same inquiry the Court in *Consumers' Research* made—how the statute operates in

practice—confirms the absence of any intelligible principle here. The lack of any

intelligible principle has: (1) resulted in the rubberstamping approval of virtually all

applications, Kelsey J. Waples, *Extreme Rubber-Stamping: The Fee-to-Trust Process of the

Indian Reorganization Act of 1934*, 40 Pepp. L. Rev. 251, 292 (2012) ("Waples") (*see infra*

Part II.B.2.ii.); (2) allowed the extremely problematic MOUs to come into existence in

the first place (Dkt. 1-3); (3) caused the Inspector General to conclude those same MOUs

should be discontinued while allowing BIA and the Tribe to disregard that

---

[9] *See supra* Part I.B.2.

[10] In *Consumers' Research*, the Court reviewed how the authority granted to the Commission was utilized in practice to aid it in concluding intelligible principles limiting the scope of the Commission's power did exist. The Court explained how the steps actually taken by the Commission aligned with the "six 'principles' on which on the FCC 'shall base' all its universal services." 606 U.S. at 667 (citing § 254(b)).

recommendation (Dkt. 1-5 at 2, 13); (4) emboldened the IBIA to rule in *Hobart II* that land may be placed in trust "whatever her [RD's] conclusion about the [25 C.F.R. § 151.10] criteria;" (A73); (5) resulted in the IBIA ruling in *Hobart II* that land may be accepted into trust even if "doing so will create jurisdictional problems, potential conflicts of land use, or have a significant impact on the tax rolls of the state or its political subdivisions," (A74-75); (6) resulted in the IBIA in *Hobart II* concluding "the factors set forth in Part 151 [and by implication what is stated in the IRA] need not be weighed or balanced in any particular way or exhaustively analyzed," (A58); (7) resulted in the District Court ruling "the regulation [nor by implication the IRA] does not establish any minimal findings the Secretary must make before granting a tribe's application to have its land placed into trust," (A17); and (8) allowed the IRA to be used in a way Congress never could have imagined. Rather than the Secretary acquiring land as Section 5 actually states, using specific and limited appropriations, tribes acquire land themselves with extensive gaming revenue, and then request land they already own be taken into trust. The lack of an intelligible principle is not theoretical—it is borne out in practice.

This runaway freight train of unlimited power is further confirmed by the recent change in the fee-to-trust regulations which now require the BIA employee who is to "review" the request, to "presume," without any evidence in the record supporting such a presumption, that the impact of placing the property into trust on local

governments "will be minimal." 25 C.F.R. § 151.10(c) (2024). Emboldened by the lack of action by the Federal Courts and Congress, the Executive Branch is continuously arrogating to itself greater and greater authority in these matters.

In short, Section 5 grants the Secretary the unlimited authority to determine whether, when, how, and how much land to remove from state authority without meaningful guidance from Congress. Because statutes with greater constraints have been found unconstitutional in *Panama Refining* and *Schechter Poultry*, Section 5 must also be found unconstitutional in violation of the nondelegation doctrine.

This Court has the opportunity to prevent this unlawful arrogation of power, and importantly, return the power to Congress. Accordingly, this Court should follow the rationale set forth in *South Dakota I*, recognize the Court's obligation to invalidate unconstitutional delegations as just confirmed by *Consumers' Research,* and show the fortitude called for by the Seventh Circuit in *City of Chicago*, by holding Section 5 of the IRA violates the nondelegation doctrine, and is, therefore, unconstitutional.

## II. The Department's Biased Decision Violated the APA Because It Was Arbitrary, Capricious, or Otherwise Not in Accordance with Law.

### A. Standard of Review.

A district court's decision of whether an agency's decision-making violated the APA is reviewed "*de novo* as questions of law." *Daviess Cnty. Hosp. v. Bowen*, 811 F.2d 338, 342-43 (7th Cir. 1987).

**B.      Argument.**

The Department's decision violated Section 706(2)(A) of the APA for multiple reasons—each of which on its own demonstrates the decision must be held unlawful and set aside—but, certainly, when all are considered demonstrate the District Court's affirmance should be reversed. Not only was the Department's decision arbitrary and capricious given the evidence in the Record, it was also contrary to law given the IRA's plain language and the biased processing under the MOU.

**1.      The Department's decision was arbitrary and capricious given the biased processing under the MOU.**

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency's action is arbitrary and capricious if the agency failed to engage in reasoned decision-making that "examine[s] 'the relevant data' and articulate[s] 'a satisfactory explanation' for [its] decision." *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42-43 (1983)). Among the various ways to demonstrate the agency acted arbitrarily and capriciously is if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. There must be a "rational connection between the facts found and the choice

made"—pretextual review that "reveal[s] a significant mismatch between the decision . . . and the rationale" must be set aside. *Dep't of Commerce,* 588 U.S. at 773-74, 783.

Here, the Department wholly disregarded or erroneously considered all the relevant facts and offered explanations that were contrary to the Record when deciding to approve the Tribe's trust applications. The Department's review was pretextual and biased in furtherance of the MOU's terms and stated outcomes.

> ### i. The Department arbitrarily disregarded the MOU's terms and failed to confront the resulting bias.

The IBIA acknowledged the MOU establishes "the fact that the tribes control the purse strings from which the consortium staffs' salaries are dependent." (A67.) Despite this acknowledgement, the IBIA then erroneously concluded the MOU does not suggest prejudgment or bias in favor of the tribes because, among other erroneous reasons which are discussed *infra*, the MOU's purpose demonstrates a "commitment to processing applications faster" not necessarily prejudgment. (A62-64.) This conclusion, however, is directly contrary to the MOU's terms and the evidence in the Record.

The stated reason for the MOU is that there is a "widening" "gap" between the tribe's applications and land "being accepted into trust." (Dkt. 1-3 at 2.) Acceptance is not just a goal under the MOU's terms—it is the whole purpose. The Department's (as well as the District Court's) decisions arbitrarily disregarded the main purpose; especially in light of the IBIA's finding that the tribes "control the purse strings" of those involved in processing (and deciding) the applications.

In addition to the main recitals, the goal of acceptance is further evidenced by the MOU's definition of the "Division"—that is, the "Midwest Region Director and a group of staff assigned to work on trust 'acquisition' cases under [the MOU]." (*Id.* at 3.) "Acquisition" in the MOU's context can only mean "acceptance," as land does not get acquired in trust, unless the decision is made to accept that land into trust—which, again, is the tribes' whole purpose for entering into the MOU.

Likewise, the MOU provides applications will be "process[ed]"—not "independently" considered or reviewed. (*Id.* at 2.) In practice, this "processing" occurs against the backdrop of MOU provisions that obligate Division employees to work collaboratively with tribes to ensure all requirements of 25 C.F.R. Part 151 are satisfied. (*Id.* at 5.) This includes assisting tribes in formulating responses to objections from local governments, such as the Village, and even helping to "eliminate or mitigate any of the Solicitor's objections" to the application. (*Id.* at 5-6.) These commitments underscore the process is structured to produce a favorable outcome. Put differently, under the MOU, BIA has "committed itself by contract to an outcome"—namely, acceptance of the Tribe's applications—which supports the finding the Department's decision was arbitrary and capricious. *Cf. Stand Up for Cal.! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 303 (D.D.C. 2016). Unlike actions taken pursuant to a purely procedural statute, the MOU itself functions as the contractual mechanism demonstrating predetermination and bias for "acceptance" of land into trust in an arbitrary and capricious manner.

BIA's undisputed track record—"not deny[ing] one application from the Tribe related to the Village" (A63-64)—reinforces the Village's concerns. Although the IBIA acknowledged the Division does not deny the Tribe's applications, it dismissed this reality based on the unsupported assumption that the Tribe simply withdraws applications to avoid denial. (A63.) That explanation is pretextual. Nothing in the Record supports the Department's theory that the Tribe withdraws applications, let alone that such withdrawals explain the complete absence of denials.

Even if that theory had merit, it would only underscore the Village's central point: The MOU framework ensures denial is not a realistic outcome. Whether through approval or recommended temporary withdrawal, the Division guides the Tribe— resulting in a tainted process designed for ultimate acceptance.

Against this backdrop, the IBIA's conclusion that the MOU does not reflect prejudgment is untenable and contrary to the evidence. (*Id.*) By relying on an unsupported theory and failing to meaningfully evaluate the MOU's terms as a whole, the Department acted arbitrarily and capriciously in violation of the APA.

### ii. The arbitrary rebuff of the RD's biased involvement and purported "independent" review.

Equally problematic, and also another reason why the decision to take land into trust must be set aside, is the IBIA's erroneous conclusion regarding the RD's level of involvement and purported "independent" review of the Division's decision. The IBIA's finding that the RD conducted her own independent review and reached her

own decision is not supported by the Record. Nor is the conclusion that the RD "is an independent, neutral decisionmaker" whose alleged review "*cured the[] conflict of interest*" in the processing of the Tribe's applications. (A60, A68) (emphasis added). Those conclusions are contradicted by the MOU's plain terms and find no evidence to support them.

The District Court compounded this error by affirming the IBIA. Relying on the same circular and unfounded reasoning, the court agreed it is acceptable for Division employees to process and prepare the decision "*as long as* the Regional Director completed her own independent review and reached her own decision." (A14) (emphasis added).

There is nothing that demonstrates though that the RD "completed her own independent review," let alone "cured the conflict of interest." There are no drafts or transmittal emails that indicate the final Remand Decision from January 19, 2017, which was indisputably prepared by Division employees, was provided to the RD for review. (*See* Dkt. 32-1 at 1; *see also* Dkt. 33-13 at 281–82.) The IBIA's conclusion that a signature alone establishes independent review ignores the factual Record.

Additionally, the MOU establishes the RD is not independent at all. The RD works with the Tribes and Division toward the same objective of accepting land into trust. The MOU expressly provides the RD is a member of the "Division"; serves on the "Oversight Advisory Council," which includes the tribes; participates in determining

Division staffing levels in consultation with those tribes; and oversees Division employees responsible for preparing both the administrative record and the decision itself. (Dkt. 1-3 at 3-5.) The RD also signed the MOU on behalf of BIA. (*Id.* at 9.) These provisions confirm the RD is not independent of the MOU, but rather contractually bound to and directly involved in it, including the very biased process she is purported to have independently reviewed in the Remand Decision.

Ignoring this evidence as well as the RD's direct involvement in the overall goal of accepting land into trust was arbitrary and capricious. It reflects the very bias that should have "cause[d] the Board to question the impartiality" of the RD's Remand Decision. (A63.) Put differently, the "evidence tells a story that does not match the explanation," *Dep't of Commerce*, 588 U.S. at 784—that being, the evidence showing the RD is directly involved and contractually bound to the MOU does not match the explanation the RD is independent from the MOU.

While agency decisionmakers are afforded a presumption of impartiality, that presumption is not absolute. Indeed, "the standard of impartiality is applied even more strictly to administrative adjudicators because of the lack of procedural safeguards normally available in judicial proceedings." *Small v. Sullivan*, 820 F. Supp. 1098, 1108 (S.D. Ill. 1992) (citing *Hummel v. Heckler*, 736 F.2d 91, 93 (3d Cir. 1984)). It may be overcome by showing the decision-maker has a conflict of interest, or has made remarks or engaged in conduct that "reveal such a high degree of favoritism or antagonism as to

make fair judgment impossible." *Cf. Sanchez ex rel. Sanchez v. Barnhart*, No. 03-C-537-C, 2005 WL 752220, at *10 (W.D. Wis. Mar. 30, 2005), *aff'd sub nom. Sanchez v. Barnhart*, 467 F.3d 1081 (7th Cir. 2006). And actual bias need not be proven where circumstances present "some [actual] incentive to find one way or the other" or a "real possibility of bias[.]" *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1372 (7th Cir. 1994); *see also Williams v. Pennsylvania*, 579 U.S. 1, 15 (2016) ("appearance of bias demeans the reputation and integrity of not just one [decision-maker], but the larger institution[.]").

Those circumstances are present here. The MOU's structure, combined with the absence of any evidence of independent review, demonstrates a clear incentive and a real possibility of bias toward acceptance. *Foster v. Mabus*, 103 F. Supp. 3d 95, 112-13 (D.D.C. 2015) (vacating agency's action because it "entirely failed to consider . . . the blatant predisposition and consequent bias in those recommendations[.]").

Rather than address this, the IBIA improperly shifted the burden to the Village suggesting the Village must prove a negative—that the RD did not independently review the decision. (A69.) But the Village has shown precisely what the law requires— the Record contains no evidence that the RD "independently" reviewed, let alone even saw, the Remand Decision admittedly drafted by Division employees whose very jobs are dependent upon the tribes' funding. Put simply, any presumption of impartiality afforded to the RD does not equate to a presumption of independent review.

### iii. The RD's incomplete review of the IG Report.

The IBIA's conclusion the RD adequately considered the IG's findings of bias in the processing of fee-to-trust applications under the MOU was also arbitrary and capricious. The RD reviewed only an incomplete, redacted version of the IG Report, which critically omitted the most relevant attachments, including those addressing the Solicitor's review of the Midwest MOU and the Solicitor's legal opinion. Without these materials, the RD could not have meaningfully evaluated the IG's findings in order to properly address the Village's concern.

The IBIA attempted to excuse this deficiency by asserting that its prior "order required the [RD] to review 'the outcome of the IG investigation,' not the documents on which it was based." (A70.) That reasoning fails under the APA. It ignores a critical aspect of the problem. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Namely, the RD was required to consider the IG's findings in relation to the Village's allegations of bias arising from the MOU. One cannot meaningfully evaluate the "outcome" of an investigation while disregarding the very materials that support it—*e.g.*, the Solicitor's review of the Midwest MOU and recommendation the MOUs be discontinued.

The IBIA's reasoning is also internally inconsistent. On the one hand, it excuses the RD's failure to review the underlying materials. On the other, it dismisses the IG's findings as "second-hand" because it lacks access to the Solicitor's legal opinion. (A70-72.) Indeed, the IBIA states:

> Because the Board does not have a copy of that legal opinion and cannot assess its reasoning . . . we do not rely on the IG Report's characterization of the opinion of the Office of Solicitor to decide this case and draw no inferences from the Inspector General's summary of it.

(A67-70 & n.22.) The District Court should have recognized this inconsistency. One cannot disregard the underlying materials as unnecessary for the RD's review while simultaneously rejecting the conclusions based on the materials because those same materials are missing.

This self-serving reasoning underscores the APA violation. Had the RD obtained a complete IG Report, including the Solicitor's legal opinion, the RD and IBIA could have evaluated and confirmed the IG's findings that are discussed *supra.* Instead, the RD's failure to obtain and review the complete report made it impossible to adequately consider "the Village's allegations of bias as well as the outcome of the IG investigation[.]" *Hobart I* at 4, n.4. The IBIA's attempt to justify incomplete review, while simultaneously faulting the Village for relying on the IG's conclusions, is arbitrary and capricious. An agency cannot claim it lacks sufficient information to evaluate evidence while excusing its own failure to obtain that information.

The consequences of this failure are significant. By disregarding the omitted portions of the IG Report, the IBIA ignored critical findings from the Solicitor, including:

> [The MOU] raises serious questions about the independence of judgment expected of BIA employees reviewing fee-to-trust

41

applications submitted by the tribes that have redirected their TPA funds in a way that enabled the employees to be hired by BIA.

We do not believe that BIA has instituted or considered any limits or controls on communication between these employees and the consortium tribes, or other measures that could assure that these employees do not appear beholden or inappropriately connected to the consortium tribes whose applications they are processing.

. . . we do not believe BIA can assure that the final decisions on the consortium fee-to-trust applications are fair and unbiased, and are also perceived as such.

. . . the absence of sufficient internal controls creates a potential for bias or the perception of bias in the review of the applications by these employees.

(Dkt. 1-5 at 13.)

The IBIA further failed to acknowledge these findings led to a recommendation to *discontinue* the MOUs—a recommendation that included the Midwest MOU. (*Id.*) The District Court reasoned that the RD concluded the IG Report had no bearing on the Village's bias claims because the report found no instances of actual bias and focused on the Pacific MOU rather than the Midwest MOU. (A15.) The District Court also noted the RD explained the MOUs in effect at the time of the IG Report had since been revised. (*Id.*) These are both faulty conclusions.

First, while the MOUs discussed in the IG Report expired and the renewals were slightly revised, the core features remained unchanged—including the same funding structure and the RD's level of involvement. The IBIA itself acknowledged that "none of th[e] revisions changed the fact that the tribes control the purse strings from which the

consortium staffs' salaries are dependent." (A67.) The operative terms remain substantially the same in purpose, structure, funding, tribal involvement, employee responsibilities, and employee governance. (*Cf.* Dkt. 1-3 at 24-30 *with* Dkt. 1-3 at 17-23, *with* Dkt. 1-3 at 10-16, *with* Dkt. 1-3 at 2-9.) Moreover, there are still Division performance milestones, achievements, and performance plans, which as discussed *infra*, must be reported to the tribes. (Dkt. 35-9 at 159, Dkt. 35-10 at 1-23.) This, among the other operative terms of the Midwest MOU, are all what the IG Report found similarly problematic in the Pacific MOU. (Dkt. 1-5 at 2-13.)

Moreover, the IG Report did consider the Midwest MOU. The report included two attachments setting forth the Solicitor's review and legal opinion relative to the Midwest MOU. (Dkt. 1-5 at 14.) Had the RD bothered to obtain those two attachments, the RD, along with the IBIA, and then the District Court could have confirmed the applicability of the IG's findings to the Midwest MOU. The RD did not, however, and the IBIA excused it.

An agency cannot base its decision on an incomplete record, ignore critical evidence, and then dismiss arguments because the missing evidence was not considered. This is the very definition of arbitrary and capricious decision-making under the APA. *See Butte Cnty, Cal. v. Hogen*, 613 F.3d 190, 194-96 (D.C. Cir. 2010) (setting aside Secretary's decision to take tribe's land into trust).

### iv. The IBIA ignored compelling evidence of prejudgment in the Record.

The IBIA's decision (and consequently, the District Court's judgment) cannot stand for another reason—substantial evidence of prejudgment, pecuniary interest, impermissible communications, and conflicts of interest in the Record were disregarded in violation of the APA.

Beginning as early as 2006—shortly after the MOU was implemented—the Division and Tribe coordinated a "phased" approach to trust acquisition that treated the Properties as a "priority" above all others, with "OT" available to "expedite" their processing. (Dkt. 32-12 at 212; Dkt. 35-5 at 211.) The Division tracked progress through an "Acquisition Activity Log." (Dkt. 34-14 at 418-23; *see also* Dkt. 35-1 at 797-803; Dkt. 34-13 at 846-852 (property identified as "1" and a "top priorit[y]"); Dkt. 34-14 at 774-75.) While allowing the applicant to dictate the order of processing applications may not in isolation confirm prejudgment, it strongly suggests its presence when viewed with the totality of the Record.

The Tribe's prioritization did not operate in a neutral setting. Division officials told the Tribe the same properties were "very close to acceptance." (Dkt. 35-5 at 206.) The straightforward conclusion—denial was not contemplated. This prejudgment is also supported by other communications by Division employees documenting their role in drafting the decision for acceptance. (Dkt. 33-13 at 281-82; Dkt. 35-5 at 192-93.)

The Record also shows sustained impermissible communications and a conflict: The Tribe and BIA were aligned and actively cooperating, while the agency purported to evaluate its own bias—the very issue the Village raised in *Hobart I*. In December 2013, a Division employee told the Tribe: "I was finally able to get a formal request to the Field Solicitor today regarding *our* MOU and potential bias. Here is a copy of the memo for your records. I'll keep you posted." (Dkt. 33-10 at 180-82) (emphasis added). That was not an isolated instance—it set the pattern.

In August 2015, the Tribe requested update on the Solicitor's review; a call was dutifully scheduled the following week. (Dkt. 33-2 at 200-03.) That same month, a Tribal member contacted the RD directly to ask about the status of the remand, including the bias of the Division. (Dkt. 33-2 at 198-99.) In September, a BIA employee contacted the Tribe stating: "I am assisting with drafting of the NOD. Can you verify for me what has gone into trust in the [Village] since we started in 2005? I need the information asap." (Dkt. 33-2 at 72.) In October, BIA again reached out asking how many applications "we" have pending within the Village, which the Tribe responded with a list of over 50 applications that "could easily be over 100 parcels." (Dkt. 33-1 at 1-19.)

The coordinated efforts continued. In April 2016, the Division sought to reschedule a "Hobart Bias Meeting" with the Tribe and RD. (Dkt. 32-12 at 192.) In June 2016, Division employees, including the RD, participated in conference calls with the Tribe and the Solicitor's Office regarding the remanded cases. (Dkt. 32-6 at 161-65.) By

45

July, the Tribe was given another update on the remand as it related to the IG's investigation. The Division employee confirmed to the Tribe's representatives "this is the last step in the process before we can issue the NOD." (*Id.* at 151.)

In continuing to keep the Tribe involved at each step, the Tribe was informed the attorney from D.C., who was working on the bias issue, was invited to the PIA conference to present on the status of the "MOU/BIAS issue." (*Id.* at 152-56.) The Tribe was invited to attend and confirmed it would. (*Id.*)

In August 2016, the Tribe requested yet another follow-up meeting with the RD to discuss the remand, asking: "When can the group get back together to follow up on the pending Hobart NOD draft?" (Dkt. 32-6 at 146.) The Division responded: "Let me check on the Regional Director's schedule and get back to you." (*Id.*) A meeting was then scheduled—showing the RD, Division, and Tribe were working to overcome the bias issue. (*Id.* at 144, 147-48.)

The Tribe continued to demand and receive updates. When it asked whether the decision had been signed, BIA responded the Solicitor's Office was taking a final look and that the Tribe would be notified once the decision was routed for signature. (Dkt. 35-9 at 156.) These are the kinds of communications that "possibl[y] . . . could affect" agency decision-making, which require the decision be set-aside. *Elec. Pwr. Supply Ass'n v. F.E.R.C.*, 391 F.3d 1255, 1259 (D.C. Cir. 2004).

The Division's meetings highlighting their accomplishments under the MOU, which the Tribe is invited to attend, further evidence the biased decision-making. (Dkt. 35-9 at 159; Dkt. 35-10 at 5-23.) The Division's "Performance Measures" that outline the tribes' applications, include a category designated as "Fee to Trust Production: Major Milestones" that identify actual versus projected notices of decisions, acceptance of conveyances, and case completions. (Dkt. 35-5 at 190; Dkt. 35-10 at 1-3.) In 2016, the RD's Remand Decision was noted as a "project for completion by 1/20/2017, *adding* an additional 499.022 acres." (Dkt. 35-10 at 1.) (emphasis added).

In August 2016, just months before the Remand Decision, a Division employee expressed concern that "we are short of our IA-PMS projections for this FY. We projected 23 decisions. To date, only 15 decisions have been issued." (Dkt. 35-5 at 209.) This is not neutral adjudication; it is outcome planning.

The IG Report recognized this problem—Tribes "pay [BIA] salaries and expect results." (Dkt. 1-5 at 10.) The pressures to perform and predetermined outcomes are confirmed by the boasted accomplishments and milestones by Division employees. (Dkt. 35-9 at 159; Dkt. 35-10 at 5-23.) The pressure and projections for acceptance the IG Report recognized do not demonstrate a reasoned, independent, and neutral decision-making process. Rather, they evidence prejudgment and predetermination based on a pecuniary interest under the MOU.

The substantial communications between the Tribe and Division employees paid for by the Tribe show the Tribe and BIA view themselves on the same team. This interaction is much more than the Tribe "simply" being "allowed to participate in th[e] process with BIA" as the IBIA arbitrarily determined. (A64.) Taken as a whole, these communications in the Record demonstrate prejudgment. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1261 (D. Wyo. 2004) (statements made prior to decision demonstrated prejudged conclusion).

This all underscores the main issue—how could the Division and RD "independently" review the allegations of bias against them? This is especially problematic when communications demonstrate the Division, RD, and Tribe, all worked hand-in-hand to try and overcome the bias claims. This self-serving review is not permitted by agencies. *In re Murchison,* 349 U.S. 133, 136 (1955)) ("no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."); *Amos Treat & Co. v. S.E.C.*, 306 F.2d 260, 266-67 (D.C. Cir. 1962) (reasoning such review "would be tantamount to that denial of administrative due process"). "When review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review." *Cf. Withrow v. Larkin*, 421 U.S. 35, 58 n.25 (1975). The prejudgment and coordinated efforts to guarantee acceptance pursuant to the MOU violates the APA's arbitrary and capricious standard.

### 2. The Department's decision was not in accordance with the law.

### i. The IRA does not authorize acquisition under the MOU.

Again, the IRA permits the Secretary to only "acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108. Notably, there are no restrictions or guidelines as to how the Secretary's acquisition is to occur other than through appropriations. *Id.* There is nothing in the IRA that allows tribes to acquire the land themselves and then, pursuant to the non-discretionary, pay-to-process agreement under the MOU, simply change title to have it be in trust.

Under the IRA, only the Secretary, not the tribes, is authorized to acquire the land for the purpose of providing land to Indians. The IRA provides that "for the acquisition of such lands . . . there is authorized to be appropriated . . . funds in the Treasury." *Id.* The District Court inherently recognizes this requirement by stating the problem that arose was "Congress did not fund reacquisition of lands that had been previously sold." (A4.) As the District Court further recognized, this lack of funding led to, with the rise of Indian gaming, the tribes purchasing land directly. (*Id.*)

Under the MOU's arrangement, though, the Tribe already acquired the land prior to any attempt to have it placed in trust. The Tribe paying the Department, through the Division employees, to do nothing more than place land it already owns in trust is not permitted by the IRA, and therefore, not in accordance with the law.

### ii. The MOU leads to rubber-stamping of the Section 151.10 criteria.

Additionally, the MOU's terms—under which the Tribe's applications were processed—do not allow for the purported discretionary decision-making process under 25 C.F.R. § 151.10. Instead, they reduce the Secretary's role to the mechanical act of "processing" and then taking land into trust.

Under the Department (and the District Court's) view, so long as the Section 151.10 criteria are considered (i.e., merely acknowledged in the Division's decision), that is enough to approve the application and take the land into trust. (A17 ("the regulation does not establish any minimal finding the Secretary must make before granting a tribe's application to have its land placed into trust."); (A58) (discussing "the factors set out in Part 151 need not be weighed or balanced in any particular way or exhaustively analyzed.").) This underscores the problem as well as the lack of any guidelines not only for the 151.10 criteria (which was an issue highlighted by the GAO Report), but also for Section 5.

For example, none of the Village's concerns relating to the Section 151.10 criteria in response to the Tribe's applications were found to weigh against acquisition. (Dkt. 1-4 at 4-17.) With respect to tax impacts in particular, there is no question the Village will be impacted negatively. The result is—removal of the Properties of the tax rolls. This was conceded in the Remand Decision. (Dkt. 1-4 at 6-7.) While the District Court concluded "Section 151.10(e) contains no requirement that the BIA consider the

cumulative impact of possible future acquisitions," (A19), it is also evident from the

Record (and acknowledged in the Remand Decision) that the Tribe has several

thousand acres pending for acquisition across 142 parcels. (Dkt. 1-4 at 6-7.) Certainly, in

this case, the evidence of the cumulative impact of possible future acquisitions should

have been considered; especially when the Tribe's stated goal is to reacquire all its

historic reservation lands. (Dkt. 1 ¶ 43; Dkt. 26 ¶ 43; Dkt. 34-4 at 64.) That means, the

entire Village.

If acknowledged existence of harms based upon the criteria above suffices, then

the regulatory framework and the wording of the IRA that allows that framework to

exist, becomes an empty formula. One that guarantees approval. This precise concern,

that the processing always results in a predetermined outcome, has been recognized.

*See* Waples at 292 (noting the GAO found "the process is merely an exercise in rubber-

stamping. Strong indications of rubber-stamping . . . include the 100% acceptance rate,

the lack of a single factor being found to support denial, meaningless 'filler'

considerations, and frequent mention of policy statements capable of negating almost

any contrary argument.").

The IBIA acknowledged this rubber-stamping by stating the RD "has not denied

one application from the Tribe related to the Village." (A63-64.) Even the District Court

acknowledged the arbitrary nature of RD's decision-making (and rubber-stamping)

under Section 151.10 in that all that the RD must do is consider the concerns. (A17.) In

other words, no matter the significance of the problem or concern, the RD still can take the land into trust. This highlights the problem with the IRA and its implementing regulations, and why the decision was not accordance with the law.

**III.     The District Court Abused Its Discretion By Denying Extra-Record Discovery.**

**A.     Standard of Review.**

This Court reviews the denial of discovery in an APA case for an abuse of discretion. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1081-82 (7th Cir. 2016).

**B.     Argument.**

The District Court abused its discretion by denying the Village narrowly tailored extra-record discovery. The Village sought limited written discovery and depositions of key agency employees involved in the processing and drafting of fee-to-trust decisions as well as members of the Tribe who communicated directly with them under the MOU. Despite the modest request, the District Court denied the Village's motion— ruling the Village had not demonstrated a "strong showing of bad faith or improper behavior." (A41.) The court reasoned the MOU's "mere existence" is not enough, and because the RD, who is the supposed "ultimate decision maker" is not paid under its terms—there is no bias. (A40-41.) This conclusion rests upon a fundamental misunderstanding of both the Record and the governing legal standard.

The Supreme Court permits extra-record discovery "into the mental processes of administrative decisionmakers" when there is a "strong showing of bad faith or improper behavior." *Dep't of Commerce,* 588 U.S. at 781 (internal quotation marks and citations omitted). This standard is satisfied upon a prima facie showing of evidence "indicative of bad faith or an incomplete record." *Cook Cnty., Ill. v. Wolf,* 461 F. Supp. 3d 779, 795 (N.D. Ill. 2020) (citing *Foxx,* 815 F.3d at 1081–82).

The Village exceeded this threshold. First, the MOU's terms alone demonstrate bad faith and improper behavior. The same employees who act as "liaison[s]" with the Tribe are responsible for preparing the decision and the record for appeal. (*Supra* Part II.B.1.i.) These same employees, whose conduct is at issue because they acted in a biased manner, control the record used to evaluate that conduct. Neither this Court nor the Village are required to trust or accept BIA's say-so under those circumstances.

Second, the Record contains substantial evidence of coordination, prejudgment, and outcome driven conduct. As discussed *supra*, communications show Division employees working directly with the Tribe to respond to objections, provide updates, and schedule meetings to overcome the bias claims. These problems mirror those identified by the IG, and raise serious questions about whether the Record is complete.

Third, the RD's involvement and contractual obligations under the MOU heighten the need for further scrutiny which requires extra-record discovery. For example, what level of review did she actually engage in for her purported

"independent" review? After all, the IBIA acknowledged the conflict of interest created by the MOU, but with no support in the provided Record claimed she "cured" the bias caused by that conflict. Did she even read the decision which she admittedly did not prepare? Yet instead of allowing discovery to answer those questions, the District Court simply presumed the RD conducted a meaningful review with nothing but a signature. That presumption cannot substitute for evidence. Where the record is silent on a critical issue—here, the RD's actual decision-making—denying discovery to probe that silence is an abuse of discretion. Nor can the RD's role, or lack thereof, be dismissed as mere policy preferences, as the District Court suggests.

As the Supreme Court has held when the particular issue (in this case, the RD's review itself) "played an insignificant role in the decisionmaking process," extra-record discovery is justified. *Dep't of Commerce,* 588 U.S. at 782. Moreover, the RD's contractual obligations places issues of "good faith" and "credibility" at the center of the action. *Porter v. Califano*, 592 F.2d 770, 783 (5th Cir. 1979). Courts have further recognized that limiting review to the record in such circumstances risks concealing improper motivations and evidence. *See Wolf*, 461 F. Supp. 3d at 792-95 (allowing discovery "because evidence of racial animus (if any) will reside outside the administrative record, presumptively limiting discovery to the record can allow the racial motivations underlying racially motivated policymaking to remain concealed").

A lack of discovery on the Village's claim would be "damaging to the pursuit of truth," and allow BIA to continue operating in the shadows with no oversight. *Porter*, 592 F.2d at 783. Because "most people know by now that the quiet part should not be said out loud," *Wolf*, 461 F. Supp. 3d at 794, discovery to determine the RD's and BIA's "general course of conduct" under the MOU is warranted. *Manker v. Spencer*, No. 3:18-CV-372, 2019 WL 5846828, at *19 (D. Conn. Nov. 7, 2019) (permitting discovery where claims challenged the agency's "general course of conduct" rather than a discrete adjudication). Indeed, the Record supplies a "reasonable inference to support some behind-the-scenes decision making, i.e., that not all reasons for the decision are in the record." *Grill v. Quinn*, No. 10 CV 0757, 2012 WL 174873, at *4 (E.D. Cal. Jan. 20, 2012). "This itself is grounds for discovery in an APA action." *Id.*

There is a strong basis to conclude there are documents, influences, and expectations driving the decisions, which will not be found in the Record and will no doubt remain "behind-the-scenes" when the bias claim is considered. Perhaps, it is best explained by the IG's investigation—which "found th[e] appearance of a conflict of interest to be, in fact, real." (Dkt. 1-5 at 2.) Even the IBIA acknowledged the MOU, which "the tribes control the purse strings" of, provides Division employees with an incentive to resolve applications for the Tribe. (A66-67.) Yet, the District Court, instead of allowing the Village to investigate these concerns of "behind-the-scenes" decision-

making, through extra-record discovery similar to that of the IG's investigation, accepted the IBIA's pretextual explanation at face value.

Evidence of bias "almost certainly will not be 'disclose[d]' in the agency's contemporaneous explanation" for its decision. *Wolf*, 461 F. Supp. 3d at 795. And because evidence of bias will "reside outside the administrative record, presumptively limiting discovery to the record can allow" biased policymaking to "remain concealed." *Id.*; *Quinn*, 2012 WL 174873, at *5 ("Bias, if any, is likely to be found in documents not part of the record, if any, which demonstrate the 'real' reason for the decision at issue…bias can be found in many forms, for example, outside pressure to deny a permit which might otherwise be granted. No one would argue with the proposition that the sine qua non of due process is an unbiased decision maker.").

Ultimately, the District Court's refusal to allow discovery permits the agency to insulate its conduct from scrutiny based solely on its own assertions. "Reasoned decision-making must be judged against the record as a whole," and given there is not one piece of evidence that shows the RD reviewed the decision drafted by Division employees, the fact that the RD did not obtain a complete copy of the IG Report, and the IBIA and Tribe worked as a team to overcome the bias claims, the District Court should have permitted discovery. *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (allowing discovery on APA claim). This Court should not allow an agency to bury or obscure its decision-making through control of the record it creates. The Village

respectfully requests this Court reverse the District Court's denial of extra-record discovery and remand with instructions to permit limited discovery necessary to ensure a full and fair review of the agency's actions.

**CONCLUSION**

This District Court's judgment should be vacated, and the Department's decision to take land into trust be set aside as unlawful under the APA and the U.S. Constitution. Alternatively, the Court should vacate the District Court's judgment and remand with instructions to permit limited discovery on the Village's claims relating to the MOU.

VON BRIESEN & ROPER, S.C.

*s/ Frank W. Kowalkowski*
Frank W. Kowalkowski
Wis. Bar No. 1018119
COUNSEL OF RECORD
300 N. Broadway, Suite 2B
Green Bay, Wisconsin 54303
T: (920) 713-7810
F: (920) 232-4897
frank.kowalkowski@vonbriesen.com

Derek J. Waterstreet
Wis. Bar No. 1090730
411 E. Wisconsin Avenue, Suite 1000
Milwaukee, Wisconsin 53202
T: (414) 287-1519
F: (414) 238-6434
derek.waterstreet@vonbriesen.com

Attorneys for Village of Hobart, Wisconsin

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the type-volume limit of Circuit Rule 32(b), the word limit of Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 13,984 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 12 font size and Palatino Linotype.

Dated:  April 30, 2026

VON BRIESEN & ROPER, S.C.

*s/ Frank W. Kowalkowski*
Frank W. Kowalkowski*
Wis. Bar No. 1018119
300 N. Broadway, Suite 2B
Green Bay, Wisconsin 54303
Phone: (920) 713-7810
Fax: (920) 232-4897
frank.kowalkowski@vonbriesen.com

Attorneys for Village of Hobart, Wisconsin
*Lead Counsel of Record*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, I electronically filed the foregoing

Appellant's Brief and Appendix with the Clerk of the Court for the United States Court

of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all

participants in the case are registered CM/ECP users, and that service will be

accomplished via the CM/ECF system.

Dated: April 30, 2026

VON BRIESEN & ROPER, S.C.

*s/ Frank W. Kowalkowski*
Frank W. Kowalkowski*
Wis. Bar No. 1018119
300 N. Broadway, Suite 2B
Green Bay, Wisconsin 54303
Phone: (920) 713-7810
Fax: (920) 232-4897
frank.kowalkowski@vonbriesen.com

Attorneys for Village of Hobart, Wisconsin
*Lead Counsel of Record*

**CERTIFICATE OF RULE 30 COMPLIANCE**

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by

Circuit Rule 30(a) and (b) are included in the below appendix.

Dated:  April 30, 2026

VON BRIESEN & ROPER, S.C.

*s/ Frank W. Kowalkowski*
Frank W. Kowalkowski*
Wis. Bar No. 1018119
300 N. Broadway, Suite 2B
Green Bay, Wisconsin 54303
Phone: (920) 713-7810
Fax: (920) 232-4897
frank.kowalkowski@vonbriesen.com

Attorneys for Village of Hobart, Wisconsin
*Lead Counsel of Record*

# Appendix

**TABLE OF CONTENTS FOR APPENDIX**

Judgment, dated December 2, 2025 ......................................................................................A-1

Decision and Order Denying Plaintiff's Motion for Summary Judgment,
　　dated December 2, 2025 ..........................................................................................A-2

Decision and Order Denying Plaintiff's Motion to Supplement the Administrative
　　Record and Engage in Discovery, dated January 28, 2025 ...................................A-32

*Village of Hobart, Wisconsin v. Acting Midwest Regional Director, Bureau
　　of Indian Affairs*, 69 IBIA 84 (Sept. 21, 2023) ("Hobart II") ...................................A-42

Indian Reorganization Act of 1934, 48 Stat. 985 (June 18, 1934)......................................A-93

i

# United States District Court
### EASTERN DISTRICT OF WISCONSIN

**VILLAGE OF HOBART, WISCONSIN,**

        **Plaintiff,**

        **v.**

**UNITED STATES DEPARTMENT OF**
**THE INTERIOR, et al.,**

        **Defendants,**

        **and**

**ONEIDA NATION,**

        **Intervenor Defendant.**

**JUDGMENT IN A CIVIL CASE**
**Case No. 23-C-1511**

☐   **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict

☒   **Decision by Court.** This action came before the Court for consideration.

      **IT IS HEREBY ORDERED AND ADJUDGED** that the decision of the Department of the Interior is affirmed. Judgment is entered in favor of Defendants United States Department of The Interior, Deb Haaland, Bureau of Indian Affairs, Tammie Poitra, Acting Midwest Regional Director Bureau of Indian Affairs, and Interior Board of Indian Appeals, and against Plaintiff Village of Hobart, Wisconsin. This action is dismissed.

      Dated:   December 2, 2025

                                       LINDA M. KLEMM
                                       CLERK OF COURT

                                       s/ Mara VandenHeuvel
                                       (By) Deputy Clerk

A-1

VILLAGE OF HOBART, WISCONSIN,

      Plaintiff,

      v.                                Case No. 23-C-1511

UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,

      Defendants,

      and

ONEIDA NATION,

      Intervenor Defendant.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Village of Hobart filed this action challenging the Department of Interior's decision to take land into trust for the Oneida Nation pursuant to Section 5 of the Indian Reorganization Act (IRA) of 1934, 25 U.S.C. § 5108. The Village asserts that the agency's determination violates the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, and the United States Constitution. The court has jurisdiction over this action under 28 U.S.C. § 1331.

Although the Village's action is one for judicial review of a decision by the Department of Interior, the Village seeks summary judgment pursuant to Fed. R. Civ. P. 56(a). Summary judgment, which asks whether there are factual disputes the court must resolve that prevent the entry of judgment as a matter of law, is not the proper vehicle for resolving an action seeking judicial review of agency action under the APA. In an action seeking judicial review of agency action, the court does not decide whether there are material facts in dispute. Instead, the court is

A-2

limited to deciding whether the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). The briefing and arguments presented by the parties on the Village's motion nevertheless present their respective positions on the questions the court must decide, and, for the reasons that follow, the decision of the Department of Interior will be affirmed.

## BACKGROUND

This case represents another chapter in the ongoing dispute between the Village of Hobart and the Oneida Nation concerning their respective jurisdiction over land located within the Oneida Tribe's original reservation. The underlying history and background of this dispute was recounted in *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, 542 F. Supp. 2d 908 (E.D. Wis. 2008), and *Oneida Nation v. Village of Hobart*, 968 F.3d 664 (7th Cir. 2020), and will not be repeated in detail here. The specific dispute in this case is over the decision of the Secretary of the Department of Interior to grant the Nation's application to have eight properties totaling 21 parcels and 499 acres of land acquired into trust by the United States for the benefit of the Nation.

The IRA authorizes the Secretary of the Interior to acquire land and place it into trust for individual Indians and tribes "for the purpose of providing land for Indians." 25 U.S.C. § 5108. Enacted in 1934, the IRA set tribes on a potential collision course with the municipalities that had been established within the original reservation boundaries during the allotment period, which began with the passage of the Dawes Act in 1887. The effect of granting fee-to-trust applications is that it removes the land placed in trust from state and local jurisdictions and exempts such land from state and local taxation. This results in shrinkage of the tax base of the local government in which the property is located and the elimination of state and local government authority to enforce zoning, public safety, or environmental regulations on the land. 25 C.F.R. § 1.4. Thus, a tribe's

2

A-3

interest in recovering its original reservation is in conflict with the interests of local governments established within the reservation boundaries in preserving their tax base and enforcing their local ordinances. State and local governments with jurisdiction over the lands that are subject to fee-to-trust applications therefore have a strong interest in the process.

The potential for conflict between tribes and the municipalities established within their original reservation boundaries lay dormant when the IRA was first enacted. Although the IRA halted the allotment of the remaining tribal land and allowed for the reacquisition of the tribal lands that had already been conveyed to individuals, the vast majority of land on some reservations had already been sold by the time the IRA was enacted, the tribes lacked the resources to repurchase land themselves, and Congress did not fund reacquisition of lands that had been previously sold. *Oneida Tribe*, 542 F. Supp. 2d at 912–13; *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.05 (Nell Jessup Newton ed., 2012). With the advent of Indian gaming, however, this changed. Fueled by the commercial revenue they were able to acquire through gaming beginning in the 1970s, many tribes, including the Oneida Nation, set as their goal "the repurchase and recovery of all original reservation lands." *Id.* at 913; *see also* COHEN'S HANDBOOK § 12.01. This is the context in which the current dispute arises.

On April 12, 2006, the Business Committee of the Oneida Nation enacted several resolutions requesting that the Bureau of Indian Affairs (BIA) accept parcels of fee land owned by the Nation into trust. In 2007, the Nation submitted 56 fee-to-trust applications to the BIA for 133 parcels containing 2,673 acres of land. The parcels are all located within the Village, which is located within the outer boundaries of the original Oneida Reservation. *See Oneida Nation*, 968 F.3d at 671. The Village received notice of the applications and submitted its comments opposing the applications.

A-4

The Midwest Regional Director of the BIA ruled in favor of the Nation and issued six Notices of Decision to accept certain parcels into trust for the benefit of the Nation. In 2010, the Village timely appealed the six Notices of Decision to the Interior Board of Indian Appeals (IBIA). On May 9, 2013, the IBIA concluded that while the Regional Director had authority to take the land into trust, she failed to consider tax loss implications, potential land use conflicts, and jurisdictional problems. *See Vill. of Hobart v. Acting Midwest Regional Director*, 57 IBIA 4, 2013 WL 3054077 (2013) (*Hobart I*). The IBIA vacated the Regional Director's Notices of Decision and remanded the matter for the Regional Director to consider these issues as well as the Village's arguments with respect to environmental impacts and bias in decision making. The IBIA did not consider the Village's arguments regarding the constitutionality of the IRA, finding that it lacked jurisdiction to do so.

On January 19, 2017, the Regional Director issued a decision that accepted some of the fee land into trust. *See* Dkt. No. 32-4 at 28–59. The Village again appealed the Regional Director's decision to the IBIA. As part of its appeal, the Village asserted that the Regional Director's decision was the product of bias due to the decision being processed and issued under a Memorandum of Understanding (MOU) entered into between the BIA and a number of tribes, including the Nation. The BIA and the Nation entered into the MOU to facilitate the expeditious processing of fee-to-trust applications. Dkt. No. 1-3 at 2. In accordance with the MOU, the BIA hired additional employees to process the fee-to-trust applications, and the tribes funded the salaries of those additional employees. The Village argued that because the fee-to-trust applications were processed by employees whose jobs were funded by the Nation, the decisions were not the product of a neutral, independent decisionmaker. It claimed that the MOU fostered improper *ex parte* communications, created an impermissible conflict of interest, and is contrary

4

A-5

to the Indian Self-Determination and Education Act, 25 U.S.C. § 5301, *et seq.*, and the Tribal Self-Governance Act, 25 U.S.C. § 5361, *et seq.* The IBIA rejected the Village's claim of bias and affirmed the Regional Director's decision in full on September 21, 2023. *See Vill. of Hobart v. Acting Midwest Regional Director*, 69 IBIA 84, 2023 WL 6458987 (2023) (*Hobart II*).

On November 10, 2023, the Village commenced this action under the APA against the United States Department of the Interior; Deb Haaland, in her official capacity as the United States Secretary of the Interior; the BIA; Tammie Poitra, in her official capacity as the Midwest Regional Director of the BIA; the Acting Midwest Regional Director of the BIA; and the IBIA. The Village seeks to vacate the IBIA's decision on the ground that it is arbitrary and capricious and represents an abuse of discretion. The Village asserts that the BIA and the IBIA violated its right to due process as a result of the bias created by the MOU. The Village also challenges the constitutionality of the IRA, 25 U.S.C. § 5108, and 25 C.F.R. § 1.4.

## LEGAL STANDARD

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). The APA authorizes a court to set aside an agency action or conclusion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). An agency decision will be found "arbitrary and capricious" if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

5

A-6

A court "reviews agency determinations with great deference, and the court cannot substitute its judgment for that of the agency." *Smith v. Garland*, 103 F.4th 1244, 1252 (7th Cir. 2024) (citations omitted); *see also F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."). While an agency's decision is presumed to be valid, courts must still "engage in a 'substantial inquiry,' or in other words, 'a thorough, probing, in-depth review.'" *Pozzie v. U.S. Dep't of Hous. & Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)). With these considerations in mind, the court turns to the substance of the Village's challenges to the argument for review of the Department's decision.

## ANALYSIS

### A. Bias

The Village asserts that the decisions to grant the Nation's fee-to-trust applications are administratively biased and prejudged in violation of the APA and the Due Process Clause of the Fifth Amendment. At the outset, the court is required to assure itself that the Village has standing to bring its Fifth Amendment Due Process Clause claim. *See Town of Chester, New York v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal quotation marks and citations omitted)). Article III of the Constitution limits "federal judicial power to certain 'cases' and 'controversies.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). The doctrine of standing is not an esoteric doctrine that courts use to avoid difficult decisions; it "serves to prevent the judicial process from being used to usurp the powers of the political

6

A-7

branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "The familiar 'triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement.'" *Garcia v. SigmaTron Int'l Inc.*, 986 F.3d 1058, 1064 (7th Cir. 2021) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998)). The plaintiff bears the burden of establishing each element. *Id.* (citation omitted).

The Nation asserts that the Village lacks standing to claim due process protection because it is a municipality, not a person. The Fifth Amendment provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. Citing *City of East St. Louis v. Circuit Court for the Twentieth Judicial District*, 986 F.2d 1142 (7th Cir. 1993), the Nation asserts that the Seventh Circuit adopted the rule that municipalities are not "persons" for purposes of the Due Process Clause. In that case, the City of East St. Louis and its mayor brought a 42 U.S.C. § 1983 action against a state circuit court arising out of the state court's conveyance of the city hall to a prevailing party to satisfy a judgment against the city. *Id.* at 1143. The Seventh Circuit held that the city lacked standing to assert its claim, reasoning that "[m]unicipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause." *Id.* at 1144. The court explained that "[b]ecause East St. Louis is not a 'person,' it cannot invoke the protection of the Fifth or Fourteenth Amendments, and therefore cannot bring a section 1983 claim." *Id.* (citing *Vill. of Arlington Heights v. Reg'l Transp. Auth.*, 653 F.2d 1149, 1152 (7th Cir. 1981)).

The Village argues that *City of East St. Louis* is factually and legally distinguishable from the instant case. It contends that, in finding that municipalities are not "persons" under the Due Process Clause, the Seventh Circuit relied on the principle that municipalities are creatures of a state and therefore lack any constitutional rights against the state. The Village maintains that,

7

A-8

while it cannot challenge the action of its creator, the State of Wisconsin, it can invoke due process protections against the federal government. But regardless of whether a municipality brings an action against the state or the federal government, because a municipality is not a "person," it "cannot invoke the protection of the Fifth or Fourteenth Amendments." *Id.* at 1144. Therefore, the Village lacks standing to assert a due process claim against the Federal Defendants.

Even if the Village had standing to assert a claim under the Due Process Clause, it would fail on the merits. "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'" *Dusenberry v. United States*, 534 U.S. 161, 167 (2002). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). A procedural due process analysis consists of two steps: "First, we must identify the protected property or liberty interest at stake. Second, if the plaintiff was deprived of one of those interests, we must determine what process was due under the circumstances." *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 536 (7th Cir. 2023) (citation omitted).

The Village claims that it has a constitutionally protected property interest in the continued collection of real property taxes. To demonstrate a procedural due process violation of a property right, the plaintiff must show that there is "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (citation omitted). A property interest protected by the Fifth or Fourteenth Amendment consists of more than a mere unilateral expectation of the claimed interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Instead, the plaintiff must "have a

A-9

legitimate claim of entitlement to it." *Id.* This entitlement must be established by statutes or regulations that delimit the scope and the condition of the right. *Id.*

Under Wisconsin law, the Village has the power to tax for the purposes of government. *See* Wis. Stat. § 61.46(1) ("The village board shall, on or before December 15 in each year, by resolution to be entered of record, determine the amount of corporation taxes to be levied and assessed on the taxable property in such village for the current year."). Yet state law does not set a minimum tax base or quantify the amount of taxes a municipality is entitled to. Thus, the Village has no more than a unilateral expectation in the continued collection of real property taxes. Because the Village has no protected property interest in future real property taxes, its procedural due process claim fails on this basis.

Although the heightened protections of the Fifth Amendment Due Process Clause do not apply here, the Village is still entitled to the procedural considerations subsumed in the APA's arbitrary and capricious standard. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). The Village argues that the entire fee-to-trust process is tainted by bias as a result of the Midwest Region Memorandum of Understanding. The MOU is a "consortium" agreement that allows participating tribes, including the Nation, to consent to the reprogramming of federal funds to supplement BIA staff to more quickly process fee-to-trust applications. Dkt. No. 1-3. The "sole duties and responsibilities" of the employees and contract staff hired with these funds are "to process fee-to-trust applications and reservation proclamations." *Id.* at 2. The Village contends that, as a result of this "pay-to-play" structure, the BIA was pressured to approve trust applications so that it could keep the additional funding. Dkt. No. 57 at 11. It asserts that the Federal Defendants' decisions are administratively biased and prejudged in violation of the APA and that it is entitled to an independent, neutral decisionmaker.

9

A-10

As the IBIA explained, "[a] party must do more than simply allege bias to show that it has been denied a 'fair tribunal.'" *Hobart II*, 69 IBIA at 102. "Adjudicators enjoy a 'presumption of honesty and integrity,' and overcoming that presumption requires an appellant to carry a 'difficult burden of persuasion.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). To succeed on its claim, a party must either make a "substantial showing of bias" or establish that the decisionmaker had a "pecuniary interest in the outcome" of the applications. *Id.* (citations omitted). The Regional Director found that the Village's claims of bias did not satisfy the difficult burden of overcoming the presumption that the Regional Director discharged her duties properly in approving the Nation's applications. Dkt. No. 32-4 at 52. The IBIA concluded that the Village had not met its burden to show that the Regional Director erred. *Hobart II*, 69 IBIA at 87.

First, the Village asserts that the Federal Defendants ignored the specific terms of the MOU showing structural bias. It notes that the MOU was created because of "[t]he need for increased land base" for tribes, that its purpose is to get land "accepted into trust," and requires BIA employees to "assist the Participating Tribes in eliminating or mitigating any of the Solicitor's objections." Dkt. No. 70 at 11 (quoting Dkt. No. 1-3 at 2, 5). The Village argues that the IBIA ignored that the MOU's "whole purpose is to have BIA work with tribes to get applications 'accepted.'" Dkt. No. 57 at 18.

The IBIA rejected the Village's claim that the Midwest MOU created an unlawful "structural bias." *Hobart II*, 69 IBIA at 104. It stated that Congress authorized the BIA to take land into trust for Indians and directed the BIA to advance the causes of Indian self-determination and self-government. *Id.* (citing 25 U.S.C. § 5108). The IBIA observed that while the Midwest MOU states that "the need for increased land base is imperative to the Tribes of Minnesota, Wisconsin, Michigan, and Iowa," that is simply a restatement of the policies that Congress had set

10

A-11

for the BIA and does not disqualify the BIA from deciding trust applications. *Id.* at 105 (quoting

MOU at 1). It noted that both the IBIA and the courts have rejected the argument that the BIA's

pursuit of those goals makes the agency "structurally biased" and disqualifies it from deciding fee-

to-trust applications. *Id.* at 104 (collecting cases). The IBIA also indicated that the Midwest MOU

states that the purpose of the agreement is "facilitating the expeditious processing of fee-to-trust

applications." *Id.* at 105 (citing MOU at 1). But the IBIA explained that the BIA's commitment

to processing applications more quickly is not evidence that it has prejudged applications and does

not equate to pre-approval of applications. *Id.* Though the Village asserts that the Division does

not deny applications, nothing in the MOU created a commitment for the BIA to approve

applications. *Id.* The IBIA observed that the record suggested that the Regional Director had not

denied any applications since 2008 because the tribes withdraw applications that are not likely to

be approved, rather than risk a denial. *Id.* at 105.

Second, the Village argues that the Federal Defendants ignored evidence in the

administrative record of alleged bias, including prejudgment, direct pecuniary interest,

impermissible communications, and conflicts of interests within the BIA. The Village asserts that

the Regional Director and other BIA employees, including Division employees, engaged in

*ex parte* communications with the Nation about the trust applications and the issue of bias. The

IBIA explained that, if this were a formal adjudication under the APA, the Regional Director would

be barred from engaging in off-the-record communications on the merits of the proceeding with

interested parties. *Id.* at 106. But because these proceedings are informal, the APA's restrictions

on *ex parte* communications do not apply. *Id.* The IBIA also noted that the BIA's regulations

require the agency to communicate with the tribal applicant, as well as state and local governments,

to evaluate the applications. *Id.* (citing 25 C.F.R. §§ 151.10; 151.12). The IBIA found that none

A-12

of the meetings or communications the Regional Director or BIA employees had with the Nation improperly influenced the Regional Director's decision or resulted in actual bias. *Id.* at 107.

Next, the Village asserts that the MOU allows for tribal influence through an Oversight Advisory Council and that the participating tribes are invited to semi-annual and annual meetings with the Regional Director to discuss the Division's accomplishments under the MOU. The Village contends that processing applications under the MOU is "inherently biased" because the participating tribes (including the Nation) pay the salaries of the Division employees. It asserts that Division employees draft decisions for the outcome of acceptance and that "[h]aving to ensure the tribes remain happy (i.e., their applications are approved) in an effort to keep your job, is certainly a disqualifying pecuniary interest." Dkt. No. 57 at 19. The IBIA found that the Village failed to point to any statements or actions by the Regional Director or any BIA employee demonstrating that the Regional Director prejudged these specific applications or that the adjudicator had a pecuniary interest substantial enough that the risk of unfairness was intolerably high. The Village points to emails showing that the Regional Director and Division employees prioritized the Nation's applications after the remand. It contends that the Nation should not be able to dictate to the BIA what applications it should prioritize. The IBIA explained that "prioritizing a decision is not the same as prejudging the result of that decision." *Hobart II*, 69 IBIA at 105.

As for any disqualifying interest based on the MOU's funding structure, the IBIA conceded that the Midwest MOU "appears to have given Division employees some interest in having these trust applications resolved, although it is not clear whether the degree and nature of that interest would disqualify them from deciding the applications." *Id.* at 108. It explained that, while Division employees do not have the kind of direct pecuniary interest in the resolution of the

12

A-13

applications that have been found disqualifying, Division employees would likely lose their jobs if the tribes stopped participating in the Midwest MOU. *Id.* The IBIA noted that though the Midwest MOU had been revised to limit the participating tribes' ability to influence the selection, performance awards, and duties and responsibilities of the federal consortium staff as well as the role of the tribes in hiring Division staff, these revisions did not change the fact that the tribes control the purse strings from which the consortium staffs' salaries are dependent. *Id.*

The IBIA ultimately concluded that it need not decide whether the Midwest MOU disqualified Division employees from deciding trust applications because Division employees do not decide the applications, the Regional Director does. It stated that it did not see how Division employees assisting in drafting decisions showed prejudgment or bias, as long as the Regional Director completed her own independent review and reached her own decision. *Id.* at 105. Even though the Regional Director oversees Division employees, the Regional Director is not an employee of the Division, her position is not funded by the Midwest MOU, and she would not lose her job even if all tribes stopped participating in the Midwest MOU. As a result, the IBIA concluded that the Regional Director was not "subject to the conflict of interest that allegedly disqualified Division employees from adjudicating these applications." *Id.* at 110. In other words, "even if Division employees had a conflict of interest here, the Regional Director's independent review cured that conflict of interest." *Id.*

The Village maintains that the Regional Director "rubber stamped" the final Remand Decision drafted by Division employees and did not conduct her own independent review. It contends that, if the Regional Director had actually reviewed the final decision, such evidence would be in the record. But the IBIA rejected the Village's contention, explaining that a legal presumption of regularity supports the official acts of public officers acting in their official

A-14

capacities. The IBIA concluded that the Village failed to meet its burden to present evidence to support its allegations that the Regional Director did not independently review the decisions drafted by Division employees. *Id.* at 110–11. It reasoned that the administrative record did show that the Regional Director undertook her own independent review of the trust applications, the Village's comments, and the related Notices of Decision and that the comprehensiveness of the Regional Director's decision belies the Village's claim that she undertook no independent review. *Id.* at 111.

Third, the Village argues that the decisions must be vacated because the Regional Director and the IBIA did not perform a complete review of the record. In particular, the Village asserts that the Regional Director and the IBIA did not fully review a 2005 Interior Office of Inspector General's Report summarizing its investigation of MOU agreements (IG Report) referenced in a 2006 Government Accountability Office report. In *Hobart I*, the IBIA directed the Regional Director to "address the Village's allegations of bias as well as the outcome of the IG investigation and its relevance, if any, to the Village's allegations." 57 IBIA at 16.

In the Remand Decision, the Regional Director concluded that the IG Report had no bearing on the Village's bias claim because the report found no instances of actual bias and centered on the terms of the Pacific MOU then in use, not the Midwest MOU. Dkt. No. 32-4 at 47. She explained that the MOUs in effect at the time of the IG Report had long since expired and were replaced by the restructured MOUs. *Id.* The IBIA found that, in the Remand Decision, the Regional Director sufficiently reviewed the IG investigation. *Hobart II*, 69 IBIA at 111–12.

The Village asserts that the Regional Director and the IBIA relied on a redacted, incomplete version of the IG Report. But as the IBIA observed, the redactions appeared to mostly be employee

14

A-15

names. *Id.* at 112. The IBIA concluded that the Village had not explained why the redacted information would have made any difference to the Regional Director's analysis. *Id.*

The Village also asserts that the Regional Director and the IBIA did not review a Solicitor's Opinion that was attached to the IG Report. Even though the IG Report summarized the conclusions contained in the Solicitor's Opinion, the Village contends that the Regional Director should have fully considered the opinion itself. The IBIA concluded that the Regional Director's decision, taken together with the record, was more than sufficient to reasonably discern her path. It explained that the remand order required the Regional Director to review the "outcome of the IG investigation," not the documents on which it was based. The IBIA stated that nothing in the remand order required the Regional Director to analyze the report more exhaustively, especially when she concluded that it was not relevant to her decision. *Id.*

Finally, the Village argued before the IBIA that the MOU is illegal because it is inconsistent with the terms of the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. § 5301, *et seq.*, and the Tribal Self-Governance Act (TSGA), 25 U.S.C. § 5361, *et seq.* The IBIA found that the Village did not have standing to bring the claim because it had not explained how its legally protected interests were harmed by the reprogramming of funds authorized by the Midwest MOU and it failed to show that its interests fall within the zone of interests protected by the ISDEAA and TSGA. *Hobart II*, 69 IBIA at 113. Even if the Village had standing to bring these claims, the IBIA concluded that the Village had not shown that the Midwest MOU was unlawful. *Id.*

Ultimately, the Village's arguments assume that the IRA requires the Secretary of the Interior to act in an adjudicatory capacity, making the essential factual findings needed to support a decision granting or denying the pending application. But that is not the procedure Congress

15

A-16

established for land acquisitions under the IRA. As part of its goal of ending the assimilationist policy reflected in the allotment of tribal lands, Congress sought to improve the economic status of Indians by authorizing the Secretary "in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . within or without existing reservations . . . ." 25 U.S.C. § 5108. The IRA says nothing about the interests and rights of municipalities that were established within the original reservation boundaries. The Department has promulgated regulations intended to guide the Secretary in exercising the discretion which the statute affords. 25 C.F.R. § 151.10.[1] But the regulation does not establish any minimal finding the Secretary must make before granting a tribe's application to have its land placed in trust. It lists the criteria the Secretary will consider in evaluating requests for the acquisition of land in trust status and the procedure that will be used to provide interested parties notice and an opportunity to comment. That procedure was used here.

As the following section shows, the Regional Director and IBIA thoroughly explained that the Village had failed to establish bias. Their decision that the Village failed to meet its burden was reasonable. Because the Regional Director and the IBIA considered the administrative record and made no clear error of judgment or law, their decisions cannot be deemed arbitrary and capricious or an abuse of discretion. To the extent the Village believes this procedure unfair, its remedy lies with Congress, not the courts.

**B. 25 C.F.R. § 151.10 Factors**

The Village asserts that the Federal Defendants' decisions were arbitrary and capricious because they failed to adequately consider the factors set out in 25 C.F.R. § 151.10. The Village

---

[1] The regulation in effect today is different from the regulation that was in effect during the Federal Defendants' decisions. References to the regulation are to those provisions in effect at the time of the Federal Defendants' decisions.

A-17

has the burden to demonstrate that the BIA's consideration of the regulatory factors was arbitrary and capricious. *See South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 800 (8th Cir. 2005). It must "present evidence that the agency did not consider a particular factor; it may not simply point to the end result and argue generally that it is incorrect." *Id.* The BIA is not required to "exhaustively analyze every factor but must base its determination upon factors listed in the appropriate regulations and must use a reasonable interpretation of the regulation and the statute in reaching its conclusion." *Id.* (internal quotation marks and citation omitted).

The Village takes issue with the Federal Defendants' analysis of the cumulative tax impacts of potential future acquisitions and the lack of compensation for fire protection and road maintenance under 25 C.F.R. § 151.10(e), jurisdictional problems and land use conflicts under 25 C.F.R. § 151.10(f), and environmental considerations under 25 C.F.R. § 151.10(h). The Village also asserts that the passage of time between decisions, including the six Notices of Decision, requires that the decisions be vacated for further consideration. The court will address each argument in turn.

### 1. 25 C.F.R. § 151.10(e)

Section 151.10(e) requires the BIA to consider "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls." 25 C.F.R. § 151.10(e). The Village asserts that the Federal Defendants violated the APA by disregarding the cumulative tax effects of future trust acquisitions. It contends that the Nation had trust applications for 133 parcels comprising 2,673 acres located within the Village, including the eight parcels under consideration by the Federal Defendants, which would result in a total property tax loss of $36,148.88. The Village asserts that the Federal Defendants ignored the reality that the "system

is set up to approve applications" and that it should not view each acquisition in isolation. Dkt. No. 57 at 27–28.

Section 151.10(e) contains no requirement that the BIA consider the cumulative impact of possible future acquisitions. Instead, the BIA is only required to consider the present impact of the proposed trust acquisitions under consideration on the tax rolls. *See Shawano County v. Acting Midwest Regional Director*, 53 IBIA 62, 80 (2011). In this case, the Federal Defendants considered the tax impact of placing the parcels into trust. They estimated that, based on tax information for fiscal year 2015, the acquisitions would cause the Village to lose $3,997.90, or 0.1443% of its tax levy. *Hobart II*, 69 IBIA at 94.

The Village asserts that the Federal Defendants ignored the Village's inability to increase its tax levy to address the effects of cumulative loss and continue to fund the public services it must provide to its residents, both tribal and nontribal, such as fire protection and road maintenance and repair. It explains that Wisconsin law limits the amount the Village may increase taxes each year and that raising taxes on nontribal land would significantly increase the burden of those who pay taxes.

The Regional Director considered the Village's comments regarding the loss of funding for public services, fire protection, and road maintenance. She acknowledged the Village's concern that it could not raise taxes above a 2% levy limit but concluded that the Village had not provided sufficient information to properly analyze its concerns about speculative future losses. Dkt. No. 32-4 at 35. The Regional Director also observed that Brown County and other nearby municipalities have executed service agreements with the Nation regarding the delivery of services to tribal lands and that the Nation and the Village had previously entered into such an agreement in the past. *Id.* at 34. She stated, "Contrary to the Village's contention, documents provided by

A-19

the Oneida Nation show that it has made clear that it is open to negotiating new service agreements, which may include payments in lieu of taxes, if the Village were to recognize the Nation as a government pursuant to federal law." *Id.* The Regional Director noted that, without an intergovernmental agreement in place, there is a possibility that emergency services for fire protection provided by the Village could go uncompensated, but that the Village provides these services to other tax-exempt properties, such as churches and schools. *Id.* at 35. She explained that, although fire protection is paid through property taxes, the Village did not provide specific information regarding the cost of fire protection. *Id.* While the Village asserts that it was never required to submit specific cost information about its programs and services, the Regional Director was not required to ask for documents supporting the Village's comments.

As for road maintenance and repair, the Regional Director noted that the Village raised the issue of the significant cost of repair for three roads. The Regional Director determined that, though the roads service private fee parcels and Oneida Trust land, they do not directly service any of the proposed acquisitions currently under consideration. *Id.* She also noted that Federal funding is available through the BIA's Tribal Transportation Program that could "partially offset" road maintenance costs, even though the Nation, and not the Village, receives the federal funding. *Id.*

The Regional Director concluded that the Village's objections did not justify exercising her discretion against trust acquisition. The IBIA explained that the Regional Director "need not resolve all objections raised in such comments to the commenter's satisfaction" and found that the Regional Director had adequately considered the issues and did not abuse her discretion. *Hobart II*, 69 IBIA at 118. The Federal Defendants' consideration of this factor was sufficient and supported by a rational basis.

19

A-20

### 2. 25 C.F.R. § 151.10(f)

Section 151.10(f) requires the BIA to consider "jurisdictional problems and potential conflicts of land use which may arise" as a result of taking land into trust for a tribe. 25 C.F.R. § 151.10(f). The Village argues that the Board erroneously affirmed the Regional Director's consideration of § 151.10(f) by concluding that the Regional Director is not required to resolve, prevent, or weigh potential jurisdictional problems. Contrary to the Village's assertion, however, the Federal Defendants are not required to resolve any conflicts; they must only consider whether those conflicts warrant denial of an application. *See Cnty. of Charles Mix v. U.S. Dep't of Interior*, 799 F. Supp. 2d 1027, 1046 (D.S.D. 2011) ("The BIA fulfills its obligation under Section 151.10(f) as long as it undertakes an evaluation of potential problems." (cleaned up) (internal quotation marks and citation omitted)). The Federal Defendants evaluated the potential jurisdictional problems presented by the Village.

The Village asserts that the Federal Defendants failed to adequately consider stormwater management disruptions. The Federal Defendants acknowledged that the trust acquisition would complicate the Village's efforts to improve stormwater management, given the fact that two separate programs would need to be implemented, but concluded the issue has been resolved because jurisdiction is clear. Citing *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, 732 F.3d 837 (7th Cir. 2013), the Village asserts that, contrary to the Federal Defendants' views, the jurisdictional conflict will only be exacerbated by trust acquisition because the Village and the Nation must implement separate stormwater management programs. Even though the Village disagrees with the Federal Defendants' conclusion, the Federal Defendants recognized and considered the potential jurisdictional concern. That is all that is required under the regulations.

20

A-21

The Village also argues that the Federal Defendants failed to consider the Tribe's ability to checkerboard by trust acquisition and thwart the Village's development through its own comprehensive zoning. It contends that the Federal Defendants ignored the Village's concern that there would be different zoning designations within a single zone if the land is held in trust. For example, the Nation will designate the Gerbers property as residential and agricultural, even though it is located within the middle of land zoned and designated by the Village as mixed commercial/industrial. The Regional Director considered these concerns and found that the location of light industrial development adjacent to residential development is not unique within the Village. She noted that the Village had itself "created the same situation unilaterally by placing agricultural and industrial zoning districts immediately adjacent to one another." Dkt. No. 32-4 at 36–37. The Regional Director concluded the zoning impacts would be minimal because the Nation had not proposed any change in use, and the Village had not raised any material conflict between existing uses and Village zoning. *Id.* at 37.

The Village further argues that the checkerboard jurisdictional pattern creates difficulty with providing emergency services. The Regional Director considered this issue and concluded that the "most feasible solution to the 'checkerboard' issue is the development of [a] cooperative service agreement." *Id.* at 39. She observed that the "inability of the Village and Nation to execute an intergovernmental service agreement contributes to the jurisdictional conflict" but noted that such agreements are ultimately not required by the BIA. *Id.*

The Regional Director concluded that the Village's jurisdictional concerns did not bar the Federal Defendants from acquiring the land into trust. The IBIA concluded that the Regional Director's consideration of § 151.10(f) was sufficient. *Hobart II*, 69 IBIA at 123. The Federal Defendants' consideration of this factor was not arbitrary and capricious.

21

A-22

### 3. 25 C.F.R. § 151.10(h)

Section 151.10(h) requires the BIA to consider "[t]he extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures [NEPA], and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations." 25 C.F.R. § 151.10(h). As an initial matter, the Village argues that the IBIA's decision regarding standing must be rejected. Even though the IBIA concluded that the Village lacked standing to advance its § 151.10(h) arguments, it ultimately rejected the Village's arguments on the merits. In short, the Federal Defendants' decision was not arbitrary and capricious on this basis.

The Village does not assert that the Regional Director erred in her consideration of the criterion set out in § 151.10(h). Instead, it argues that the Federal Defendants (1) failed to comply with the agency's NEPA compliance regulations by relying on outdated categorical exclusions and Phase I environmental site assessments and (2) did not conduct interviews with state and/or local agency officials, as required by Part 602. With respect to the Phase I assessments, the administrative record shows that the Federal Defendants complied with the required Phase I assessment within one year of the renewed Notice of Decision. Dkt. No. 35-12 at 41. The renewed Notice of Decision is dated January 19, 2017. The BIA prepared and approved site assessments in September 2016. It subsequently determined there was no change in use of any of the parcels, so no further compliance with NEPA was required. Dkt. No. 32-4 at 42–45. In addition, the 180-day deadline to update the assessment applies after the acquisition, not before. Dkt. No. 35-12 at 41. The Village also argues that the Federal Defendants erred in not conducting interviews with state and/or local agency officials. But, as the Federal Defendants explain, the regulations do not require consultation with the Village itself, only environmental professionals of any state or local

A-23

government.  Dkt. No. 32-4 at 43 (citing ASTM 1527).  The Federal Defendants' consideration of § 151.10(h) was not arbitrary and capricious.

### 4.  Passage of Time

Finally, the Village argues that the passage of 15 years since the issuance of the Notices of Decision requires that the decision be vacated and remanded for further consideration of the regulatory factors.  But the passage of time alone does not render the Regional Director's consideration of the regulatory factors stale.  In any event, the passage of time here is a function of the procedural history of this case, including multiple appeals and decisions.  The Village has not demonstrated that the case should be remanded on this basis.

## C.  IRA Claims

The Village asserts that Section 5 of the IRA is unconstitutional.  Section 5 of the IRA states:

> **Acquisition of lands, water rights or surface rights; appropriation; title to lands; tax exemption.**
>
> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
>
> For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisitions, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: Provided, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico, and for other purposes, or similar legislation, becomes law.
>
> The unexpected balances of any appropriations made pursuant to this section shall remain available until expended.

A-24

> Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 5108. The Village argues that the broad and unlimited grant of extraordinary power to the Secretary of the Interior to acquire any interest in lands, within or without existing reservations, for the purpose of providing land for Indians is problematic for two reasons.[2] First, it claims that Section 5 exceeds Congress's power under the Indian Commerce Clause. Second, it asserts that Section 5 violates the nondelegation doctrine.

### 1. Indian Commerce Clause

The Village asserts that Section 5 of the IRA is unconstitutional because it exceeds Congress's plenary power under the Indian Commerce Clause. It argues that the Indian Commerce Clause only vests Congress with authority over trade and, thus, Congress exceeded its authority when it enacted Section 5 of the IRA. To support its position, the Village cites Justice Thomas' dissent from the denials of certiorari in *Upstate Citizens for Equity, Inc. v. United States*, 583 U.S. 1004 (2017), where he states that "the Indian Commerce Clause does not appear to give Congress the power to authorize the taking of land into trust under the IRA." *Id.* at 2587 (Thomas, J., dissenting).

---

[2] The Village raised additional constitutional challenges in its complaint. In particular, it asserts that the IRA is unconstitutional under the Enclave Clause, under the Fifth, Tenth, and Fourteenth Amendments, and because it deprives the Village of its right to a republican form of government. *See* Compl. ¶¶ 69, 73, 77, 84–85, Dkt. No. 1. The Village also claims that 25 C.F.R. § 1.4 is unconstitutional. *See id.* ¶ 91. By not raising arguments relating to these claims in its opening brief, it appears the Village has abandoned these claims. The Federal Defendants assert that, by not discussing these claims in its opening brief, the Village waived these arguments. Dkt. No. 64 at 31 (citing *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) ("[A]rguments not raised in an opening brief are waived.")). The Village did not respond to the Federal Defendants' waiver argument. For these reasons, the Village's other claims regarding the constitutionality of 25 U.S.C. § 5108 and 25 C.F.R. § 1.4 are dismissed.

A-25

But the majority of the Court has not adopted Justice Thomas' view. The Supreme Court has long held that "the central function of the Indian Commerce Clause is to provide Congress with the plenary power to legislate in the field of Indian affairs." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). Although the Court has acknowledged that "Congress's authority to legislate with respect to Indians is not unbounded," it has broadly defined Congress's plenary power to concern "not only trade, but also 'Indian Affairs.'" *Haaland v. Brackeen*, 599 U.S. 255, 276, 278 (2023) (citations omitted). The Court explained that it has "not doubted Congress's ability to legislate across a wide range of areas, including criminal law, domestic violence, employment, property, tax, and trade." *Id.* at 275 (citations omitted). Consistent with this understanding, the court concludes that Section 5 of the IRA is constitutional under Congress's plenary power.

### 2. Nondelegation Doctrine

The Village argues that Section 5 also violates the nondelegation doctrine. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Article I of the Constitution provides that "[a]ll legislative Powers herein shall be vested in a Congress of the United States, which shall consist of a Senate and House of representatives." U.S. Const. art. I, § 1. Under the nondelegation doctrine, "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991). Congress may, however, obtain "the assistance of its coordinate Branches." *Mistretta*, 488 U.S. at 372. In particular, Congress may "'vest[] discretion' in executive agencies to implement and apply the laws it has enacted—for example, by deciding on 'the details of [their] execution.'" *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, --- U.S. ---, 145 S. Ct. 2482, 2496–97 (2025) (alterations

25

A-26

in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)). "So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta*, 488 U.S. at 372 (cleaned up) (internal quotation marks and citation omitted). When setting forth an "intelligible principle," Congress is not required to "prescribe detailed rules" but must "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).

Consistent with these principles, the Supreme Court has only twice struck down federal statutes for violating the nondelegation doctrine: *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). In each case, Congress "had failed to articulate *any* policy or standard to confine discretion." *Gundy v. United States*, 588 U.S. 128, 146 (2019) (internal quotation marks and citation omitted). In *Panama Refining*, for example, "the statute empowered the President to bar the transport of petroleum products while 'establishing no criterion' and 'declaring no policy' for whether, when, or how he should do so." *Consumers' Rsch.*, 145 S. Ct. at 2502–03 (cleaned up) (quoting *Panama Refining*, 293 U.S. at 430). The statute at issue in *Schechter Poultry*, which the Supreme Court described as "even worse," authorized the President to "approve 'codes of fair competition' for 'the government of trade and industry throughout the country,' yet imposed 'few restrictions' and 'set up no standards' aside form a 'statement of general aims of rehabilitating, correcting, and expanding' the economy." *Consumers' Rsch.*, 145 S. Ct. at 2503 (quoting *Schechter Poultry*, 295 U.S. at 521–22). But since 1935, and even as recently as June 2025, *see generally Consumers' Rsch.*, 145 S. Ct. 2482, the Supreme Court has rejected all other nondelegation challenges asserted against an

26

A-27

Act of Congress. The Court explained that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (internal quotation marks and citation omitted).

The Village argues that Section 5 is an unconstitutional delegation of legislative authority because it fails to supply an intelligible principle by which the Secretary of the Interior is to be guided. It asserts that Section 5 lacks minimal directives or guidance governing the Secretary's acquisitions, only the identification of the beneficiaries on whose behalf the United States should acquire the land: "for Indians." This, the Village contends, is "not enough." Dkt. No. 57 at 37. The Village explains, "The simple statement of who land may be provided to, 'Indians,' with absolutely no instructions as to when, for what purpose, how, why, how much, how often, under what conditions, without any consideration for use, or the impact on the states and their sovereignty is no directive at all." Dkt. No. 70 at 35. It argues that the lack of any intelligible principle has resulted in the "rubberstamping" approval of virtually every application. *Id.* at 36.

In support of its argument, the Village relies heavily on the Eighth Circuit's decision in *South Dakota v. United States Department of the Interior*, 69 F.3d 878 (8th Cir. 1995), *vacated* 519 U.S. 919 (1996) (*South Dakota I*). There, the Eighth Circuit held that Section 5 of the IRA was an unconstitutional delegation of power. *Id.* at 880. It found that "when Congress authorize[d] the Secretary to acquire land in trust 'for Indians,' it [gave] the agency no 'intelligible principle,' no 'boundaries' by which the public use underlying a particular acquisition may be defined and judicially reviewed." *Id.* at 883. The court observed that Section 5 would "permit the Secretary to purchase the Empire State Building in trust for a tribal chieftain as a wedding present." *Id.* at 882. The Eighth Circuit's decision, however, was vacated by the Supreme Court and predates

A-28

subsequent Eighth Circuit cases upholding Section 5 against nondelegation challenges. *See Dep't of the Interior v. South Dakota*, 519 U.S. 919 (1996); *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790 (8th Cir. 2005) (*South Dakota II*).

While the United States Supreme Court and the Seventh Circuit have not yet addressed whether Section 5 violates the nondelegation doctrine, all other circuits that have addressed it have concluded it does not. *See United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999); *Carcieri v. Kempthorne*, 497 F.3d 15 (1st Cir. 2007); *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008); *see also Sauk Cnty. v. U.S. Dep't of Interior*, No. 07-cv-543, 2008 WL 2225680 (W.D. Wis. May 29, 2008). The Village criticizes these courts for using legislative history to establish Section 5's intelligible principle. It asserts that an intelligible principle must be established by "legislative act," not legislative history. Dkt. No. 57 at 40. But as the Supreme Court recently explained, its cases concerning nondelegation "did not examine those statutory phrases in isolation but instead looked to the broader statutory contexts, which informed their interpretation and supplied the content necessary to satisfy the intelligible-principle test." *Consumers' Rsch.*, 145 S. Ct. at 2503 (citation omitted). Courts must consider "the purpose of the Act, its factual background, and the statutory context in which [the challenged phrases] appear," *Am. Power*, 329 U.S. at 104, which includes legislative history, *Gundy*, 588 U.S. at 141–44. In the cases affirming Section 5's constitutionality, the courts analyzed the text, purpose, and statutory context of the IRA to do so.

For instance, the Eighth Circuit in *South Dakota II* held that "an intelligible principle exists in the statutory phrase 'for the purpose of providing lands for Indians' when it is viewed in the statutory and historical context of the IRA." 423 F.3d at 799. It also found that the statute places adequate limits on the Secretary's discretion, namely, that the Secretary must only acquire trust

28

lands for Indians as defined in 25 U.S.C. § 479 and is prohibited from taking extra-reservation lands into trust for Navajo Indians. *Id.* at 797. The court noted that the goals motivating trust acquisition are to further economic development and tribal self-governance. *Id.* at 798; *see also Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) ("The intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'" (quoting H.R. Rep. No. 1804, 73rd Cong., 2d Sess., at 6 (1934))). The Eighth Circuit acknowledged that "the scope and power conferred in [the statute] is broad." *South Dakota II*, 423 F.3d at 797. But the court concluded "[t]he statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department." *Id.* The First, Tenth, and D.C. Circuits used similar reasoning to find Section 5 constitutional. *See Roberts*, 185 F.3d at 1136–37; *Carcieri*, 497 F.3d at 41–43; *Mich. Gambling*, 525 F.3d at 30–33. Consistent with these cases, the court concludes that Section 5 of the IRA does not violate the nondelegation doctrine.

The Village raises legitimate concerns that it will suffer significant consequences if land within its boundaries continues to be accepted into trust for the benefit of the Nation under Section 5 of the IRA. Any claimed statutory inequity may only be remedied by Congress, however. The court realizes that it may ring hollow to advise the Village to go to Congress to seek a change in the law. But it is from that body alone that relief is available.

## CONCLUSION

For the foregoing reasons, the Federal Defendants' actions were not arbitrary, capricious, or an abuse of discretion. Furthermore, Section 5 of the IRA is constitutional. The Village's remaining constitutional arguments are dismissed. Accordingly, the Village's motion for summary

A-30

judgment (Dkt. No. 56) is **DENIED**.  The decision of the Department of the Interior is affirmed.

The Clerk is directed to enter judgment in favor of the defendants and against the plaintiff.

      **SO ORDERED** at Green Bay, Wisconsin this 2nd day of December, 2025.

William C. Griesbach
United States District Judge

30

A-31

VILLAGE OF HOBART, WI,

        Plaintiff,

        v.                          Case No. 23-C-1511

UNITED STATES DEPARTMENT
OF THE INTERIOR, et al.,

        Defendants,

    and

ONEIDA NATION,

        Intervenor Defendant.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD AND ENGAGE IN DISCOVERY

The Village of Hobart filed this action challenging the Department of the Interior's decision to take land into trust for the Oneida Nation pursuant to § 5 of the Indian Reorganization Act (IRA) of 1934, 25 U.S.C. § 465. The case is currently before the court on the Village's motion to supplement the administrative record and to engage in extra-record discovery. For the following reasons, the motion will be denied.

### BACKGROUND

The IRA authorizes the Secretary of the Interior to acquire land and place it into trust for individual Indians and tribes "for the purpose of providing land for Indians." 25 U.S.C. § 465. The effect of granting fee-to-trust applications is that it removes the land placed in trust from state and local jurisdictions and exempts such land from state and local taxation. This results in

A-32

shrinkage of the tax base of the local government in which the property is located and the elimination of state and local government authority to enforce zoning, public safety, or environmental regulations on the land. 25 C.F.R. § 1.4. As a result, state and local governments with jurisdiction over the lands that are subject to fee-to-trust applications have a strong interest in the process.

On April 12, 2006, the Business Committee of the Oneida Nation enacted several resolutions requesting that the BIA accept several parcels of fee land owned by the Nation into trust. In 2007, the Nation submitted 56 fee-to-trust applications to the BIA for 133 parcels containing 2,673 acres of land. The parcels are all located within the Village. The Village received notice of the applications and submitted its comments opposing the applications.

The Midwest Regional Director of the BIA ruled in favor of the Nation and issued six notices of decision to accept certain parcels into trust for the benefit of the Nation. In 2010, the Village timely appealed the six notices of decision to the IBIA. On May 9, 2013, the Interior Board of Indian Appeals (IBIA) concluded that while the Regional Director had authority to take the land into trust, she failed to consider tax loss implications, potential land use conflicts, and jurisdictional problems. *See Vill. of Hobart v. Acting Midwest Regional Director*, 57 IBIA 4, 2013 WL 3054077 (2013) (*Hobart I*). The IBIA vacated the Regional Director's notices of decision and remanded the matter for the Regional Director to consider these issues as well as the Village's arguments with respect to environmental impacts and bias in decision making. The IBIA did not consider the Village's arguments regarding the constitutionality of the IRA finding that it lacked jurisdiction to do so.

On January 19, 2017, the Regional Director issued a decision accepting the fee land into trust. *See* Dkt. No. 1-4. The Village again appealed the Regional Director's decision to the IBIA.

2

A-33

As part of its appeal, the Village asserted that the Regional Director's decision was the product of bias due to the decision being processed and issued under a Memorandum of Understanding (MOU) entered into between the BIA and a number of tribes, including the Nation. The BIA and the Nation entered into the MOU to facilitate the expeditious processing of fee-to-trust applications. Dkt. No. 1-3 at 2. In accordance with the MOU, the BIA hired additional employees to process the fee-to-trust applications, and the tribes funded the salaries of those additional employees. The Village argued that because the fee-to-trust applications were processed by employees whose jobs were funded by the Nation, the decisions were not the product of a neutral, independent decision maker. It claimed that the MOU fostered improper *ex parte* communications, created an impermissible conflict of interest, and is contrary to the Indian Self-Determination and Education Act, 25 U.S.C. § 5301, *et seq.*, and the Tribal Self-Governance Act, 25 U.S.C. § 5361, *et seq.* The IBIA affirmed the Regional Director's decision in full on September 21, 2023. *See Vill. of Hobart v. Acting Midwest Regional Director*, 69 IBIA 84, 2023 WL 6458987 (2023) (*Hobart II*).

The Village initiated this action under the Administrative Procedure Act (APA), 7 U.S.C. § 701, *et seq.*, on November 10, 2023, seeking to vacate the IBIA's decision on the ground that it is arbitrary and capricious and represents an abuse of discretion. The Village asserts that the BIA and the IBIA violated its right to due process as a result of the bias created by the MOU. The Village also challenges the constitutionality of the IRA, 25 U.S.C. § 5108, and 25 C.F.R. § 1.4.

<strong>ANALYSIS</strong>

**A. Motion to Supplement the Record**

The defendants filed the administrative record from the IBIA appeal with the court on June 28, 2024, and relodged the administrative record with the court on July 30, 2024. The Village

A-34

moved to supplement the record, arguing that the defendants have not provided the court with the entire administrative record that was before the IBIA.

An index included in the administrative record submitted to the IBIA notes the existence of "post-remand privileged documents" and "pre-remand privileged documents" amounting to 2,391 total pages. *See* Dkt. No. 35-13 at 1138–40. The index submitted to the IBIA stated, "The following documents are confidential privileged communications exempt from disclosure under the Freedom of Information Act and should not be released outside the Department of the Interior. They are included in the Administrative Record in compliance with 43 CFR 4.335." *Id.* at 1138. The index provided a description of the documents, the date they were created, the sender of each document, the recipient, the nature of the material or communication, and the claimed privilege. The defendants produced the documents to the IBIA in a sealed box, but the documents were not reviewed by the IBIA or disclosed to the Village. The Village requests that the court compel The defendants to produce and disclose the 2,391 pages of excluded documents.

The defendants argue, however, that the Village waived any argument regarding the disclosure of documents. They assert that because the Village did not object to the sealed documents being withheld from review by the IBIA or request that they be disclosed to the Village when the IBIA was reviewing the Regional Director's decision, it cannot raise the argument here. If the Village believed the sealed documents contained evidence of bias on the part of the Regional Director, it should have demanded access to them at that stage of the proceeding and presented its argument to the IBIA so that the IBIA could have addressed it in the first instance instead of waiting until after the IBIA had issued its decision.

The defendants' argument is persuasive. In a normal case, objections not made in the trial court are waived on appeal. Administrative appeals to district courts work the same way.

A-35

"[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts." *United States v. v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see also Ester v. Principi*, 250 F.3d 1068, 1072 (7th Cir. 2001) ("[A]ny objections not made before the administrative agency are subsequently waived before the courts."). Just as appellate courts do not entertain arguments which could have been, but were not, raised in the trial court, a court reviewing a decision by an administrative agency should decline to consider arguments that were never presented to the agency whose decision it is called upon to review. *Massachusetts, Dep't of Pub. Welfare v. Sec'y of Agric.*, 984 F.2d 514, 523 (1st Cir. 1993).

Applying these principles to the facts of this case, it follows that the Village has waived its right to review and supplement the record before this court with the sealed documents by failing to raise the issue before the IBIA. Had it done so, the IBIA could have addressed its argument that the documents should be disclosed as evidence of bias on the part of the Regional Director, just as the IBIA did in its earlier decision remanding the case to the Regional Director for consideration of the Village's claim of bias due to the MOU with the Tribes. But no such argument was made to the IBIA, even though the Village knew that the documents were submitted to it under seal. Having failed to raise the issue before the IBIA, the Village is precluded from doing so before the court.

The Village contends that waiver aside, it is entitled to access to the sealed documents because they are part of the record before the IBIA. But the documents are not in any real sense part of the administrative record. The documents the Village asks the court to disclose remained under seal throughout the IBIA review and the IBIA states that it did not consider them in arriving at its decision. *See Hobart II*, 2023 WL 6458987, at *111 n.24 ("The Board has not reviewed the

5

A-36

contents of those withheld documents."). Thus, they do not form any part of the basis for the IBIA's decision which the court is called upon to review.

In reviewing an agency's decision, the APA instructs courts to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (judicial review must be "based on the full administrative record" before the agency), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). This means "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "The complete administrative record consists of all documents and materials directly or indirectly considered by the agency." *Miami Nation of Indians of Ind. v. Babbitt*, 979 F. Supp. 771, 775 (N.D. Ind. 1996). The agency is responsible for compiling the administrative record, and there is a strong presumption that the administrative record as furnished by the agency is complete. *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 12–13 (D.D.C. 2015). Plaintiffs may overcome this presumption by "identifying reasonable, non-speculative grounds for their belief that the documents" they seek to add to the administrative record "were considered by the agency and not included in the record." *Id.* at 13 (cleaned up).

Because the Board did not consider the withheld documents, they are not considered part of the record in this case. Since they were not viewed by the Board and neither party cited them in the respective submissions to the Board, in no sense could they have formed any part of the IBIA's decision in this case. Because they were not part of the record considered by the IBIA, the Village's motion to supplement the record is denied. And since the undisclosed documents are not part of the administrative record, the court need not decide whether they fall within the deliberative process or attorney-client privileges.

6

A-37

**B. Motion to Engage in Discovery**

The Village also asks to engage in discovery on its constitutional claims. In particular, the Village seeks to take the following discovery: requests for admission; interrogatories; requests for production of documents; and depositions of certain agency employees, such as the Regional Director, BIA employees involved in drafting and processing fee-to-trust applications, and certain employees or members of the Nation who communicated directly with the BIA employees responsible for drafting and processing the fee-to-trust applications.

"Discovery is generally not appropriate for claims brought under the APA." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). This rule reflects the recognition that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142; *see also Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1081–82 (7th Cir. 2016) ("Generally, discovery is not appropriate for claims brought under the APA since review of an agency's decision is confined to the administrative record."). Only under rare circumstances, where a plaintiff can make a "strong showing of bad faith or improper behavior," may a court permit extra-record discovery. *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) (citation omitted). A "strong showing of bad faith or improper behavior" is necessary to venture beyond the agency's "administrative findings" and inquire into "the mental processes of administrative decisionmakers." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). "Bad faith requires a strong showing of evidence suggesting improprieties; 'mere assertions' will not suffice." *Doe v. United States Citizenship & Immigration Servs.*, No. 15-C-10958, 2016 WL 3640687, at *5 (N.D. Ill. June 29, 2016) (citation omitted). The Village has not met that burden here.

A-38

The Village contends that the defendants' failure to include the sealed documents in the administrative record they filed with the court constitutes the bad faith needed to justify extra-record discovery. But for the reasons already set forth, the court has concluded that the sealed documents are not part of the administrative record since they were not considered by the IBIA and played no part in its decision. The defendants contend that the sealed documents fall within the attorney-client privilege or the deliberative process privilege. Having waived any objection it may have had to the defendants' refusal to disclose these documents by failing to raise the issue before the IBIA, the Village cannot claim now that the defendants' assertion of privilege constitutes the level of bad faith that opens the door to discovery of all aspects of the internal decision-making process by the Regional Director. This is not a case where the agency hid or denied the existence of evidence that the claimant later acquired from other sources. The documents the Village only now seeks access to were included in the record before the IBIA, albeit under seal. As noted above, if the Village believed these documents were relevant to its appeal, it should have raised that issue before the IBIA. It is not bad faith to oppose the Village's current request on grounds of waiver.

The Village also argues that "the Defendants' bad faith or improper behavior is demonstrated under the very terms of the MOU that the Village challenges in this matter." Dkt. No. 40 at 15. Under the MOU, the Village argues, the Nation is funding the salaries of the same employees who act as liaisons with the Nation, who prepare the draft notices of decision, and who prepared the record for appeal. *Id.* In support of its argument of bias, the Village has cited the final report of the Inspector General (IG) of the Department of Interior that focused primarily on an MOU between a consortium of California tribes and the BIA's Pacific Regional Office under which the tribes reprogramed federal funds to the Regional Office to hire additional employees to

A-39

facilitate fee-to-trust applications and eliminate the backlog caused by limited BIA funding. Although the IG found no instances of actual bias under either the Pacific MOU or the Midwest Region MOU, it acknowledged the possibility of the appearance of unfairness of the fee-to-trust application process. The MOU between the tribes and the Midwest Regional Office in effect when the Regional Director approved the Nation's applications, however, was a revised version of the MOU that was reviewed by the IG. The revised agreement clarified that BIA employees funded through the consortium are federal employees subject to Title 5 of the United States Code and supervised by BIA staff outside the Division of Fee-to-Trust.

The mere existence of the MOU under which tribes redirect funds to regional BIA offices to assist in processing fee-to-trust applications is not enough to justify allowing the Village to engage in extra-record discovery. The MOU itself is a part of the record and it is undisputed that the procedures and framework it established were in place at the time the challenged decisions were entered. The Village's argument that those procedures and framework violate the Constitution or the APA can be addressed based on the administrative record.

Finally, the Village argues that it is entitled to discovery on its constitutional claims. But the Village's constitutional challenges, for the most part, raise only legal questions. The Village alleges, for example, that the power granted to the Department of Interior to grant fee-to-trust applications constitutes an unconstitutional delegation of legislative power to the executive branch (Count I), that it exceeds Congress's power under the Commerce Clause (Count II), that it violates the Enclave Clause (Count III), that it violates the Tenth Amendment (Count IV), that it violates the privileges and immunities of non-Indians under the Fifth and Fourteenth Amendments (Count V), that it violates the guarantee of a republican form of government to every State set forth in Article IV, section 4 of the Constitution (Count VI), and that 25 C.F.R. § 1.4 unconstitutionally

9

A-40

exceeds the scope and authority of the IRA (Count VII). These claims rest on legal arguments that are not dependent on any amount of discovery beyond what the administrative record contains.

Only as to Count VIII, the Village's claim that its due process rights were violated by an allegedly biased fee-to-trust application process, could extra-record discovery conceivably be relevant. But the conclusory allegation that the Regional Director was biased does not constitute the strong showing of bad faith or improper behavior needed to permit extra-record discovery. And for the reasons set forth above, the fact that various tribes redirected funds to the BIA in an effort to eliminate the backlog on fee-to-trust applications does not give rise to a presumption of bias. Like the court in *Morrison County v. United States Department of Interior*, No. 24-cv-23 (D. Minn. Dec. 3, 2024), this court "does not find this widely adopted practice commensurate with strong evidence of improper bias because the MOUs pertain to the salaries of only some staff personnel at the BIA and <u>not</u> the ultimate decision maker—the Regional Director." Dkt. No. 50-1 at 9–10 (underline in original).

## CONCLUSION

For these reasons, the Village's motion to supplement and complete the administrative record and to engage in discovery (Dkt. No. 39) is **DENIED**. The clerk is directed to set the matter on the court's calendar to address further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this 28th day of January, 2025.

William C. Griesbach
United States District Judge

10

A-41

# United States Department of the Interior



OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

| | | |
|---|---|---|
| VILLAGE OF HOBART, WISCONSIN, | ) | Order Affirming Decision |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. IBIA 17-054 |
| ACTING MIDWEST REGIONAL | ) | |
| DIRECTOR, BUREAU OF INDIAN | ) | |
| AFFAIRS, | ) | |
| Appellee. | ) | September 21, 2023 |

69 IBIA 84

A-42

## Table of Contents

Background.................................................................................................... 87

  I.   The Board's Decision in Hobart I ...................................................... 87

  II.  Review and Reconsideration on Remand ........................................ 90

  III. The Remand Decision ...................................................................... 92

    A.   Bias in the Fee-to-Trust Process ................................................. 92

      1.   2006 IG Report...................................................................... 93

      2.   The Structure of the Midwest MOU ..................................... 93

      3.   Regional Director's Conclusion Regarding Bias .................... 94

    B.   25 C.F.R. § 151.10(e) – Impact on the Village Tax Rolls................. 94

    C.   25 C.F.R. § 151.10(f) – Jurisdictional and Land Use Conflicts ........ 96

    D.   25 C.F.R. § 151.10(h) – Compliance with Environmental Requirements.......... 97

  IV. Appeal of the Remand Decision to the Board ................................... 99

Standard of Review ...................................................................................... 100

Discussion.................................................................................................... 100

  I.   Bias and Due Process ...................................................................... 101

    A.   General Principles of Due Process............................................... 102

    B.   Specific Claims of Bias .............................................................. 104

      1.   Prejudgment/Structural Bias ................................................. 104

      2.   Ex Parte Communications...................................................... 106

      3.   Conflict of Interest ............................................................... 107

    C.   Completion of Remand............................................................. 111

    D.   Legality of the Midwest MOU ................................................... 113

  II.  Section 151.10 Criteria and Compliance with Environmental Laws .................... 115

    A.   Overview of § 151.10 Criteria..................................................... 115

    B.   § 151.10(e) – Impact on the Tax Rolls........................................ 116

      1.   Cumulative Tax Impacts......................................................... 116

      2.   Tax Calculations.................................................................... 118

      3.   Failure to Address the Village's Comments............................. 118

        a)   Public Services ................................................................. 119

        b)   Fire Protection Services .................................................... 120

        c)   Road Maintenance ........................................................... 120

        d)   Impact on School Funding................................................ 121

      4.   Conclusion............................................................................ 121

    C.   § 151.10(f) – Jurisdictional Problems and Conflicts of Land Use .................... 121

      1.   Stormwater Management......................................................... 122

      2.   Zoning and Land Use Conflicts ............................................. 123

      3.   Emergency Services .............................................................. 124

A-43

D. Compliance with Environmental Laws and § 151.10(h) .................................. 124
  1. Remand on Environmental Issues ............................................................. 125
  2. Environmental Laws, Regulations, and Guidance .................................... 126
    a) NEPA .................................................................................................. 126
      (1) Standing ........................................................................................ 126
      (2) Categorical Exclusion .................................................................. 128
    b) NHPA and ESA Compliance ............................................................ 129
    c) 602 DM 2 – Hazardous Substance Determination .......................... 130
    d) Consultation Under 516 DM 1.6 ..................................................... 131
  3. § 151.10(h) – Environmental Compliance ............................................... 131
III. Procedure on Remand ..................................................................................... 132

Conclusion ................................................................................................................ 133

A-44

The Village of Hobart, Wisconsin (Village), seeks review by the Board of Indian Appeals (Board) of a January 19, 2017, decision (Remand Decision) of the Acting Midwest Regional Director (Regional Director), Bureau of Indian Affairs (BIA), to accept eight properties, known as the Hobart Parcels, into trust on behalf of the Oneida Nation (Nation).[1] The Remand Decision was issued after the Board affirmed in part, and vacated in part, the original six Notices of Decision (NODs) issued by the Midwest Regional Director and Acting Midwest Regional Director between March and November 2010, and remanded the case to the Regional Director for further consideration. *Village of Hobart, Wisconsin v. Midwest Regional Director*, 57 IBIA 4, 5 (2013) (*Hobart I*). On appeal now from the Remand Decision, the Village argues that the Regional Director again failed to address its concerns regarding: (1) the tax loss to the Village; (2) land use and jurisdictional conflicts; (3) the sufficiency of BIA's environmental review; and (4) the existence of bias in the Midwest Regional Office. We affirm the Remand Decision because the Village has not met its burden to show that the Regional Director erred.[2]

**Background**

I.     The Board's Decision in *Hobart I*

The facts of this case are not in dispute. For a more detailed explanation of the factual and procedural background, *see Hobart I*, 57 IBIA at 5-11. In 2010, the Regional Director issued six NODs to accept the Hobart Parcels into trust on behalf of the Nation.[3] *See id.* at 5 & n.5; *see generally*, Notices of Decision (Administrative Record (AR) Volume (Vol.) 7, Tab 73).[4]

---

[1] The Nation's official name was changed from the Oneida Tribe of Indians of Wisconsin to the Oneida Nation in 2016. Remand Decision at 1 n.1.

[2] The Regional Director in *Hobart I* was female. For ease of reference, this decision uses female pronouns.

[3] The decisions were issued by both the Regional Director and the Acting Regional Director, but because all six NODs were issued under the authority of the Midwest Regional Director, we will refer in our decision to both the Acting Midwest Regional Director and the Midwest Regional Director as "Regional Director."

[4] The administrative record submitted by BIA in this appeal comprises 41 binders, labeled Volumes 1 through 41, with consecutively numbered tabs. The documents in the record are also bates stamped. When referencing a document, we cite to the volume and tab number. Where multiple documents are located behind one tab, we will also cite to the bates stamp for ease of reference.

A-45

The Hobart Parcels are made up of 8 properties,[5] consisting of 21 parcels and approximately 499.022 acres of land within the boundaries of the Village of Hobart, Brown County, Wisconsin. *See* 57 IBIA at 5; *see also* Opening Brief (Br.), Sept. 21, 2017, at 3. The Village appealed those Notices to the Board, the appeals were consolidated, and the Board affirmed in part, vacated in part, and remanded the matter to the Regional Director for further consideration.

Where a trust acquisition is not mandatory and the land is located within or contiguous to an Indian reservation, BIA's regulations require it to consider seven criteria before it takes land into trust on behalf of an Indian tribe. *See Hobart I*, 57 IBIA at 8-9. The seven criteria are:

> (a) The existence of statutory authority for the acquisition and any limitations contained in such authority;
>
> (b) The need of . . . the tribe for additional land;
>
> (c) The purposes for which the land will be used; . . . .
>
> (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
>
> (f) Jurisdictional problems and potential conflicts of land use which may arise; . . .
>
> (g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status[; and]
>
> (h) The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures [NEPA], and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.

25 C.F.R. § 151.10.[6]

In *Hobart I*, the Village challenged the Regional Director's consideration of these criteria and also raised several procedural and Constitutional challenges. After considering

---

[5] The properties are known as the Boyea, Buck, Calaway, Catlin, Cornish, DeRuyter, Gerbers, and Lahay properties.

[6] Section 151.10(d) only applies to acquisitions for individual Indians and is therefore omitted here.

the effect of the Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009),[7] the Board affirmed the Regional Director's determination that she had authority to take land into trust for the Nation under the Indian Reorganization Act (IRA), 25 U.S.C. § 465 (now recodified as 25 U.S.C. § 5108), 57 IBIA at 18-25, and declined to consider the constitutionality of the IRA because the Board lacks jurisdiction to hear such Constitutional challenges, *id.* at 18. The Board then concluded that the Regional Director had properly considered three of the seven applicable factors set out in § 151.10: the need for the land (§ 151.10(b)), the purpose for and use of the land (§ 151.10(c)), and BIA's ability to discharge any additional responsibilities that might result from the acquisition (§ 151.10(g)). *Id.* at 11. The Board rejected the Village's procedural arguments, concluding that it was given enough time to submit comments. *Id.* at 14. The Board also denied the Village's motion to strike the Nation's brief on appeal. *Id.* at 15.

The Board concluded, however, that the Regional Director failed to adequately consider the Village's comments concerning tax loss, potential land use conflicts, and jurisdictional problems that could result from these trust acquisitions. *See id.* at 28-30. On potential tax losses, the Board found that "[t]he Regional Director did not identify the Village's concerns, much less discuss them." *Id.* at 29. The Board concluded that the Regional Director "did not provide any substance or context to her conclusory opinions" that the Village's tax concerns were "speculative," "unsupported," and "unpersuasive," "[n]or did she discuss why she believed the impact on the Village . . . would be outweighed by the economic or social benefits to be gained" from the acquisition. *Id.* Because the NODs did not "reflect consideration of any of" the Village's specific comments on tax impacts, the Board vacated the NODs and remanded them for further consideration.[8] *Id.* at 30. The Board also vacated the NODs for the Regional Director's failure to address the Village's concerns about stormwater management, and directed the Regional Director to also address, on remand, the other land use and zoning concerns raised by the Village. *Id.*

The Village raised two significant new arguments for the first time on appeal to the Board in *Hobart I*. First, the Village argued that BIA staff were biased in favor of approving these trust acquisitions because their positions were funded under a "consortium agreement" that allowed participating tribes to direct Federal funding back to BIA to expedite the processing of fee-to-trust applications. *Id.* at 15. Second, the Village raised

---

[7] *Carcieri* addressed BIA's authority under 25 U.S.C. §§ 5108 (formerly § 465) and 2202 to accept land into trust for tribes. It was issued while the applications for the Hobart Parcels were pending before the Regional Director.

[8] *See Hobart I*, 57 IBIA at 29-30, for the Board's summary of the Village's comments to the Regional Director.

certain environmental concerns that it had not been able to raise fully in its comments because those comments had been submitted before BIA completed its environmental review. *Id*. at 30-31. The Board instructed the Regional Director to address these new issues on remand in the first instance since the NODs were already being remanded to the Regional Director for further review. *Id* at 16, 31.

II.     Review and Reconsideration on Remand

On remand, BIA solicited updated comments from the Village on the specific issues remanded by the Board through supplemental Notices of Application (NOAs). *See* Email from Rosen to Baker, Aug. 9, 2015 (AR Vol. 12, Tab 132) (forwarding an August 2, 2013, email discussing supplemental NOAs). The supplemental NOAs were issued on August 6, 2013. Supplemental NOAs (AR Vols. 7 & 8, Tabs 81-88). The NOAs acknowledged that the Board found that the Regional Director "insufficiently addressed the information provided to her concerning the impacts relating to the Village," and that the Notices "did not address the Village's concerns in a way that would inform the Village that [they] have been heard and considered." *See, e.g.*, Supplemental NOA for DeRuyter Property, Aug. 6, 2013, at 2 (AR Vol. 7, Tab 81). The Village was advised that BIA was "soliciting the Village's comments, if any, on the remanded portions of the" NODs.[9] *Id.* at 1.

The NOAs specifically asked the Village to "explain its relationship with the County vis-à-vis taxes" and to "provide any further tax or land use information" that it believed would be relevant. *Id.* at 2. The NOAs also invited the Village to submit any additional information that it believed would aid the Regional Director in her reconsideration of its concerns about potential jurisdictional and land use conflicts, including "concerns regarding adjacent fee and trust land that are subject to . . . different zoning and uses." *Id.* And they asked the Village "to articulate its specific environmental concerns for BIA's consideration." *Id.*

In response to each of the NOAs, the Village submitted a standardized three-page summary of its comments on the proposed acquisitions, changing only the parcel numbers for each of its eight responses. *See, e.g.*, Letter from Kowalkowski to Rosen re: HB-520-1, Sept. 5, 2013 (AR Vol. 13, Tab 142 at VOH 04116); Letter from Kowalkowski to Rosen re: HB-328, Sept. 5, 2013 (Response to Supp. NOA) (AR Vol. 13, Tab 142 at VOH

---

[9] The NOAs were issued by the Chairman of the Nation on behalf of BIA. *See* Supplemental NOA for DeRuyter Property at 2 (explaining that on January 25, 1996, the Department granted a waiver under 25 C.F.R. § 1.2 of the requirement in 25 C.F.R. § 151.10 that the Secretary issue notices to state and local governments of applications for trust acquisitions).

04202). After quoting the Board's decision at length, the Village opined that "[i]t is important to note that the [Board] did not vacate the [NODs] because it felt that the [Regional Director] did not have enough information, or lacked information, on the Village's concerns." Response to Supp. NOA at 2. Instead, the Village explained, the NODs were vacated because they did not show that the Regional Director had considered the Village's comments. *See id.* As such, "the Village [stood] by its previously submitted comments, objections, and briefing" regarding its tax loss, zoning, bias, and environmental concerns. *See id.*

The Village did provide some new information for BIA's consideration. *See id.* at 2-3. The Village explained that it was a party to a lawsuit before the Seventh Circuit Court of Appeals involving stormwater management assessments on the Nation's trust land, and enclosed copies of its briefs to that court for the Regional Director's review. *Id.* at 2. Regarding its environmental concerns, the Village noted that Environmental Compliance Memorandum No. ECM-10-2, issued by the Secretary of the Interior on June 16, 2010, "is mandatory," but did not elaborate further. *Id.* at 3. The Village also updated its tax loss calculations and enclosed a spreadsheet showing the tax loss "associated with the [Nation's] simultaneous trust applications for approximately 142 parcels of land . . . within the Village," arguing that it would be "extremely detrimental to the Village . . . given the [Nation's] stated goal to reacquire the entire historic reservation . . . and given the fact the Village receives no money in lieu of this tax loss." *Id.* The Village closed by "maintain[ing] its position that the [Nation] must reinstate the entire fee to trust process, including the submission of a new application" because the "decision relating to this parcel was vacated." *Id.*

Over the next few years, BIA updated the tax information and completed the environmental record for the Regional Director's consideration. The agency collected tax bills for the Hobart Parcels for the period following remand of the NODs. *See* AR Vol. 8, Tabs 99-106 (2013 tax information); Vol. 7, Tab 77 (2014 tax bills); Vol. 1, Tabs 6-7 (2015 tax information). On July 7, 2015, the Midwest Regional Office concluded that the proposed trust acquisitions would not affect historic properties. *See, e.g.*, Memorandum from Kitto to Doig, Apr. 29, 2016, at 1 (2016 Compliance Memo) (AR Vol. 3, Tab 27).[10] In March 2016, the U.S. Fish and Wildlife Service (FWS) confirmed that only one threatened or endangered species might reside within the reservation boundaries. *See* Email from Hartman to Kitto, Mar. 16, 2016 (attaching FWS letter to Nation) (AR Vol. 6, Tab 54). In April, FWS forwarded the Official Species List for each parcel in compliance

---

[10] The Board was unable to locate the July 7, 2015, determination regarding National Historic Preservation Act (NHPA) compliance in the record.

with the Endangered Species Act (ESA), 87 Stat. 884, 16 U.S.C. § 1531 *et seq.* *See, e.g.,* AR Vol. 5, Tabs 45-47 (emails from FWS forwarding Official Species List).

In April 2016, BIA also began updating the Phase I environmental site assessments for the Hobart Parcels. Updates for seven of the eight parcels were completed in April 2016; the last update, for the Lahay parcel, was completed in June 2016. *See* AR Vols. 2-5, Tabs 17-18, 24, 27-37 (updated Phase I ESAs and related documents). The environmental protection specialist assigned to the updates determined that nothing further was required to comply with NEPA, the NHPA, or the ESA. *See e.g.*, 2016 Compliance Memo at 1.

III.    The Remand Decision

The Regional Director issued her Remand Decision on January 19, 2017. Remand Decision (AR Vol. 1, Tab. 5). She considered "the comments from the Village of Hobart contained within its replies to the original Notices of Application, its filings with the [Board], and its reply to the supplemental Notice of Application." Remand Decision at 2.

A.    Bias in the Fee-to-Trust Process

In *Hobart I*, the Board instructed the Regional Director to consider the Village's allegations of bias and to explain the relevance, if any, of an investigation by the Department of the Interior's Office of the Inspector General (IG) referenced in a 2006 Government Accountability Office (GAO) report. *See Hobart I*, 57 IBIA at 15-16. The Regional Director was also ordered to describe any corrective actions taken in response to the IG investigation. *Id.*

In the Remand Decision, the Regional Director began by noting that the Village did not allege actual bias by the Regional Director or any BIA employee, but instead alleged that the whole fee-to-trust process was tainted by a series of "consortium" agreements between the Midwest Regional Office and several participating tribes, including the Nation. *See* Remand Decision at 17-18; *see also* Memorandum of Understanding Between Oneida Tribe of Indians of Wisconsin and the Bureau of Indian Affairs–Midwest Regional Office (Midwest MOU) FY 2005–FY 2007 (AR Vol. 33, Tab 215 at VOH 12066); Midwest MOU FY 2008–FY 2010 (AR Vol. 21, Tab 196 at VOH 7125). These agreements established a "Midwest Fee to Trust Consortium" (Consortium) so that participating tribes could "reprogram" certain Federal funds to BIA's Midwest Regional Office, which BIA then used to hire additional employees to help process fee-to-trust applications. *See* Remand Decision at 20-21; Midwest MOU FY 2005–FY 2007 at 1. Those employees made up the Midwest Regional Office's Division of Fee-to-Trust. The Village argued that, because these trust acquisitions were processed by employees whose jobs were funded by the Nation, they were "not the product of a neutral, independent decision maker" and violated the Village's

right to due process. *See* Remand Decision at 18. The Regional Director reviewed the Village's bias claims and concluded that it had failed to meet its burden of proof. *Id.* at 24-25.

1.  2006 IG Report

The result of the IG's investigation into the use of these consortiums was set out in a final report. U.S. Dept. of the Interior, Office of Inspector General, Report of Investigation: California Fee to Trust Consortium MOU, Case No. PI-PI-06-0091-I (Sept. 20, 2006) (Opening Br., Ex. 5 at 102-114) (IG Report). On remand, the Regional Director reviewed that report. Remand Decision at 19-20. The Regional Director noted that the IG Report focused on a consortium established by BIA's Pacific Regional Office, but found that neither the Pacific MOU nor the Midwest MOU was unlawful or inconsistent with Government ethics rules. *See id.* at 20. The Regional Director also explained that the IG Report found no instances of actual bias under either MOU and that it expressly pointed out that the Midwest MOU was implemented after review by the Office of the Solicitor. *See id.* For those reasons, the Regional Director concluded that the IG investigation had "no bearing" on the Village's allegations of bias in this case. *Id.* The Regional Director also emphasized that the Midwest MOU in effect at the time of the IG investigation was replaced by the FY 2008–FY 2010 MOU, which was in effect when the NODs were issued. *Id.* "Based on these circumstances," the Regional Director found that the IG investigation did not create a conclusive presumption of actual bias. *Id.*

2.  The Structure of the Midwest MOU

The Regional Director then examined whether the structure of the consortium agreement itself created a conclusive presumption of bias. The Regional Director explained that the original consortium agreement was implemented in 2004 "to address the growing backlog of fee-to-trust applications caused by limited BIA funding," and that funds reprogrammed through the consortium "are federal appropriations" that the Regional Director is authorized to reallocate within the BIA accounting system to address a tribe's needs. *See id.* at 21-22. The 2004 consortium agreement was "revised and replaced" by the FY 2008–FY 2010 Midwest MOU. *Id.* at 23. The revised agreement "clarifies" that BIA employees funded through the consortium "are . . . federal employees subject to Title 5 of the United States Code and supervised by BIA staff outside the Division [of Fee-to-Trust]."[11] *Id.* at 23-24. The revised agreement also states that "Division staff must comply

---

[11] The Regional Director explains that the Midwest MOU established a Division of Fee-to-Trust within the Midwest Regional office to process fee-to-trust applications submitted by tribes participating in the consortium. Remand Decision at 22.

with all requirements of 25 C.F.R. Part 151," and "mak[es] clear that only BIA officials with the delegated authority may exercise inherent federal functions." *Id.* at 24. The Regional Director concluded that "the Midwest MOU [thus] ensures against the appearance of bias or conflict of interest" and that its terms did not create an inference of bias that could overcome the presumption of honesty and integrity that applies to BIA employees.[12] *See id.* at 20, 24.

### 3. Regional Director's Conclusion Regarding Bias

Having considered the Village's comments, the IG Report, and the record, the Regional Director concluded that the Village's allegations of bias did "not satisfy the 'difficult burden' of overcoming the presumption that [she] discharged her duties properly in approving the Nation's applications." *Id.* at 24. She found that the Village had not shown actual bias, that her decision was based on information outside the administrative record, or that she failed to review the materials prepared by Division employees objectively. *Id.* at 24-25. The Regional Director also found that, even if the Village had shown "possible bias by BIA employees of the Division," it had failed to show that "the Regional Director's independent review of the materials did not cure any such bias." *Id.* at 25. For these reasons, the Regional Director concluded that the Village had failed to meet its burden of proof to show bias in the agency's approval of these trust acquisitions. *See id.*

### B. 25 C.F.R. § 151.10(e) – Impact on the Village Tax Rolls

Next, the Regional Director considered the impacts of these trust acquisitions on the Village's tax rolls. She began by rejecting the Village's argument that BIA was required to consider "the cumulative and aggregate impact" of all of the Nation's pending trust applications, concluding instead that it "need only consider the impact on the tax rolls of a specific proposed acquisition." *Id.* at 5-6. Turning, then, to the specific proposed acquisition (i.e., the acquisition of the Hobart Parcels), the Regional Director estimated that, based on tax information for fiscal year 2015, these acquisitions would cause the Village to lose $3,997.90, or 0.1443% of its tax levy. *Id.* at 6. With respect to stormwater management fees for the Hobart Parcels, the Regional Director clarified that "any overdue or unpaid assessments on these parcels must be paid, or otherwise resolved, prior to

---

[12] The Regional Director also rejected the Village's contention that the Midwest MOU was invalid for its failure to address *Carcieri*, which held that the Secretary's authority to acquire land in trust under the Indian Reorganization Act (IRA) was limited to those tribes that were under Federal jurisdiction when the IRA was enacted in 1934. Remand Decision at 24. The Regional Director concluded that there "is no reason for the Midwest MOU to expressly address *Carcieri*." *Id.*

acceptance into trust." *Id.* The Regional Director also acknowledged that these acquisitions would result in the loss of $8,294.50 in taxes for the school district, but found that "no school districts submitted comments or objection[s] . . . and the Village has not explained how a loss of revenue to a school district would impact the Village's budget or operations." *Id.* at 7.

The Regional Director found that some of the financial burden imposed on the Village by these tax losses would be offset by services provided by the Nation to both tribal and non-tribal residents, and by the availability of Federal funding for other municipal services. *Id.* at 7-8. The Regional Director explained that policing and emergency services are provided by the Oneida Nation Police Department to tribal and non-tribal residents of the Oneida reservation, and that the Nation similarly provides utility services and recreation areas for all residents of the reservation. *Id.* at 8. Tribal members and their families also benefit from waste and recycling pickup, health care, various social services, housing, and public transportation provided by the Nation. *See id.* at 7-8. The Regional Director acknowledged that fire protection would continue to be provided by the Village, and that, absent an intergovernmental agreement, the Village "could go uncompensated" for those services. *Id.* at 8. Nonetheless, she found that this situation was not unlike other tax-exempt properties within the Village, such as churches and schools, and that the Village had not provided "specific information regarding the cost of fire protection." *Id.* The Regional Director also explained that while the cost of maintenance and repair of three roads identified by the Village (St. Josephs St., Shenandoah St., and Westfield Rd.) would be ineligible for Federal funding, they "do not directly service any of the proposed acquisitions currently under consideration," and "several other nearby roadways . . . are on the Indian Reservation Road Inventory (IRR), and are eligible for BIA funding . . . [which] partially offsets the Village's financial burden for road maintenance." *Id.*

Finally, the Regional Director determined that some of the Village's allegations were speculative and thus outside the scope of the Regional Director's consideration. *See id.* at 8-9. For example, the Village argued that the Nation was attempting "to thwart" its plans for industrial and economic development, depriving it of future tax revenue, and that it could not recoup future tax losses due to a state law limiting its ability to raise its taxes above a 2% levy limit. *Id.* at 8. The Regional Director concluded that BIA was not obligated to consider the Village's speculation about potential future losses, and that, in any event, the Village had not provided enough information to analyze such concerns. *Id.*

A-53

C.    25 C.F.R. § 151.10(f) – Jurisdictional and Land Use Conflicts

Turning to the Village's land use and jurisdictional concerns, the Regional Director compiled a detailed comparison of the zoning classifications of the Hobart Parcels. *See id.* at 9-10.  The Regional Director found that "[o]f the 21 parcels under consideration here, the Village's zoning classification and the Nation's zoning classification are in concordance for all but three." *Id.* at 9.  She found that two of those three (the Cornish and Lahay parcels) had similar zoning classifications and thus would present "a low probability for conflict in land use." *See id.* at 9.

This left the Gerbers parcel, which was zoned "A1 - Agricultural" by the Nation, but "L1 - Limited Industrial" by the Village. *Id.*  The Gerbers property is located "within and adjacent to land zoned by the Village for a commercial industrial park," and the Regional Director determined that "there is a potential for land use conflict where industrial development and agriculture exist side by side." *Id.*  Nonetheless, the Regional Director concluded that the Village had "failed to provide evidence" that the Nation's zoning classification for this parcel was "completely inconsistent" with the Village's development plans, and also noted that it is "not unique" to have different zones located next to each other. *See id.*  The Regional Director emphasized that the Nation had not proposed a change in land use for any of the Hobart Parcels, including the Gerbers property, and that "the Village has not raised any material conflict between existing land uses and Village zoning." *Id.* at 10.  The current uses of the parcels, the Regional Director found, "are also generally consistent with the Village's draft future land use map." *Id.*

Next, the Regional Director addressed potential jurisdictional conflicts over stormwater management.  As the Regional Director noted, the Seventh Circuit held that the Nation is not required to pay the Village's stormwater assessments on trust land because it is the equivalent of a local tax and the Village may not impose local taxes on trust land. *See id.* at 11; *see also Oneida Tribe of Indians v. Village of Hobart*, 732 F.3d 837, 842 (7th Cir. 2013).  The Regional Director acknowledged the Village's concern that the "checkerboard pattern of trust land"[13] resulting from these trust acquisitions would hurt its ability to

_____

[13] In *Hobart I*, the Board ordered the Regional Director "to explain terms that the Village contends it does not understand." *Hobart I*, 57 IBIA at 30.  The Village had complained to the Board that the phrase "jurisdictional pattern" as used in the original NODs was unclear.  In the Remand Decision, the Regional Director explained that the phrase referred to the "checkerboard pattern of jurisdiction" that results when trust land is "scattered throughout the village," resulting in "Indian and non-Indian properties [forming] an irregular checkerboard pattern." Remand Decision at 12 (quoting *Oneida Tribe of Indians*, 732 F.3d at 842).  The Village does not challenge this explanation on appeal.

69 IBIA 96

A-54

manage stormwater. In light of the Seventh Circuit's decision, the Regional Director concluded that the Village and the Nation, if they cannot reach an agreement, may need to implement separate stormwater management programs. *Id.* at 11-12.[14]

The Village also objected to these trust acquisitions on the grounds that they could cause "jurisdictional confusion" and thus impair emergency services. *Id.* at 12. The Regional Director suggested that the best solution to resolve such jurisdictional conflicts "is the development of cooperative service agreements with other government bodies in the area," and noted that a prior service agreement between the Village and the Nation expired in November 2007. *Id.*

D.      25 C.F.R. § 151.10(h) – Compliance with Environmental Requirements

With respect to the Village's environmental concerns, the Regional Director began by acknowledging that all trust acquisitions must comply with applicable environmental laws, including the National Historic Preservation Act (NHPA), the Endangered Species Act (ESA), and the National Environmental Policy Act (NEPA), as well as various binding agency guidance documents (including 516 Department Manual (DM) 6 (NEPA Revised Implementing Procedures) and 602 DM 2 (Land Acquisitions: Hazardous Substances Determinations)). Remand Decision at 13-15. The Regional Director then explained that BIA had concluded in 2015 that nothing further was required to comply with the NHPA, because these trust acquisitions do not have the potential to affect historic properties, or the ESA, because the Nation did not propose any change in land use and thus the agency had determined that these acquisitions would have "no effect" on threatened and endangered species.[15] *Id.*

Next, the Regional Director addressed the Village's contention that the trust acquisitions did not comply with NEPA. The Regional Director explained that, because no change in land use was anticipated for these parcels, BIA had determined that the acquisitions would "not have a significant effect on the quality of the human environment (individual or cumulatively)" and that it was appropriate to rely on a categorical exclusion (CE) for these properties. *Id.* at 14. And because the trust acquisitions fell within this

---

[14] The Seventh Circuit found that Congress had authorized the Environmental Protection Agency (EPA) to delegate the authority to issue stormwater permits to the states, but that Wisconsin disclaimed the authority to regulate stormwater runoff on Indian lands when it applied for such permitting authority. Remand Decision at 11; *Oneida Tribe of Indians*, 732 F.3d at 840.

[15] The FWS concurred with BIA's "no effect" determination on March 14, 2016. Remand Decision at 13.

categorical exclusion, BIA was not required to prepare either an environmental assessment (EA) or an environmental impact statement (EIS). *Id.* The Regional Director acknowledged the Village's argument that the categorical exclusion could not be applied to this trust acquisition and that an EIS should have been prepared instead, but she ultimately disagreed, finding that "all applications for the Hobart properties contemplate maintaining the current land use," and that a categorical exclusion was therefore appropriate. *Id.*at 14-15. The Regional Director concluded that BIA had complied with NEPA. *See id.* at 14.

The Regional Director then summarized the Village's four arguments that BIA failed to comply with 602 DM 2. *Id.* at 15. First, the Village objected that BIA did not consult with the Village or interview local government officials when preparing its environmental site assessments. *Id.* Second, the Village argued that the environmental site assessments were deficient because they identified nearby environmental concerns, but did not complete further (Phase II) assessments. *Id.* Third, the Village contended that the environmental site assessments were the product of institutional bias. *See id.* And fourth, the Village argued that BIA failed to comply with the requirements mandated by Environmental Compliance Memorandum No. ECM 10-2.[16] *See id.*

In response, the Regional Director explained that the purpose of 602 DM 2 is to:

prescribe[] Departmental policy, responsibilities, and functions regarding required determinations of the risk of exposing the Department to liability for hazardous substances or other environmental cleanup costs and damages associated with the acquisition of any real property by the Department for the United States.

*Id.* To that end, Phase I environmental site assessments were used to "ascertain the nature and extent of any potential liability resulting from hazardous substances or other

---

[16] Pre-Acquisition Environmental Assessment Guidance for Federal Land Transactions, Environmental Compliance Memorandum No. ECM 10-2 (ECM 10-2), U.S. Department of the Interior, Office of the Secretary (June 16, 2010), available at ecm-10-2-pre-acquisition-ea-guidance-for-federal-land_0.pdf (doi.gov) (last accessed Sept. 20, 2023). ECM 10-2 provides an overview of the steps taken by the Federal government when acquiring an interest in real property "to assist the bureaus and agencies in identifying environmental conditions associated with real property, and to enable them to secure, to the extent possible, the protections of the liability defenses set forth in [the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)] and [the Oil Pollution Act (OPA)]." *See id.* (cover memorandum from Director, Office of Environmental Policy and Compliance to Heads of Bureaus and Offices).

environmental problems associated with the subject property." *Id.* The Regional Director acknowledged that Phase I environmental site assessments must comply with "current ASTM standards"[17] for consultation with local officials, identification of "recognized environmental conditions," and performance by "Environmental Professionals." *See id.* (citing ASTM E1527-13).[18]

The Regional Director, however, concluded that the Phase I environmental site assessments for the Hobart Parcels satisfied those requirements. *Id.* at 17. The Regional Director explained that interviews were conducted with the Nation's environmental and land department staff, which, "[i]n combination with extensive site visits, . . . serve[d] to meet the requirements of ASTM E1527." *Id.* at 16. And despite the conditions noted by the Village, the Regional Director concluded that "evidence was not found on the Hobart properties that justified the issuance of notice of a recognized environmental condition as defined by the applicable ASTM standard." *Id.* In addition, the Regional Director disagreed with the Village's characterization of ECM 10-2 as mandatory, finding that "602 DM 2.6(a) allows bureaus to establish their own pre-acquisition environmental site assessment procedures." *Id.* at 17. The Regional Director thus found "the Village's concerns to be without merit." *Id.*

IV.    Appeal of the Remand Decision to the Board

Having completed her reconsideration of the Village's comments on remand, the Regional Director issued her Remand Decision on January 19, 2017. The Remand Decision included notice of BIA's intent to accept the Hobart Parcels into trust on behalf of the Nation. *Id.* at 25. On February 22, 2017, the Village appealed the Remand Decision to the Board. The Village filed an opening brief, the Regional Director and the Nation filed answer briefs, and the Village replied.

---

[17] ASTM standards are voluntary consensus technical standards for materials, products, systems, and services. *See* ASTM International, Wikipedia.org, https://en.wikipedia.org /wiki/ASTM_International (last visited September 8, 2023).

[18] ASTM E1527-13, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, ASTM International, West Conshohocken, PA, 2013, available at: https://www.astm.org/e1527-21.html (last accessed September 8, 2023).

**Standard of Review**

The standard of review in trust acquisition cases is well established. Decisions of BIA officials on requests to take land into trust are discretionary, and the Board does not substitute its judgment for BIA's. *Hobart I*, 57 IBIA at 12. Instead, the Board reviews these discretionary decisions to determine whether BIA gave proper consideration to all legal prerequisites to the exercise of that discretion, including any limitations on its discretion that may be established in regulations. *Id.* An appellant bears the burden of proving that BIA did not properly exercise its discretion. *Id.*

"[P]roof that the Regional Director considered the factors set forth in 25 C.F.R. § 151.10 must appear in the record, but there is no requirement that BIA reach a particular conclusion with respect to each factor." *Shawano County, Wisconsin v. Acting Midwest Regional Director*, 53 IBIA 62, 68-69 (2011). An appellant cannot carry its burden of proof simply by disagreeing with BIA's decision. *Id.* at 69; *Hobart I*, 57 IBIA at 13. Moreover, the factors set out in Part 151 need not be weighed or balanced in any particular way or exhaustively analyzed. *State of Kansas v. Acting Eastern Oklahoma Regional Director*, 62 IBIA 225, 233 (2016) (quoting *State of South Dakota v. Acting Great Plains Regional Director*, 49 IBIA 84, 98 (2009)). The Board must be able to discern from the record and the Regional Director's decision, however, that due consideration was given to timely submitted comments by interested parties. *Hobart I*, 57 IBIA at 13.

In contrast to the Board's limited review of BIA's discretionary decisions, the Board has full authority to review any legal issues raised in a trust acquisition case, except those challenging the constitutionality of laws or regulations, which the Board lacks authority to adjudicate. *Shawano County*, 53 IBIA at 69.

**Discussion**

In *Hobart I*, the Board affirmed the Regional Director's consideration of four of the criteria set out in 25 C.F.R. § 151.10: the agency's statutory authority (§ 151.10(a)), the Nation's need and purpose for the lands (§ 151.10(b) and (c)), and the additional duties that taking this land into trust might impose on BIA (§ 151.10(g)). 57 IBIA at 16-31. The Board vacated and remanded the original notices of decision in remaining part, however, so that the Regional Director could reconsider the remaining criteria, as well as the Village's claims of bias and violations of environmental laws. *Id.* at 31. The Regional Director completed that remand on January 19, 2017. Remand Decision at 25 (AR Vol. 1, Tab 5).

The Village now appeals that Remand Decision to the Board, making three main arguments. First, it argues that it was denied due process because BIA and the Regional

69 IBIA 100

A-58

Director were biased against it. Second, it challenges the Regional Director's reconsideration of the remaining criteria set out in § 151.10—tax losses (§ 151.10(e)), jurisdictional problems and land use conflicts (§ 151.10(f)), and environmental compliance (§ 151.10(h))—and argues that the Regional Director failed to comply with various environmental laws. Third, it argues that the process that the Regional Director used to reach this Remand Decision was defective.

For the reasons explained below, we reject the Village's arguments and affirm the Regional Director's Remand Decision.

I.      Bias and Due Process

The Village argues that the Regional Director's decision to approve these trust acquisitions was tainted by bias and violated the requirements of due process. Opening Br. at 4-30; Reply Brief, Dec. 14, 2017, at 2-13. That bias, the Village claims, grew out of the Midwest MOU, a "consortium" agreement which allowed participating tribes (including the Nation) to consent to the reprogramming of Federal funds so that additional BIA employees could be hired to process fee-to-trust applications faster. *See* Midwest MOU FY 2008–FY 2010 (Opening Br., Exhibit (Ex.) 3 at 17-27).[19] The Village contends that BIA was pressured into approving these trust acquisitions so that it could keep this additional funding, and that, as a result, the Midwest MOU (1) fostered institutional bias at BIA, (2) encouraged impermissible ex parte communications between the Nation and BIA staff, and (3) created an unlawful conflict of interest that forced BIA staff to choose between keeping their jobs and evaluating these applications fairly. *See* Opening Br. at 4-30. The Village demands that the Remand Decision "be vacated and remanded for consideration by an independent, neutral decision-maker." *Id.* at 5.

We address each of the Village's allegations in turn below, after discussing the general principles of due process. We conclude that the Village has not shown that the Regional Director's approval of these trust acquisitions was biased or that the Village was denied due process. We find no evidence of improper institutional bias or impermissible ex parte

---

[19] The Midwest MOU that was in effect at the time that the original NODs were issued was the FY 2008–FY 2010 MOU. Remand Decision at 20. Throughout this order, when the Board refers to the Midwest MOU, we mean the FY 2008–FY 2010 MOU. Midwest MOU FY 2008–FY 2010 (AR Vol. 21, Tab 196, VOH 7125-31). The terms of the Midwest MOU in effect when the Remand Decision was issued (that is, the Midwest MOU FY 2014–FY 2017) do not differ materially, and the Board would reach the same conclusions regarding the Village's claims of bias and violations of due process if that MOU were applicable. *See* Midwest MOU FY 2014–FY 2017 (Opening Br., Ex. 3 at 2-9).

69 IBIA 101

communications.  Most importantly, even assuming that the BIA employees hired under the Midwest MOU faced a conflict of interest, due process was not violated here because those employees were not the decisionmakers.  Instead, these trust acquisitions were approved by the Regional Director, who is an independent, neutral decisionmaker whose employment is not funded by the Midwest MOU.

A.    General Principles of Due Process

The Due Process Clause of the Fifth Amendment states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  This does not mean that a full courtroom trial must precede every deprivation of property; what constitutes "due process" is not "fixed," but is "flexible" and varies based on the "time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (holding that due process did not require an evidentiary hearing before the termination of disability benefits); *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985) (noting that "the processes required by the [Due Process] Clause . . . vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur").  But while the exact requirements vary, a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955).  That requirement applies both to the courts and also to "administrative agencies which adjudicate." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).

A party must do more than merely allege bias to show that it has been denied a "fair tribunal" and due process.  Adjudicators enjoy a "presumption of honesty and integrity," and overcoming that presumption requires an appellant to carry a "difficult burden of persuasion." *Id.* at 47; *see also, e.g., South Dakota v. United States DOI*, 787 F. Supp. 2d 981, 1000 (D.S.D. 2011); *South Dakota v. United States DOI*, 401 F. Supp. 2d 1000, 1011 (D.S.D. 2005).  As such, the Board has repeatedly confirmed that an appellant must make a "substantial showing of bias" to disqualify a hearing officer in an administrative proceeding. *See, e.g., Starkey v. Pacific Regional Director*, 63 IBIA 254, 270-71 (2016).  The courts have also identified narrow situations where a "substantial showing of bias" is not required because "[e]xperience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47.  Chief among these is where "the adjudicator has a pecuniary interest in the outcome" of the case.[20] *Id.*

---

[20] The other such situation identified by the Supreme Court is not relevant here. *Withrow*, 421 U.S. at 47.

Thus, to succeed on its claims here, the Village must either make a substantial showing of bias or it must establish that the BIA decisionmaker had a "pecuniary interest in the outcome" of these applications. The Village argues that it need only show a "probability of unfairness" or that the adjudicator might face "a possible temptation," Opening Br. at 5, but we reject that argument. It is true that the Supreme Court has stated that "[e]very procedure which would offer a possible temptation to the average man as a judge . . . denies . . . due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). But the "procedure" at issue in that case was that the judge only got paid for his work if he convicted the defendants; as a result, he had an impermissible "pecuniary interest in the outcome" of the trial. *Id.* at 531-32, 535. No court has ever held that every judge and agency adjudicator that faces "possible temptation" must be disqualified. *See also, e.g., Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994) (agreeing that claimant must show either "actual bias" or "that circumstances were such that an appearance of bias created a conclusive presumption of actual bias").

We also note that the Due Process Clause, as interpreted and applied by the courts, establishes the Constitutional minimum for fairness and impartiality in adjudications.[21] Less fundamental matters of bias, such as "kinship" and "personal bias," do not violate due process but may be restricted as a matter of "legislative discretion." *Tumey*, 273 U.S. at 523. Thus, Congress and Federal agencies may impose higher standards on agency adjudications through statutes and regulations (respectively). The Administrative Procedure Act (APA), for example, requires trial-type, adversarial hearings for "formal adjudications." 5 U.S.C. §§ 554, 556-57. The Regional Director's resolution of these fee-to-trust applications, however, was not a "formal adjudication" because it was not required by law to be conducted "on the record"; instead, it falls into the APA's broad, catch-all category of "informal adjudications." *See, generally,* Cong. Rsch. Serv., R46930, Informal Administrative Adjudication: An Overview (2021), at 24-28 (describing informal adjudications and their requirements). The APA imposes only minimal requirements on informal adjudications like the resolution of these trust applications: such adjudications are subject to judicial review, 5 U.S.C. §§ 701-06, and certain other modest limits that are not relevant here, *see, e.g., id.* § 555(e) (requiring the agency to provide notice and reasons for denial of requests in an informal adjudication). *See also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990).

---

[21] The Due Process Clause only applies to those adjudications that deprive a person of life, liberty, or property. For the sake of this analysis, we assume (without deciding) that the potential reduction of the Village's future taxes by these trust acquisitions constitutes a deprivation of property.

69 IBIA 103

A-61

Finally, the Village bears the burden of proof in this case. *See, e.g., Roberts County, South Dakota v. Acting Great Plains Regional Director*, 51 IBIA 35, 46 (2009); *Heirs and Successors in Interest to Mose Daniels v. Eastern Oklahoma Regional Director*, 55 IBIA 139, 145 n. 7 (2012). "[U]nsubstantiated claims of bias generally are not enough to overcome the presumption of impartiality in an administrative decision-maker." *Cty. of Charles Mix v. United States DOI*, 799 F. Supp. 2d 1027, 1044 (D.S.D. 2011). Nor can the Village reverse the burden of proof by arguing that the Regional Director has not proven an absence of bias. *See, e.g.,* Opening Br. at 23 ("[T]here is no evidence in the record that the RD independently reviewed the decisions drafted by the Division."). To prevail on its claims, the Village must show that it was denied due process and that "something more than harmless error resulted." *Cty. of Charles Mix*, 799 F. Supp. 2d at 1043.

B.      Specific Claims of Bias

1.      Prejudgment/Structural Bias

First, the Village argues that the Regional Director prejudged these issues because she was "going to accept these parcels into trust no matter what." Opening Br. at 13. A party is denied due process when an adjudicator has "prejudged" the party's case against them before the case is even heard. *See United States v. Morgan*, 313 U.S. 409, 421 (1941). The Village claims that the Midwest MOU created a "structural bias" that fostered prejudgment here. *See* Opening Br. at 29-30.

We reject the claim that the Midwest MOU created an unlawful "structural bias." Congress has authorized BIA to take land into trust for Indians, and it has directed BIA to advance the causes of Indian self-determination and self-government. *See, e.g.,* 25 U.S.C. § 5108 (formerly 25 U.S.C. § 465). Both the Board and the Courts have consistently rejected the argument that BIA's pursuit of those goals makes the agency "structurally biased" and disqualifies it from deciding fee-to-trust applications. *Starkey*, 63 IBIA at 270; *Thurston County, Nebraska v. Great Plains Regional Director*, 56 IBIA 296, 304 (2013); *Roberts County*, 51 IBIA at 48; *see also South Dakota*, 401 F. Supp. 2d at 1011 ("Following Congress's statutory policies does not establish structural bias warranting reversal of the Director's decision."). BIA may adjudicate trust applications without bias—and without any denial of due process—even though it has "an underlying philosophy" and "strong views" on these issues, so long as it has not prejudged the law and facts of a specific application. *See Morgan*, 313 U.S. at 421.

The Village recognizes that its argument has been rejected before, but it argues that this case is different because it is alleging that the Midwest MOU, not just BIA's general policies, creates structural bias here. *See* Opening Br. at 29. But the Village fails to show that the Midwest MOU is creating structural bias. As the Village notes, the Midwest MOU

69 IBIA 104

states that "[t]he need for increased land base is imperative to the Tribes of Minnesota, Wisconsin, Michigan, and Iowa." Midwest MOU at 1. That, however, is simply a restatement of the policies that Congress has already set for BIA and, consistent with our previous decisions, does not evidence a structural bias that would disqualify BIA from deciding these trust applications. The Midwest MOU also states that the purpose of the agreement is "facilitating the expeditious processing of fee-to-trust applications." *Id.* But BIA's commitment to processing applications faster is not evidence that it has prejudged those applications; it could still deny the applications, consistent with the Midwest MOU. (We address the Village's claims that the Midwest MOU's funding mechanisms create bias and a conflict of interest in Section I.B.3 below.)

The Village has also failed to identify any evidence that the Regional Director prejudged these specific applications. The standard for proving such prejudgment is "high." *Stand Up for Cal.! v. United States DOI*, 204 F. Supp. 3d 212, 303 (D.D.C. 2016). The courts have not found it "except in cases where an agency has *committed* itself . . . to an outcome" ("for example, by contract"). *Id.* (emphasis in original); *see also, e.g., FTC v. Cement Inst.*, 333 U.S. 683, 701 (1948) (holding that plaintiff must demonstrate that the mind of the decisionmaker was "irrevocably closed" to prove denial of due process). In *Rio Arriba, New Mexico, Board of County Commissioners v. Acting Southwest Regional Director*, the Board found the "taint" of prejudgment where a Regional Director had commented in the press on the specific trust acquisition challenged by the appellant. 38 IBIA 18, 28-29 (2002) (holding that it was "inappropriate for a BIA deciding official to make public comments of this nature on a matter that is pending before him").

But here, unlike *Rio Arriba*, the Village has not pointed to any statements or actions by the Regional Director (or anyone else at BIA) that would cause the Board to question the impartiality of the Remand Decision. Nothing in the Midwest MOU shows any prejudgment about the Hobart Parcels. The Village argues that "[t]he fact that the [Regional Director's] Decision was written by [] Division employees . . . evidences prejudgment," Opening Br. at 23, but even if Division employees helped to prepare a draft of the Remand Decision for the Regional Director's use, we do not see how that shows prejudgment, as long as the Regional Director completed her own independent review and reached her own decision (and we conclude below in Section I.B.3 that she did).

Similarly, the Village cites e-mails showing that the Regional Director and Division employees made the completion of this remand a priority, *id.* at 18-19, but prioritizing a decision is not the same as prejudging the result of that decision. The Village argues that the fact that the Regional Director "has not denied one application from the Tribe related to land in the Village" since 2008 shows prejudgment. *Id.* at 17. The record, however, suggests that the Regional Director has not denied any applications because the tribes withdraw applications that are not likely to be approved, rather than risking denial. *See* IG

A-63

Report at 10 (explaining that the Regional Director had never denied a trust application because "if an application has a problematic issue, it would be dealt with prior to the application reaching the adjudication stage; if an application has an issue that cannot be overcome, the tribe simply withdraws the application since they know it will not be adjudicated favorably."). Moreover, the mere fact the Remand Decision is adverse to the Village—even on all of the issues raised—is not evidence of bias as long it is supported by the law and the facts. *See Crenshaw v. Hodgson*, 24 Fed. Appx. 619, 621 (7th Cir. 2001). The Village was required to substantiate its claim that the Regional Director impermissibly prejudged these issues—it is not enough to rely on "assumptions and speculation"—and it has failed to do so. *See Roberts County*, 51 IBIA at 50.

2.    Ex Parte Communications

Second, the Village claims that it was denied due process because the Regional Director and other BIA employees (especially Division employees) engaged in impermissible ex parte communications with the Nation about these trust applications. *See, e.g.*, Opening Br. at 23 ("BIA and Division employees communicate directly with the Oneida in a joint effort to get the parcels accepted into trust."). The Village argues that "Division employees who communicate with the participating tribes [] on a regular basis . . . should not be the same employees responsible for drafting the decision 'issued' by the [Regional Director]." Reply Br. at 10 n.48. These "ex parte communications," the Village contends, "create[] an unacceptable level of bias." Opening Br. at 10-11, 20-22.

The Village, however, fails to identify any provision of any statute or regulation that prohibits ex parte communications between BIA and the applicant when reviewing a trust acquisition application. If this were a formal adjudication under the APA, then the Regional Director (as adjudicator) would be barred from engaging in off-the-record communications on the merits of the proceeding with interested parties. *See* 5 U.S.C. §§ 551(14) (definition of "ex parte communication"), 557(d)(1) (prohibiting ex parte communications in formal adjudications); *see also* 5 U.S.C. § 554(d)(1) (prohibiting ALJs from "consult[ing] a person or party on a fact in issue"). But this is not a formal adjudication or any other kind of adversarial, trial-type proceeding where ex parte communications are necessarily improper. Instead, it is an informal adjudication, and the APA's restrictions on ex parte communications do not apply.

Moreover, BIA's regulations explicitly require the agency to communicate with the tribal applicant (as well as state and local governments) to evaluate these applications. 25 C.F.R. § 151.10; *see also id.* § 151.12 (permitting BIA to "request any additional information . . . deemed necessary to reach a decision"). The Village was not deprived of due process here simply because the Nation was allowed to participate in this process with BIA.

69 IBIA 106

A-64

And even if the law were on the Village's side, the Village would still have had to show, not only that the Regional Director engaged in impermissible ex parte communications, but also that those communications resulted in actual bias. *See, e.g., Menard v. FAA*, 548 F.3d 353, 360-61 (5th Cir. 2008) (rejecting claim that FAA orders were subverted by ex parte communications where plaintiffs had "not put forth a scintilla of evidence showing that bias or improper communications clouded the [agency's] judgment"). Many of the communications that the Village cites between BIA and the Nation were merely inquiries about the status of the applications. *See, e.g.,* Opening Br. at 20 (claiming that "the Oneida and BIA Division employees regularly communicate with one another regarding the status of fee-to-trust applications and the Division's accomplishments"); *id.* at 21-22 (stating that, "just days before the [Regional Director's] Decision was released, the Oneida representative inquired whether the notice of decisions for the Hobart properties had been signed and issued"). Such inquiries would not be impermissible even under the APA's stricter standards for formal adjudication. *See* 5 U.S.C. § 551(14) (excluding "requests for status reports" from the definition of "ex parte communication"); *id.* § 557(d)(1) (only prohibiting ex parte communications "relevant to the merits of the proceeding"). And while the Village cites other meetings and communications that might have been barred if this were a formal adjudication, nothing the Village cites shows that the Regional Director's interactions with the Nation improperly influenced her decision. *See Roberts County*, 51 IBIA at 49 (finding that an allegation of bias against a superintendent based on the superintendent's status as a tribal member and former tribal official was insufficient absent evidence that the superintendent's former service improperly influenced his decision). Speculation about the Regional Director's motives in approving these applications is not sufficient to meet the Village's burden of proof. *See Roberts County*, 51 IBIA at 49 n.8 ("Instead of evidence, the State simply speculates about the Superintendent's motives for approving the acquisitions."); *cf. Elec. Power Supply Ass'n v. Fed. Energy Regulatory Comm'n*, 391 F.3d 1255, 1259 (D.C. Cir. 2004) (holding that the key to determining if an ex parte communication is prohibited is "whether there is a possibility that the communication could affect the agency's decision in a contested on-the-record proceeding"). As such, we reject the Village's claim that it was denied due process because BIA engaged in impermissible ex parte communications with the Nation.

   3.  Conflict of Interest

Third, the Village argues that it was denied due process because the Midwest MOU created an impermissible conflict of interest. The Village alleges that, because the tribes participating in the Midwest MOU (including the Nation) were "paying the salaries of these Division employees," Opening Br. at 8, those BIA employees had to "do everything in [their] power to guarantee the land will be accepted into trust, or lose [their] job[s]," *id.* at

69 IBIA 107

A-65

14; *see also* Reply Br. at 6 (arguing that the "preeminent problem" is that "the consortium tribes pay 100% of the salaries of the BIA employees who process these applications, and the employees will lose their jobs if they do not accept the parcels into trust"). The Village also contends that the Midwest MOU gave participating tribes significant power over personnel matters within the Division (including power over hiring and performance awards). *See* Opening Br. at 8-9. Due process, the Village contends, demands that this Remand Decision be vacated and remanded "to be decided by independent BIA employees whose jobs are not in jeopardy if they deny a fee-to-trust application." *Id.* at 8.

As discussed above in Section I.A, a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. at 136. A party is denied due process where an adjudicator has "a direct, personal, substantial, [and] pecuniary interest in reaching a conclusion against [that party] in [its] case." *Tumey*, 273 U.S. at 523 (holding that due process was violated where judges were only paid for convicting defendants); *see also Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 872 (2009) (holding that due process was violated when elected judge heard a case against a corporation who had given him "campaign contributions in an extraordinary amount"). Unlike the Village's other allegations of bias, it need not show actual bias to prove a violation of due process under such circumstances, but only that the adjudicator had a pecuniary interest substantial enough that "the risk of unfairness is intolerably high." *Withrow*, 421 U.S. at 58. The Village bears the burden of proving facts that establish that the adjudicator here held such a disqualifying interest.

The Midwest MOU appears to have given Division employees some interest in having these trust applications resolved, although it is not clear whether the degree and nature of that interest would disqualify them from deciding the applications. On the one hand, Division employees did not have the kind of direct pecuniary interest in the resolution of these applications that the courts have found disqualifying: unlike the judge in *Tumey*, for example, they were not paid for each trust acquisition that was approved. *Tumey*, 273 U.S. at 531; *cf. Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (holding that administrative judges on licensing board had impermissible conflict of interest because they would inherit business if they suspended licenses of their competitors).

On the other hand, describing this funding mechanism as "reprogramming," Remand Decision at 22, does not change the fact that Division employees would likely lose their jobs if the tribes stop participating in the Midwest MOU (although apparently some might keep jobs at BIA at the expense of lower grade employees). *See* IG Report at 7, 11; Midwest MOU at 1 (stating that Division employees are hired "[t]hrough funds provided by participating tribes to supplement BIA staff"). The IG Report shows that Division employees under the former Pacific MOU worried that they would lose their jobs if tribes

stopped participating, IG Report at 9, and there is no reason to believe that Division employees hired under the Midwest MOU did not share those concerns.[22]

The Regional Director argues that there was no conflict of interest because the Midwest MOU was revised in light of the IG Report and "corrective actions" were taken. Remand Decision at 23-24. It does appear that the Midwest MOU was revised to limit the participating tribes' ability to "influence the selection, performance awards, and duties and responsibilities of the federal consortium staff," which the Inspector General found to be significant in creating a conflict of interest. *See* IG Report at 1. Notably, the Midwest MOU provided that "Federal employee's personnel rights are governed by Title 5 of the [United States Code]" and that "[s]tatutory rights and obligations will not be superseded by this Agreement." Midwest MOU at 3. In contrast to the former Pacific MOU, it also limited the role of the tribes in the hiring of Division staff. *Id.* ("It is agreed that the process for selecting staff for filling of the Division positions will follow federal personnel rules and regulations. The position descriptions, interviewing of prospective candidates, will be made by the MWRO. MWRO shall inform Advisory Council of selection criteria and the selected employees."). But none of these revisions changed the fact that the tribes control the purse strings from which the consortium staffs' salaries are dependent.

In any event, we need not decide whether the Midwest MOU disqualified Division employees from deciding these trust applications because Division employees did *not* decide these trust applications; the decisions were made by the Regional Director. While the Midwest MOU tasked Division employees with the preparation of draft "notices of determination" for the Regional Director's use, Midwest MOU at 5, those employees reported to the Regional Director's office, *id.*, and the Regional Director "alone . . . [made] all final decisions with respect to applications submitted pursuant to the Midwest MOU,"

---

[22] Both the Village and BIA make loose claims about the Inspector General's report and the conclusions that it reached. In fact, the only conclusions reached in the IG Report were that the former Pacific MOU created "a patent perception of a conflict of interest," which the Inspector General's investigation found "to be, in fact, real" due to the participating tribes' ability to "influence the selection, performance awards, and duties and responsibilities of the federal consortium staff—coupled with the fact that the tribes control the purse strings from which the consortium staffs' salaries are dependent." IG Report at 1. The IG Report reaches no other conclusions. It does purport to summarize the conclusions set out in a "legal opinion rendered by the Office of the Solicitor" on the "legality of consortiums." IG Report at 1, 11-12. Because the Board does not have a copy of that legal opinion and cannot assess its reasoning, and because we review these legal issues *de novo*, we do not rely on the IG Report's characterization of the opinion of the Office of the Solicitor to decide this case and draw no inferences from the Inspector General's summary of it.

69 IBIA 109

A-67

Remand Decision at 21; *see also id.* at 23 ("The Deputy Regional Director-Trust Services, a BIA employee outside the Division, reviews all application recommendations by Division staff before forwarding them to the decision maker for final determination. Final determinations are then made by the Regional Director."). The Regional Director has full authority to review decisions of her subordinates *de novo* and was not bound by the recommendations of Division employees. *Thurston County*, 56 IBIA at 304; *State of South Dakota*, 49 IBIA at 102. The Regional Director is not an employee of the Division, and her position was not funded by the Midwest MOU. She would not lose her job even if all tribes stopped participating in the Midwest MOU. As such, she was not subject to the conflict of interest that allegedly disqualified Division employees from adjudicating these applications.

Thus, even if Division employees had a conflict of interest here, the Regional Director's independent review cured that conflict of interest.[23] *Roberts County,* 51 IBIA at 49 ("Even if the State had shown possible bias on the part of the Superintendent, the State has provided no basis for us to conclude that the Regional Director's independent review of the applications did not cure any such bias."). The Village asks that these applications "be decided by independent BIA employees whose jobs are not in jeopardy if they deny a fee-to-trust application," Opening Br. at 8, but that has already happened here: the Regional Director is an "independent BIA employee," her job is "not in jeopardy if [she] den[ies] a fee-to-trust application," and she was the decisionmaker.

The Village goes on to argue that the Regional Director "merely rubber stamp[ed]" decisions already made by Division employees and never conducted her own independent review. *Id.* at 23. But the Village cites no evidence to support those allegations. Instead, the Village tries to reverse the burden of proof by arguing that "there is no evidence in the record that the [Regional Director] independently reviewed the decisions drafted by the

---

[23] Similarly, under the National Environmental Protection Act (NEPA), a contractor may prepare an environmental impact statement (EIS) for a project and, even if that contractor has a conflict of interest, the conflict does not invalidate the EIS unless it is proven that the agency—as the ultimate decisionmaker—failed to engage in adequate independent oversight. *See, e.g., Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 607-08 (9th Cir. 2018) (holding that contractor's conflict of interest did not invalidate EIS where plaintiffs had "not presented any evidence that the BIA failed to engage in adequate independent oversight over the preparation of either the DEIS or the FEIS"); *Ass'ns Working for Aurora's Residential Env't v. Colo. DOT*, 153 F.3d 1122, 1128-29 (10th Cir. 1998) (holding that, to the extent contractor had conflict of interest, it was cured by agency oversight). It should be noted that NEPA's restrictions on conflicts of interest are imposed by regulation and are not grounded in the Due Process Clause.

Division." *Id.* That is not sufficient because the Village bears the burden of proof here and was required to show that the Regional Director failed to conduct an independent review, a showing it has not made. *See Roberts County*, 51 IBIA at 50 (holding that appellant bore the burden of proving that Regional Director did not "independently and thoroughly evaluate the applications"); *Walch Logging Co. v. Assistant Portland Area Director (Economic Development)*, 11 IBIA 85, 112 (1983) (holding that "[a] legal presumption of regularity supports the official acts of public officers acting in their official capacities").

The record, moreover, does show that the Regional Director undertook her own independent review of these trust applications, the Village's comments, and the related notices of decision.[24] The comprehensiveness of the Regional Director's decision also belies the Village's claim that she undertook no independent review. *See Roberts County*, 51 IBIA at 50; *see also South Dakota*, 401 F. Supp. 2d at 1012 (holding that Regional Director's responses to objections raised by local governments was "substantial evidence that the Director conducted the proceedings in a fair, unbiased manner"). For all these reasons, we conclude that the Village was not denied due process here, even if the Midwest MOU created a conflict of interest for Division employees, because the Regional Director's independent review cured any such conflict.

C. Completion of Remand

In *Hobart I*, the Board directed the Regional Director to "address the Village's allegations of bias as well as the outcome of the IG investigation and its relevance, if any, to the Village's allegations." 57 IBIA at 16. The Regional Director did that, Remand

---

[24] BIA certified that the administrative record—including the Village's comments—reflects all the documents utilized by the Regional Director in rendering the Remand Decision. *See* Memo from Regional Director to Board, June 2, 2017. Unsurprisingly, many of the documents related to the Regional Director's review of the draft notices of decision have been withheld as privileged (either under the deliberative process privilege or attorney-client privilege). The Board has not reviewed the contents of those withheld documents. Nonetheless, the descriptions of the documents set out in the privilege log (which was produced on all parties, including the Village) show that the Regional Director (and other non-consortium BIA and Solicitor's Office staff) reviewed the draft notices of decision. *See, e.g.,* AR Priv. Vol. 1, Tabs 4- 8, 12 (showing review of draft NODs by Field Solicitor's Office); AR Priv. Vol. 2, Tabs 14-15, 23 (same); AR Priv. Vol. 3, Tab 34 (showing review by BIA's Director of the draft notices of decision); *see also* Memorandum from Acting Regional Director Tammie Poitra to Field Solicitor, Twin Cities Field Office (Dec. 9, 2013) (AR Vol. 12, Tab 140) (asking Field Solicitor's Office for independent review of Village's bias claims).

A-69

Decision at 17-25, concluding that the IG Report "has no bearing on the Village's current bias claim" because it "found no instances of actual bias" and "centered on the terms of the Pacific MOU then in use, not the Midwest MOU," and because "the MOUs in effect at the time . . . have both long since expired and been replaced by restructured MOUs," *id*. at 20.

The Village disagrees with the Regional Director's conclusions. As discussed above, we have reviewed the Village's claims of bias and denial of due process *de novo* and reject those claims. The Village also argues, however, that the Regional Director failed to complete the remand ordered by the Board in *Hobart I* because she failed to grapple with the IG Report's findings. *See, e.g.*, Opening Br. at 16. This is simply untrue: the Regional Director discussed the IG Report and the Village's claims of bias at length in the Remand Decision. *See* Remand Decision at 17-25. And even if it were of "less than ideal clarity," her discussion is more than sufficient that, together with the record, her "path may reasonably be discerned" and her completion of the remand affirmed. *See, e.g., Wolf Point Community Organization v. Acting Rocky Mountain Regional Director*, 40 IBIA 131, 134 (2004) (noting that the Board will affirm a decision, even if it does not explain itself, if "the administrative record and the decision, read together, . . . show how BIA reached its conclusion"); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (holding that the courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). Nothing in our remand order in *Hobart I* required the Regional Director to analyze the IG Report more exhaustively, especially where she concluded that it was not relevant to her decision.

The Village also contends that the Regional Director failed to complete the remand because she reviewed only "a redacted, incomplete version of the report that did not contain any of the 19 attachments upon which the report was based."[25] Opening Br. at 12. Many of the redactions in the IG Report appear to be names (which were presumably redacted to protect the privacy of the interviewed employees). The Village has not explained why that information (or any other redacted information) would have made any difference to the Regional Director's analysis. Moreover, our order required the Regional Director to review "the outcome of the IG investigation," not the documents on which it was based. The Village has not shown that the Regional Director abused her discretion by relying on the redacted version of the IG Report or that such reliance was contrary to the Board's instructions on remand.

---

[25] The Regional Director explains that BIA did not obtain an unredacted copy of the IG Report because its disclosure "could only be made with the express written consent of the [Inspector General]." Remand Decision at 19 n.98.

A-70

D.   Legality of the Midwest MOU

Finally, the Village argues that the Midwest MOU was "illegal" because it is inconsistent with the terms of both the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. § 5301 *et seq.*, and the Tribal Self-Governance Act (TSGA), 25 U.S.C. § 5361 *et seq.*  Opening Br. at 24-25; *see also* Reply Br. at 12-13.  We reject this claim for two reasons.

First, the Village has not shown that it has standing to bring this claim.  Even if the Village were correct, and the reprogramming of funds authorized by the Midwest MOU was unlawful, it has not explained how its legally protected interests were harmed by that reprogramming.  As discussed above, we have already concluded that the Midwest MOU did not violate the Village's right to due process.  And even if BIA had been deprived of the funding provided by the consortium agreement, it still had funding to complete its review of these trust acquisitions eventually.

Importantly, the Village has not only failed to show that it has Article III standing to bring such a claim, but it has also failed to show that its interests fall within the zone of interests protected by these statutes.  *See Preservation of Los Olivos (POLO) v. Pacific Regional Director*, 58 IBIA 278, 297-98 (2014).  The purpose of these Acts is to support and assist Indian tribes in "the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." 25 U.S.C. § 5302(b).  Nothing in the Acts suggests that Congress meant to allow parties like the Village to bring suit to enforce the terms of these statutes simply because their economic interests might be indirectly affected by a project funded under the Acts.  Nor is this a case where the Village's economic interests are "closely enough and often enough entwined with" decisions made under these Acts that parties like the Village have become "reasonable" and "predictable" challengers to such decisions.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224, 227 (2012).  The Village simply has not shown that it is the proper party to challenge the legality of the Midwest MOU or BIA's reprogramming of funds under that consortium agreement.  For these reasons, we conclude that the Village does not have standing to bring these claims.[26]

---

[26] Similarly, the Village argues at length that the Midwest MOU violated the "annual funding agreements between the Oneida and the United States."  Opening Br. at 26-28. The Village does not explain how it has standing to bring such a claim, and we conclude that it does not for the same reasons discussed in this section: because it cannot sue to vindicate the terms of an agreement to which it is not a party and which at most indirectly affects its interests.

69 IBIA 113

A-71

Second, even if the Village had standing to bring these claims, we would still deny them because the Village has not shown that the Midwest MOU was unlawful. The Midwest MOU cites several provisions of law as "[l]egal authority." Midwest MOU at 1 (citing 25 U.S.C. § 123c, *id.* § 458cc(b)(3) (now codified at *id.* § 5363(b)(3)), and *id.* § 450j (now codified at *id.* § 5324)). Together, these provisions authorize the tribes to use tribal funds for many purposes (including the broad category of "expenditures for the benefit of Indians and Indian tribes," 25 U.S.C. § 123c), allow the tribes to enter into a range of "self-determination agreements," and permit the tribes to "redesign" "programs, services, functions, and activities . . . and reallocate funds for such program, services, functions, and activities," 25 U.S.C. § 5363(b)(3).

Given these provisions, it is not obvious why the Midwest MOU would be unlawful, and the Village has not presented any argument that persuades us that it was. It is certainly not sufficient, in light of these broad statutory authorizations, for the Village to argue that the Midwest MOU was unlawful simply because the Acts do not "expressly authorize the funding of a Division created for expediting fee-to-trust applications." Opening Br. at 24-25. The conclusions that the Village cites from the Solicitor's Office opinion on the Pacific MOU are also not sufficient—not only because we have those conclusions second-hand and stripped of their reasoning, as quoted in the IG Report—but also because the Solicitor's Office apparently concluded that these consortium MOUs were lawful. *See* IG Report at 11-12 (stating that the Solicitor's Office "determined that they 'do not believe that the consortiums violate the government-wide ethics rules or appropriations laws'" and that "the SOL opinion did not determine that the consortiums were 'directly inconsistent with [ISDEAA]'").

The single statutory argument that the Village makes also fails to carry its burden here. The Village claims that the Midwest MOU violated 25 U.S.C. § 5363(b)(2) because the "reprogramming of federal TPA funds for the purpose of processing fee-to-trust applications on behalf of certain tribes creates precisely the preference forbidden" by that provision of the statute. Opening Br. at 25. Section 5363(b)(2), however, merely states that "nothing *in this subsection* may be construed to provide any tribe with a preference with respect to the opportunity of the *tribe to administer* programs, services, functions, and activities" (emphases added). But Division employees are Federal employees compensated with reprogrammed funds, not tribal employees. And even assuming that the Midwest MOU created such a "preference" for the participating tribes (i.e., to expedite BIA's processing of their applications), this provision does not "forbid" such preferences; it merely states that Section 5363(b) does not itself create any preference. Thus, even if the Village had standing to bring these claims, we would still deny them because none of the Village's arguments show that the Midwest MOU was unlawful.

II.     Section 151.10 Criteria and Compliance with Environmental Laws

The Board remanded these notices of decision for further consideration of three criteria set out in § 151.10: impact on tax rolls (§ 151.10(e)), jurisdictional problems and land use conflicts (§ 151.10(f)), and compliance with environmental laws (§ 151.10(h)). *See Hobart I*, 57 IBIA at 29-31. The Village now appeals the resulting remand decision, arguing that the Regional Director abused her discretion by failing to "properly consider" these criteria and asks the Board to vacate and remand the matter "to a neutral and independent decision-maker." *See* Reply Br. at 1. The Village also argues that the Regional Director violated various environmental laws, regulations, and agency guidance documents. Opening Br. at 43-56; Reply Br. at 23-28.

We disagree. The record and the Remand Decision show that the Regional Director considered the Village's comments on remand, and the Village's continued objections to the Remand Decision are not supported by the facts or the law. The Village's disagreement with the Regional Director's analysis of these acquisition criteria is not enough to show that the Regional Director erred here. Nor has the Village shown that the Regional Director violated any environmental laws.

A.     Overview of § 151.10 Criteria

Through Section 5 of the Indian Reorganization Act (IRA), Congress conferred broad authority on the Secretary of the Interior to take land into trust for Indians. *See South Dakota v. United States DOI*, 423 F.3d 790, 797 (8th Cir. 2005). The only limitations that Congress imposed on that authority are that the land must be acquired for Indians, it must be acquired using authorized funds, and the acquisition must serve the goals identified in the Act's legislative history. *See id.*

That authority, here delegated to the Regional Director, is further constrained by the regulations adopted by the Department set out at 25 C.F.R. Part 151. For trust acquisitions that are "within or contiguous to an Indian reservation" and that are not mandatory, like the trust acquisitions at issue here, those regulations require the Regional Director to "consider" eight listed criteria before taking the land into trust. 25 C.F.R. § 151.10. The Regional Director need only "consider" these factors, however: there is "no requirement that [she] reach a particular conclusion with respect to each factor." *Roberts*, 51 IBIA at 46. "Nor must the factors be weighed or balanced in a particular way or exhaustively analyzed." *Id.* at 46.

Notably, nothing in the Act or these regulations prohibits the Regional Director from taking land into trust whatever her conclusions about these criteria. She is not required to "resolve" any "problems or issues" that the trust acquisition might create. *Id.* at

52. These criteria were introduced only "to insure that conflicting interests are *evaluated* before land is acquired in trust status." 45 Fed. Reg. 62035 (Sept. 18, 1980) (emphasis added). Thus, the Regional Director may take land into trust even if she concludes, for example, that doing so will create "jurisdictional problems," "potential conflicts of land use," or have a significant impact on the tax rolls of the State or its political subdivisions. *See* 25 C.F.R. § 151.10(e), (f).

To succeed on its claims here, the Village must show that the Regional Director erred, either by failing to consider one of the listed criteria or by reaching conclusions regarding those criteria that were "arbitrary and capricious" or otherwise unsupported by the administrative record. "Simple disagreement" with the Regional Director's conclusions cannot carry the Village's burden of proof. *Roberts*, 51 IBIA at 46.

B.    § 151.10(e) – Impact on the Tax Rolls

On appeal, the Village raises three main objections to the Remand Decision's analysis of the impact of these trust acquisitions on the Village's tax rolls. First, the Village argues that the Remand Decision fails to address the cumulative impact of all of the Nation's pending applications for trust acquisitions. Second, the Village claims that the Remand Decision's tax calculations for fiscal year 2015 are wrong. Third, the Village argues that the Remand Decision fails to respond to the Village's comments. The Board is not persuaded by the Village's arguments.

1.    Cumulative Tax Impacts

The Village argues that the Regional Director erred by failing to consider the cumulative tax impacts of all of the Nation's pending applications for trust acquisitions together. *See* Opening Br. at 30-31; Reply Br. at 18. The Village argues that this case is "exactly the type of situation" where cumulative tax impacts must be considered because the Nation's "stated goal" is "placing 100% of [the Village of] Hobart in trust." Opening Br. at 31; Reply Br. at 18 (citing *Roberts County*, 51 IBIA at 51 n.13). Because the Nation allegedly has pending applications to place over 100 parcels of land within the Village in trust, the Village contends that the Regional Director's decision not to analyze cumulative tax impacts here is "nonsensical." Opening Br. at 31.

As the Village notes, the Board has noted that BIA may be required to consider "the collective tax impact of simultaneous trust acquisitions—e.g., numerous simultaneous acquisitions which, collectively, would have a significant tax impact"—in "an appropriate case." *Roberts County,* 51 IBIA at 51-52 n.13. The Board, however, has drawn a distinction between the cumulative impacts of trust applications that are being decided simultaneously and the impacts of other applications that are merely pending before BIA (and that may or

may not ultimately be approved). *See Thurston County*, 56 IBIA at 312 n.20. We have rejected the argument that BIA must consider the cumulative effects of all pending trust applications. *Id.* ("[W]e reject the County's argument that the Regional Director must consider the cumulative impact of all fee-to-trust applications *pending* before BIA. These applications will be considered in due course by BIA and, if appropriate, BIA may then consider any cumulative impact based on, e.g., the tax loss from all applications decided simultaneously or previously in the same tax year.").

Requiring the Regional Director to determine the potential cumulative tax impacts of applications that have not been decided would result in a decision based not on the record, but on speculation about potential future effects that might never come to pass. The Board has repeatedly held that BIA is not required to consider speculation about potential future losses of revenue under this criteria.[27] *Shawano County*, 53 IBIA at 80 (BIA is only required to "consider the present impact on the tax rolls of a proposed trust acquisition"); *see also City of Eagle Butte, South Dakota v. Acting Great Plains Regional Director*, 49 IBIA 75, 82 (2009) ("The Regional Director . . . has no obligation to consider [the appellant's] speculation about what might happen in the future"). Contrary to the Village's claim that this "future tax loss is not speculative, but rather a real threat against the Village's survival as a community," Opening Br. at 35, such a cumulative analysis would require the Regional Director to speculate about each pending application and whether it will ultimately be approved or denied. Nothing in the regulations or our precedent requires that. For all these reasons, we conclude that the Regional Director was not required to consider the potential cumulative impacts of other pending (but not simultaneous) trust applications on the Village's tax rolls.[28]

---

[27] The Regional Director also concluded that the Village's comments on the Wisconsin tax levy limit and its allegations concerning the Nation's efforts to "thwart" the Village's economic development plans were speculative, unsupported, and need not be considered. *See* Remand Decision at 8-9. The Village appears to have abandoned the latter argument on appeal. *See* Opening Br. at 30-35. With respect to the tax levy, the Village has not met its burden to show that the Regional Director erred in exercising her discretion, i.e., it has not shown that the concern is more than speculative.

[28] The Regional Director did consider the collective impact of the acquisition of the Hobart Parcels on the Village's tax rolls, as required by *Roberts County*, because her decisions to acquire those parcels were made simultaneously.

2.  Tax Calculations

Next, the Village argues that the Remand Decision "erroneously calculates the tax loss for the Village for the year 2015." *Id.* at 31.  According to the Village, the 2015 tax bills show that the Village was due $4,090.40 in taxes on the Hobart Parcels, but the Remand Decision undervalued those taxes by $92.50 (a difference of about 2%).[29] *Id.* at 31-32.  Similarly, the Village argues that the Regional Director miscalculated the 2015 school district taxes, explaining that the Village collected $8,483.20 in taxes from the Hobart Parcels on behalf of the Pulaski Community School District and the West De Pere School District, which the Remand Decision incorrectly undervalued by $188.70 (again, a difference of about 2%). *Id.* at 32.  The Regional Director does not dispute these errors, but contends they were harmless transcription errors and that her analysis of the tax losses would not have changed if "the proper figures [been] transcribed." Answer Br. at 24-25.

The Board concludes that these errors are harmless.  The errors are small, and the Village does not argue that the Regional Director would have reached a different conclusion if not for the errors, does not allege that it was harmed by the errors, and does not allege that it was precluded from presenting colorable arguments by the errors. *See South Dakota*, 787 F. Supp. 2d at 997 (an error is more than harmless if it "precludes an interested party from presenting certain colorable arguments to the ultimate decision maker").  Most importantly, the record supports the Regional Director's explanation that these were merely transcription errors, *see* Taxes/Zoning Spreadsheet (AR Vol. 1, Tab 6) (showing improper transcriptions in work product), and that the accurate tax information is in the record and was before the Regional Director when she issued the Remand Decision, *see* 2015 Tax Bills (AR Vol. 2, Tab 22); Town, Village, and City Taxes 2015 (AR Vol. 1, Tab 7).

3.  Failure to Address the Village's Comments

The Regional Director must give due consideration to all timely comments submitted by interested parties, but she need not "resolve" all objections raised in such comments to the commenter's satisfaction. *Mille Lacs County, Minnesota v. Acting Midwest Regional Director*, 62 IBIA 130, 137 (2016); *Desert Water Agency v. Acting Pacific Regional Director*, 59 IBIA 119, 127-28 (2014); *State of New York v. Acting Eastern Regional Director*, 58 IBIA 323, 329 (2014); *Jefferson County, Oregon, Board of Commissioners v. Northwest Regional Director*, 47 IBIA 187, 199-200 (2008).  Here, the Village argues that the Regional Director failed to address the Village's comments on the impacts of these tax

---

[29] Specifically, the Remand Decision cites the taxes due on the DeRuyter property as $162.10, but the 2015 tax bills show that $254.60 was due, a discrepancy of $92.50. *Compare* Remand Decision at 6 *with* 2015 Tax Bills (AR Vol. 2, Tab 22).

A-76

losses. In particular, the Village contends that the Regional Director did not "directly" address the Village's duty to provide public services to these parcels with reduced funding and made "no meaningful analysis" of the Village's continuing obligation to provide fire protection services. Opening Br. at 33-34. The Village claims that the Regional Director dismissed its comments about road maintenance and repair without any "real review" and failed to provide evidence to support her conclusion that the Indian Reservation Road Inventory Program (IRR) would offset the Village's financial burden. *See id.* at 34. And the Village asserts that the Remand Decision "fails to recognize" that the loss of tax revenue to the school district will increase the financial burden on Village residents as student enrollment increases.[30] *See id.* at 35. But while the Village continues to disagree with the Regional Director's conclusions, it is clear from both the Remand Decision and the record that the Regional Director gave due consideration to the Village's comments.

a)      Public Services

The Village argues that the Regional Director did "not directly address the Village's concerns related to the Village's obligation to continue to provide services with reduced funding." *Id.* at 33. But the Remand Decision does acknowledge the Village's comment that "it provides numerous services to those residing within the area to be acquired . . . which, if the land is taken into trust, it would have to perform with reduced funding." Remand Decision at 4. The Regional Director also recognized the absence of a service agreement between the Nation and the Village and reviewed the services provided by the Nation that may offset some of the Village's responsibilities. *See* Remand Decision at 7. Nothing in the principles of administrative law or Part 151 required the Regional Director to solve this potential problem or prohibited her from taking this land into trust even though doing so may impose some burdens on the Village. She was required to consider

---

[30] The Village also argues that the Regional Director abused her discretion by failing to address a statement in the original NODs that the benefits of the acquisition to the Nation outweigh the impacts on the Village. *See* Opening Br. at 33; Reply Br. at 19; *Hobart I*, 57 IBIA at 29 (finding that the Regional Director failed to provide any substance or context to the conclusory statement that she believed the impact of taking the parcels into trust would be outweighed by the economic or social benefits to be gained from the acquisition). The Regional Director was not required to explain or support this line of reasoning on remand because it does not appear in the Remand Decision and thus makes up no part of the basis for her decision here. The Regional Director was not required to address this issue by our remand order. *Hobart I*, 57 IBIA at 29-30 (noting that the Regional Director did not "discuss why she believed the impact on the Village . . . would be outweighed," but remanding because the Regional Director did not identify or discuss any of the Village's concerns regarding tax loss).

69 IBIA 119

A-77

these issues and the Village's comments, and she did so. The Village's dissatisfaction with the result does not show that she violated the law or abused her discretion.

b)     Fire Protection Services

The Regional Director also acknowledged the Village's comment that it was unlikely to enter into an agreement on fire protection services with the Nation in the near future, *see id.* at 7 & n.43, and thus "there is a possibility that emergency services provided by the Village, including fire protection, could go uncompensated," *id.* at 8. As the Regional Director noted, that is also true of other tax-exempt properties within the Village, such as churches and schools. *Id.* The Village continues to object, but, again, the Regional Director was only required to consider this potential problem, not fix it. The Village has not shown that she failed to consider it.

The Village also argues that the Regional Director was required to ask the Village for "specific information regarding the cost of fire protection" and failed to do so. Opening Br. at 34; *see also* Remand Decision at 8. But the Regional Director solicited additional comments from the Village, and the Village chose to rely largely on its previous comments and its briefs submitted to the Board in *Hobart I*. *See, e.g.*, Response to Supp. NOA (AR Vol. 13, Tab 142 at VOH04202). If the Village wanted the Regional Director to consider "specific information regarding the cost of fire protection," it should have submitted it then.[31] *See Thurston County*, 56 IBIA at 68 ("[I]t is arguably incumbent on the [appellant], which was informed of the remand by the Regional Director . . . to advise the Superintendent of any updated information it wished to submit.").

c)     Road Maintenance

The Village argues that the Regional Director "dismissed, without any real review," its comments regarding its obligation to continue to provide road maintenance and repair services with reduced funding. Opening Br. at 34. But the Regional Director acknowledged those comments and found that the three roads identified by the Village "do not directly service any of the proposed acquisitions currently under consideration, but are only located near the Boyea property." Remand Decision at 8. Nonetheless, the Regional Director concluded that Federal funding through the Indian Reservation Road Inventory Program (IRR) (a Federal program that, among other things, funds the maintenance of public roads that provide access to Indian reservations and trust land) was available for

---

[31] We also note that the Village has not identified what information regarding the cost of fire protection services it would have presented if it had been given another opportunity to comment.

other nearby roadways and would "partially offset[] the Village's financial burden for road maintenance." *Id.*

The Village argues that the Regional Director failed to "provide . . . evidence to support [her] conclusion regarding BIA funding for maintenance of roads." Opening Br. at 34; Reply Br. at 14. But it is the Village's burden to show that the Regional Director failed to consider its comments or abused her discretion on appeal. The record shows that the Regional Director considered the estimated cost of road work and maintenance in the area and reviewed the directory of roads eligible for Federal funding near the Hobart Parcels. *See* Road Work Estimates (AR Vol. 5, Tab 49); Indian Reservation Road (IRR) Summary (AR Vol. 5, Tab 51). The Regional Director acknowledged the Village's concerns and considered whether other sources of funding might offset some of its road maintenance costs. That was enough to satisfy her duty to give due consideration to the Village's comments, *see Hobart I*, 57 IBIA at 13, and the Village's disagreement with her decision does not show that she erred.

### d)      Impact on School Funding

The Regional Director acknowledged the Village's comment that the "loss of tax revenue [for schools] will not be reflected in additional federal grants," but concluded that the Village had failed to explain how the loss of revenue for the school district would affect the Village. Remand Decision at 7. On appeal, the Village argues that the Regional Director failed to recognize that this loss of revenue could lead the schools to ask for more funding from the Village, possibly leading to "increased tax burdens" on Village residents. Opening Br. at 35. The Regional Director, however, was not required to infer or speculate about an indirect harm that the Village itself did not explicitly identify in its own comments. The Village cannot show that the Regional Director erred simply because she did not address potential harms that the Village itself did not raise in its own comments.

### 4.      Conclusion

The Regional Director considered the impacts of these trust acquisitions on the Village's tax rolls and gave due consideration to the comments submitted by the Village. The Village disagrees with her conclusions, but has not shown that she failed to consider the Village's comments or otherwise erred.

### C.      § 151.10(f) – Jurisdictional Problems and Conflicts of Land Use

The Village alleges that the Regional Director failed to consider its comments on jurisdictional problems and potential conflicts of land use (the criterion set out in § 151.10(f)) "in any meaningful manner (apart from contradictory, conclusory

statements).” Opening Br. at 36. Specifically, the Village argues that these trust acquisitions will (1) impair its stormwater management programs, (2) create a “checkboard pattern of zoning” that will lead to conflicts of land use, and (3) cause jurisdictional conflicts over the provision of emergency services. *See* Opening Br. at 35-43; Reply Br. at 20-22. The Village argues that the Regional Director failed to consider these issues, and that, even if she did, “it is not enough for [her] to simply acknowledge a jurisdictional problem”; rather, she must “respond to that concern, explain why it was not warranted, or otherwise address it.” Opening Br. at 36 (citing *Jefferson County*, 47 IBIA at 200).

As discussed above in Section II.A, § 151.10 only requires the Regional Director to consider potential jurisdictional problems and conflicts of land use that may arise from these trust acquisitions. She is not required to resolve or prevent those problems, nor is she required to weigh those problems against the potential benefits of the trust acquisition to the tribe. *See State of New York*, 58 IBIA at 346; *Roberts County*, 51 IBIA at 52. The law does not prohibit her from taking this land into trust even if doing so would cause all of the problems identified by the Village.

We conclude that the Regional Director’s consideration of the Village’s comments regarding jurisdictional problems and potential conflicts of land use was consistent with her obligations under § 151.10(f), and the Village has not shown that she erred.

> 1.      Stormwater Management

The Village argues that the Regional Director “noted the stormwater management issue in her [Remand] Decision,” but “failed to recognize” that “the current state of affairs between the Village and the Oneida” will worsen jurisdictional problems related to stormwater management if the Hobart Parcels are taken into trust. Opening Br. at 37. In *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, the Seventh Circuit Court of Appeals found that the Village could no longer impose stormwater management fees on the Nation’s trust lands. 732 F.3d 837, 842 (7th Cir. 2013). The Village argues that the trust acquisitions at issue here will “hamper” its efforts to “improve stormwater runoff” because (1) they will contribute to a “checkerboard pattern” of jurisdiction alternating between the Village and the Nation, (2) stormwater does not recognize these jurisdictional boundaries (i.e., it “does not flow in a checkerboard pattern”), and (3) the Village can no longer impose its stormwater management program on the Nation after the Seventh Circuit’s decision. Opening Br. at 38-39. The Village argues that the Regional Director ignored this “real jurisdictional conflict.” *Id.* at 38.

But the Regional Director did not ignore this issue. To the contrary, she summarized the Village’s comments and objections as well as the Seventh Circuit’s decision and its effects. Remand Decision at 11-12. She never denied that these issues may

A-80

complicate the Village's efforts to manage stormwater. She simply concluded that the "jurisdictional problem" has been resolved because jurisdiction is now clear: as a result of the Seventh Circuit's decision and the State of Wisconsin's disclaimer of authority to regulate stormwater on Indian lands, the Village and the Nation must "implement separate stormwater management programs" (although presumably they could reach an agreement to work together on this issue). *Id.* at 12. The Regional Director considered the Village's comments, and the fact that she characterized the issue differently than the Village does not show that she erred. And, again, she was only required to consider this problem, not solve it.

### 2. Zoning and Land Use Conflicts

The Village also argues that the Regional Director "completely ignore[d]" the Village's concerns about the "checkerboard pattern of zoning and land use" that could result from the acquisition of the Hobart Parcels. Opening Br. at 39. According to the Village, the Regional Director "fail[ed] to provide any meaningful analysis" of conflicts in zoning and relied on "unsubstantiated" and "erroneous" conclusions regarding the consistency of the Nation's and the Village's intended uses for these parcels. *See id.*

The Regional Director did not "completely ignore" the Village's comments. She compared and contrasted the Village's and the Nation's zoning and proposed uses for these properties. She found that only three parcels had inconsistent zoning and concluded that there was "a low risk for conflicting land use" for two of those three parcels. Remand Decision at 9. She found that the remaining parcel—the Gerbers parcel—did have "a potential for land use conflict," but that conflict was not "unique" and the Village itself had "created the same situation unilaterally by placing agricultural and industrial zoning districts immediately adjacent to one another." *Id.* at 9-10. The Village objects that the Regional Director failed to consider that taking the Gerbers parcel into trust would create "different zoning designations *within* a single zone," Opening Br. at 40 (emphasis in original), but, in fact, she explicitly noted that the Gerbers parcel is located "*within* and adjacent to land zoned by the Village for a commercial industrial park." Remand Decision at 9 (emphasis added).

Again, as discussed in Section II.A, the law only requires the Regional Director to consider these jurisdictional problems and potential conflicts of land use; it does not require her to resolve them, and it does not bar her from taking land into trust even if doing so would create such problems or conflicts. *See Roberts County*, 51 IBIA at 52. She was not required to "reconcile the different zoning designations," as the Village suggests. Opening Br. at 40. The Regional Director plainly considered these issues, and the Village has not shown that her conclusions were "arbitrary and capricious" or unsupported by the record. Finally, to the extent that the Village argues that the Regional Director failed to follow the

69 IBIA 123

Board's "order[] . . . to provide more detail" in her consideration of § 151.10(f), *see* Opening Br. at 41, we note that the Board did not decide that the Notices of Decision failed to address this criteria, *see Hobart I*, 57 IBIA at 30, but were remanded instead because they failed to address the stormwater management issues and so that the Regional Director could "address [the zoning issues] in more detail to make clear they have been considered," *id*. The Regional Director's analysis in the Remand Decision complies with that order.

3.     Emergency Services

The Village argues that the Regional Director failed to "properly consider" that these trust acquisitions will harm its ability to provide emergency services because they will contribute to the "checkerboard pattern" of alternating jurisdiction which complicates, for example, police responses. *See* Opening Br. at 41-43; Reply Br. at 21-22. Again, though, the Regional Director explicitly acknowledged these issues and responded to the Village's comments. Remand Decision at 12. She concluded that a cooperative services agreement is "the most feasible solution." *Id*. And while the Village contends that no such agreement is "anticipated," due to its ongoing conflict with the Nation, the Regional Director also recognized that conflict and acknowledged that the "inability of the Village and Nation to execute an intergovernmental service agreement contributes to the jurisdictional conflict that the Village complains of." *Id*.

Again, this is all that was required. The Regional Director heard the Village's comments and considered these potential jurisdictional problems. She was not required to resolve them and was not required to balance the factors in any particular way. She was not prohibited from taking this land into trust even if it may affect the Village's ability to provide emergency services. The Village has not shown that the Regional Director erred.

D.     Compliance with Environmental Laws and § 151.10(h)

The Village claims that the Regional Director ignored its environmental concerns and relied on "inconsistent and outdated environmental information." Opening Br. at 47. As a consequence, the Village argues that the Regional Director (1) failed to complete the remand ordered by the Board; (2) violated various environmental laws, regulations, and binding agency guidance documents (including NEPA, the NHPA, and the ESA); and (3) did not properly consider the potential environmental effects of this trust acquisition, as the Village alleges is required by § 151.10(h). We conclude that, even assuming that the Village has standing to bring these claims, it has not shown that the Regional Director failed to complete the Board's remand, violated any environmental laws, or erred in her consideration of the criterion set out in § 151.10(h).

69 IBIA 124

1.      Remand on Environmental Issues

First, the Village again claims that the Regional Director failed to complete the remand ordered in *Hobart I*, here because it alleges that the Remand Decision does not address "any of the environmental concerns the Village raised in its prior . . . briefs." *See* Opening Br. at 47-48. In fact, the Remand Decision addresses the Village's environmental concerns at length. *See* Remand Decision at 12-17. What the Village seems to be arguing is that the Regional Director failed to complete the remand because she treated many of these environmental issues generally and did not address each one specifically. For example, the Village argues that the presence of a "major pipe line and three sets of high voltage power lines located near the Lahay property as well as one underground storage tank upslope of the Lahay property" triggered the need for a more detailed environmental site assessment. Opening Br. at 48. The Regional Director provided a general response to the Village's argument that more detailed site assessments were needed, but did not specifically address the pipeline or power lines or many of the other specific environmental conditions identified by the Village. *See, e.g.,* Remand Decision at 15 (summarizing the Village's concern as: "[t]he Phase I ESA's were deficient . . . because they identified environmental concerns nearby (e.g., an underground storage tank 0.2 miles from the Lahay property), yet no Phase II studies were completed").

The Regional Director argues that she did complete the remand because, "instead of addressing and refuting each particularized claim, [she] addressed the issue at [the] heart of each claim." Answer Br. at 48. We agree. Nothing in our remand order or the principles of administrative law required the Regional Director to discuss each of these alleged environmental issues separately or prohibited her from considering them collectively where appropriate. It is clear from the Remand Decision that the Regional Director did consider these issues. *See* Remand Decision at 12-17; *see State of South Dakota v. Acting Great Plains Regional Director*, 63 IBIA 179, 180 (2016) ("BIA's consideration of comments and objections, individually or collectively, must be demonstrated in the decision or the record."). The Village's briefs from its last appeal are also in the record and thus were part of the basis for the Regional Director's Remand Decision. *See, e.g.,* VOH Opening Br. (Lahay) (AR Vol. 15, Tab 162); VOH Opening Br. (Buck, Catlin, Calaway, DeRuyter) (AR Vols. 16-17, Tab 168). The Village has not shown that the Regional Director failed to complete this remand simply because she did not specifically and explicitly address, for example, "three sets of high voltage power lines located near the Lahay property." *See* Opening Br. at 48.

A-83

2.  Environmental Laws, Regulations, and Guidance

a)  NEPA

Second, the Village argues that the Regional Director violated NEPA.  Opening Br. at 50-54; Reply Br. at 24-26.  BIA must comply with NEPA before approving a trust acquisition.  NEPA does not prohibit an agency from taking any action, even if it will harm the environment, but it does require the agency to be fully apprised of the likely environmental impacts of its action.  *See, generally, Voices for Rural Living v. Acting Pacific Regional Director*, 49 IBIA 222, 239 (2009).  To ensure that, NEPA requires all Federal agencies to prepare a detailed "environmental impact statement" (EIS) if they are considering taking an action that may "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(C).  Where an agency concludes that its action will not "significantly affect the quality of the human environment," however, it is not required to prepare an EIS and may comply with NEPA by preparing a less-comprehensive "environmental assessment" (EA) and reaching a "finding of no significant impact" (FONSI).  40 C.F.R. §§ 1501.5, 1501.6.  Alternatively, NEPA also allows agencies to "categorically exclude" whole classes of actions from further NEPA review where they do not "individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1501.4; *id.* § 1508.4.

Here, the Regional Director applied a "categorical exclusion" to these trust acquisitions because she concluded that they would not result in any significant change in land use (and thus she completed her NEPA review without preparing an EA or EIS). Remand Decision at 14.  The Village argues that these trust acquisitions were not eligible for a categorical exclusion because they will, in fact, cause changes in land use.  *See* Opening Br. at 51.  The Village also argues that BIA failed to comply with Departmental guidance because it did not consult with local officials on those effects.  *See id.* at 54-55.

(1)  Standing

As a threshold matter, the Village has not shown that it has standing to challenge the Regional Director's NEPA compliance.  An appellant must demonstrate that it has standing to have a right to appeal to the Board.  *See* 25 C.F.R. § 2.2 (2022) (definitions of "Appellant" and "Interested party");[32] 43 C.F.R. § 4.331 (Who may appeal); *County of Santa Barbara, California v. Pacific Regional Director*, 65 IBIA 204, 211 (2018).  An

_____

[32] The Board's regulations incorporate by reference the definitions in 25 C.F.R. § 2.2 (2022).  *See* 43 C.F.R. § 4.330(a).  The 25 C.F.R. Part 2 regulations were amended effective September 8, 2023.  88 Fed. Reg. 53774.

appellant must demonstrate standing for each of its claims. 65 IBIA at 211; *Thompson v. Great Plains Regional Director*, 58 IBIA 240, 241 (2014); *County of Sauk, Wisconsin v. Midwest Regional Director*, 45 IBIA 201, 218 (2007), *aff'd sub nom. Sauk County v. U.S. Dep't of the Interior*, No. 07-543, 2008 U.S. Dist. LEXIS 42552 (W.D. Wis. May 29, 2008). To evaluate standing, the Board applies the elements of constitutional standing articulated by the Federal courts. *Santa Barbara*, 65 IBIA at 211 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The elements of constitutional standing require an appellant to demonstrate that: (1) it has suffered an actual or imminent, concrete and particularized injury to or invasion of a legally protected interest; (2) the injury is causally connected with or fairly traceable to the challenged action; and (3) the injury will likely be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560-61; *POLO*, 58 IBIA at 296-97. These standards may be relaxed when an appellant asserts a "procedural" injury, such as a claim that an agency has failed to comply with the procedures required by NEPA. *Arizona State Land Department v. Western Regional Director*, 43 IBIA 158, 169 n.14 (2006) (emphasis omitted) (quoting *Lujan*, 504 U.S. at 573 n.7).

In addition to the constitutional elements of standing, the Board also applies the principle of "prudential standing": An appellant must show that "the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Ass'n. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *see POLO*, 58 IBIA at 297-98; *County of Sauk*, 45 IBIA at 219. The zone of interests test is "not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 399 (1987).

Here, while standing may be somewhat relaxed for procedural claims brought under NEPA, the Village was still required to show that these trust acquisitions had some potential to harm its environmental interests. The Village's economic interests do not give it standing to bring a NEPA claim because they do not fall within the "zone of interests" that NEPA is meant to protect. *See Ass'n. of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 153; *see also Voices for Rural Living*, 49 IBIA at 237. The Village's recitation of a list of alleged environmental hazards on these parcels (e.g., "used tires, waste piles, machinery and used drums on the Calaway property," Opening Br. at 51) does not demonstrate standing because, again, the Village has not alleged that these hazards will harm its environmental interests. Moreover, it is not enough for the Village to show that environmental hazards may exist on these parcels; to demonstrate standing, it had to show that BIA's acquisition of these lands in trust would somehow cause those hazards to harm the Village's environmental interests. The Village's briefs and notice of appeal contain only vague allegations of environmental harm. *See, e.g.,* Notice of Appeal at 4 ("The placement of such a substantial amount of land into trust will have serious detrimental, social, economic and environmental [e]ffects on the local community"). In any event, even assuming that the

Village has standing to bring these NEPA claims, we conclude for the reasons discussed below that it has not shown that the Regional Director violated NEPA.

(2)    Categorical Exclusion

Where there is a "category of actions" that "do not individually or cumulatively have a significant effect on the human environment," a Federal agency may adopt a "categorical exclusion" that excludes such actions from further NEPA review (and thus no EA or EIS need be prepared). 40 C.F.R. § 1508.4. BIA has adopted a categorical exclusion for "[a]pprovals or grants of conveyances and other transfers of interests in land where no change in land use is planned." 516 DM 10.5(I). The Board has consistently affirmed the application of this categorical exclusion to trust acquisitions where there is no anticipated change in land use. *See, e.g.*, *Benewah County, Idaho v. Northwest Regional Director*, 55 IBIA 281, 297-98 (2012); *Thurston County*, 56 IBIA at 297; *State of New York*, 58 IBIA at 349-350. BIA applied that categorical exclusion here to exclude these trust acquisitions from further NEPA review (and did not prepare an EA or EIS). Remand Decision at 14.

The Village makes two arguments challenging this use of the categorical exclusion. First, it argues that the exclusion cannot be applied here because the use of these lands will change once they are taken into trust. Opening Br. at 51. But as evidence of those alleged changes, the Village cites only certain slight differences in zoning. *Id.* (referring back to *id.* at 39-41). A change in zoning does not necessarily mean that there will be a change in land use, and, in fact, the Nation "has not proposed a change in use for any of the subject properties." Remand Decision at 10. It is certainly possible that some uses will change after the trust acquisition, but the Regional Director was not required to speculate about possible future land uses.[33] *See City of Yreka, California v. Pacific Regional Director*, 51 IBIA 287, 297 (2010), *aff'd, City of Yreka v. Salazar*, No. 10-1734, 2011 WL 2433660 (E.D. Cal. June 14, 2011). By its own terms, this categorical exclusion may be applied as long as no change in land use is "planned," and no change is planned here.

Second, the Village argues that "extraordinary circumstances" prevented the use of this categorical exclusion. *See* Reply Br. at 25. NEPA's regulations require categorical exclusions to include a "safety valve" that compels further environmental review of an

---

[33] In addition, the Village's argument may be barred by the law of the case because, in *Hobart I*, the Board affirmed the Regional Director's consideration of the "purposes for which the land will be used" (25 C.F.R. § 151.10(c)), in part, on the grounds that the Nation's "intended uses and purposes for [these] lands . . . will remain unchanged." 57 IBIA at 27; *see Estate of Richard Lucero*, 1 IBIA 46, 54 (1970) (discussing the "law of the case" rule).

69 IBIA 128

A-86

action, even if it would normally be excluded, if that action may have a significant environmental effect due to "extraordinary circumstances." 43 C.F.R. §§ 46.205(c), 46.215 (listing criteria for such extraordinary circumstances); *see also* Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Establishing, Applying, and Revising Categorical Exclusions Under the National Environmental Policy Act, 75 Fed. Reg. 75628, 75629-30 (Dec. 6, 2010). The Village, however, fails to make a case that any such extraordinary circumstances existed here. Instead, it lists the extraordinary circumstances set out in NEPA's regulations and argues that they "may exist." Reply Br. at 25. Arguing that "extraordinary circumstances" "may" exist is not enough to carry the Village's burden of proof, and it cannot reverse that burden of proof by demanding that the Regional Director prove that extraordinary circumstances do not exist. *See id.* To prevail on these claims, the Village had to show that the Regional Director erred by applying this categorical exclusion, and it has failed to make that showing.

b)    NHPA and ESA Compliance

The Village also argues that the Regional Director used outdated information to comply with the National Historic Preservation Act (NHPA) and that there is nothing in the record or the Remand Decision to show what the Regional Director considered in making the determination that no further compliance with the NHPA was necessary. Opening Br. at 49-50. The Village has not demonstrated that it has standing to bring these NHPA claims. It does not allege any injury to its own legally protected interests from these alleged violations of the NHPA. It has not even argued that the Regional Director's determination was in error or that these trust acquisitions would have a detrimental effect on any historic property. *See id.*; Reply Br. at 23-25. As such, we deny these claims for lack of standing. And even if we considered these claims, we would still deny them because the Village has failed to show that the Regional Director violated the NHPA.

Similarly, the Village argues that the Regional Director violated the Endangered Species Act (ESA) because she relied on "outdated determinations" and failed "to provide any analysis of the threatened species" that the FWS identified as living within the boundaries of the reservation. *See* Opening Br. at 50. The Village also objects that BIA did not follow up with the FWS after 12 months (as that agency recommended) to determine if the information remained current. *Id.* But again, the Village has not explained how these alleged violations of the ESA have injured its own legally protected interests. Moreover, BIA determined that these trust acquisitions would have "no effect" on ESA-listed species, and the FWS concurred in that determination. Letter from Fasbender, Field Supervisor, USFWS to Flowers, Oneida Nation (Mar. 14, 2016) (AR Vol. 6, Tab 54) (stating that "the Service would concur that these transactions are appropriate to document as a 'no effect'"). The Village does not argue that these trust acquisitions will affect listed species or that BIA's "no effect" determination or the FWS's concurrence were in error. As such, we hold that

69 IBIA 129

the Village lacks standing to bring an ESA claim against BIA and that, even if it did, it has failed to prove any violation of the ESA or that the Regional Director erred in her analysis.

c)     602 DM 2 – Hazardous Substance Determination

The Village also argues that the environmental site assessments that BIA prepared for these parcels failed to comply with the requirements set out in binding agency guidance in the Departmental Manual (at 602 DM 2) and in an Environmental Compliance Memorandum (ECM) (ECM 10-2). Opening Br. at 46-47, 52-54; Reply Br. at 25-28. Specifically, the Village claims that these assessments are defective because they did not recommend further environmental review, BIA failed to interview local government officials when preparing them, and they were allegedly not updated after the Board remanded the Regional Director's original decision. Opening Br. at 46-47, 52-54; Reply Br. at 25-28.

Again, the Village has not demonstrated standing to bring these claims. The purpose of the cited provisions of the Departmental Manual and the Environmental Compliance Memorandum is to protect the Department—not the Village—from environmental liability. *See* 602 DM 2.1 (stating that its purpose is to "prescribe[] Departmental policy, responsibilities, and requirements regarding determinations of the potential to expose the Department . . . to liabilities and costs of remediation related to the release or threatened release of hazardous substances"); ECM 10-2 at 1 (stating that its purpose is to "minimize environmental liability by not acquiring contaminated real property"). In this appeal, the Village must defend its own interests, not the Department's. *See, e.g., Cheyenne River Sioux Tribe v. Acting Great Plains Regional Director*, 41 IBIA 308, 311 (2005) (a party must assert its own rights and interests, and cannot rest its claim of relief upon the rights or interests of others). As discussed above in Section II.D.2(a)(1), the Village has not clearly alleged that these trust acquisitions will harm its environmental interests, much less that its environmental interests will somehow be harmed by the agency's alleged failure to properly complete these site assessments. Thus, the Village has failed to show that it has standing to bring these claims.

And even if the Village had standing, we would still deny these claims. For example, the Village argues that BIA must prepare a more comprehensive (Phase II) environmental site assessment for the Gerbers property because the original assessment identified "unknown containers on the property" and "there is still no evidence . . . that those containers have been removed or what hazards may be present." Opening Br. at 52. BIA, however, considered this issue and concluded that these containers—and the other environmental issues identified by the Village—posed minimal environmental concerns. Phase I ESA (Boyea), Apr. 27, 2016 (AR Vol. 5, Tab 36 at VOH 1388). The Village's argument—that this land cannot be taken into trust as long as there is any unresolved

69 IBIA 130

environmental concern, even if it has been reviewed and found to be insignificant—finds no support in the law, and we reject it.

### d) Consultation Under 516 DM 1.6

Next, the Village argues that the Regional Director erred because she "did not consult or coordinate with the Village on any environmental-related concerns," which the Village claims was required by two provisions set out in the Department of the Interior's Departmental Manual. Opening Br. at 54-55 (citing 516 DM 1.6(A)(1) & (C)(1)). Those provisions require certain Departmental officials to "consult, coordinate, and cooperate" with State, local, and tribal governments on the potential environmental effects of the Department's "plans and programs," as well as on the plans and programs of State, local, and tribal governments. 516 DM 1.6(A)(1) & (C)(1).

These provisions do not apply here. They only require consultation when the Department is "planning or implementing Departmental plans and programs" (or when State, local, or tribal governments are planning or implementing their own plans and programs), and the Regional Director's approval of these trust acquisitions is not a "plan or program." *See* 516 D.M. 1.6(A)("Departmental Plans and Programs"), (C) ("Plans and Programs of Other Agencies and Organizations").

Even if they did apply, the Village has not shown that the Regional Director violated these requirements because she did attempt to consult with the Village: the supplemental notices of application, mailed to the Village on August 6, 2013, expressly asked the Village to "articulate its specific environmental concerns for BIA's consideration." Supplemental NOA at 2. In response, the Village chose to stand "by its previously submitted comments, objections, and briefing on these issues." Response to Supp. NOA at 3. It cannot now be heard to complain that BIA refused to consult with it.

### 3. § 151.10(h) – Environmental Compliance

Next, the Village argues that § 151.10(h) required BIA to consider the potential environmental effects of this trust acquisition and that the Regional Director failed to do so. Opening Br. at 47-49; Reply Br. at 24. Section 151.10(h) requires the Regional Director to consider "[t]he extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, [NEPA] Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations." 25 C.F.R. § 151.10(h). The Village claims that the Regional Director violated this requirement because "she failed to properly consider environmental concerns" and "relied upon inconsistent and outdated environmental information." Reply Br. at 23; Opening Br.

at 47-49. The Village lists nine environmental concerns that the Regional Director allegedly ignored. *See* Opening Br. at 48.

As discussed above, we have already reviewed the merits of the Village's environmental claims and concluded that it has not shown that the Regional Director violated 516 DM 6, appendix 4 or 602 DM 2 (or any environmental laws or that she failed to complete the remand ordered by the Board). The Village does not allege, much less prove, that the Regional Director failed to consider the criterion actually set out in § 151.10(h); namely, the extent to which the Nation provided the information needed to comply with the provisions of 516 DM 6, appendix 4, and 602 DM 2. As such, we reject the Village's claims that the Regional Director did not properly consider the factor in § 151.10(h).

III.    Procedure on Remand

Third and finally, the Village argues that the process that the Regional Director used to reach this Remand Decision was defective. The Village contends that, because the Board vacated the original NODs in part, the Nation was required to start the whole process over again by submitting new applications for these trust acquisitions. Opening Br. at 56; Reply Br. at 28. But nothing in the Board's decision in *Hobart I* required the Nation or BIA to start over; to the contrary, the Board affirmed the original NODs in part and only remanded certain issues to the Regional Director. Requiring the Nation to submit new applications now would circumvent the Board's decision. Moreover, the Village points to no authority, and we have found none, that supports its argument: the Board has never required BIA to start the trust acquisition process over, with a new application, simply because some aspects of a decision were remanded. Nor is it "contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around"; rather, it is fundamental to our legal system. *Withrow*, 421 U.S. at 56-57.

The Village also argues that the Regional Director should have solicited updated comments from it throughout the remand proceedings and cites *Okanogan County, Washington v. Acting Portland Area Director*, 30 IBIA 42 (1996), for the proposition that the Board has "vacated decisions for the BIA's failure to solicit or request additional information after a significant passage of time." Reply Br. at 28. But *Okanogan County* is inapposite here because the Regional Director did ask the Village to supplement and update its comments. *See* Supplemental NOAs (AR Vols. 7 & 8, Tabs 81-88). In response, the Village submitted standardized comments for each property that focused on summarizing the issues remanded by the Board and stated that "the Village stands by its previously submitted comments, objections, and briefing on these issues." *See* Response to Supp. NOA at 2-3. Because the Village chose not to submit whatever updated information it now

69 IBIA 132

A-90

believes was relevant, it cannot complain that the Regional Director did not solicit its comments.

We conclude that the Village has not shown that the Regional Director made any procedural errors that would require vacatur of the Remand Decision.[34]

**Conclusion**

Therefore, pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the Board affirms the decision of January 19, 2017.

I concur:

JAMES MAYSONETT
Digitally signed by JAMES MAYSONETT
Date: 2023.09.21 13:32:03 -04'00'

_____
James A. Maysonett
Administrative Judge

_____
Thomas A. Blaser
Chief Administrative Judge

---

[34] The Village attempts to incorporate all of its previous arguments by reference to "preserv[e] [those] arguments for further appeal." *See* Opening Br. at 57. This is not sufficient; on appeal, an appellant must show error in the decision being appealed and making that showing requires more than a cursory incorporation by reference. *See Crest-Dehesa-Granite Hills-Harbison Canyon Subregional Planning Group v. Acting Pacific Regional Director*, 61 IBIA 208, 217 (2015). We reject these arguments and any other remaining arguments made by the Village that we have not already explicitly addressed above.

69 IBIA 133

**Village of Hobart, Wisconsin v.**
**Acting Midwest Regional Director,**
**Bureau of Indian Affairs**
**Docket No. IBIA 17-054**
**Order Affirming Decision**
**Issued September 21, 2023**
**69 IBIA 84**

Frank W. Kowalkowski, Esq.
for Appellant, Village of Hobart, Wisconsin
von Briesen & Roper, s.c.
300 North Broadway, Suite 2B
Green Bay, WI 54303
   **BY CERTIFIED MAIL**

James R. Bittorf, Deputy Chief Counsel
for the Oneida Nation
Oneida Law Office
P.O. Box 109
Oneida, WI 54155

Patrick Pelky, Acting Director
Division of Land Management
Oneida Nation
P.O. Box 365
Oneida, WI 54155

Office of the Governor of Wisconsin
115 East State Capitol
Madison, WI 53702

Office of the Executive
Brown County
P.O. Box 23600
Green Bay, WI 53707

Superintendent
Great Lakes Agency
Bureau of Indian Affairs
916 West Lakeshore Drive
Ashland, WI 54806

Midwest Regional Director
Bureau of Indian Affairs
Norman Pointe 2
5600 American Boulevard West, Suite 500
Bloomington, MN 55437

Alex J. Dyste -Demet, Esq.
Office of the Solicitor
U.S. Department of the Interior
5600 American Boulevard West, Suite 650
Bloomington, MN 55437

Congress approved February 28, 1931, June 9, 1932, and June 13, 1933, are hereby extended one and three years, respectively, from June 13, 1934.

*Amendment.*

SEC. 2. The right to alter, amend, or repeal this Act is hereby expressly reserved.

Approved, June 18, 1934.

---

[CHAPTER 576.]

AN ACT

*June 18, 1934.*
*[S. 3645.]*
*[Public, No. 383.]*

To conserve and develop Indian lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That hereafter no land of any Indian reservation, created or set apart by treaty or agreement with the Indians, Act of Congress, Executive order, purchase, or otherwise, shall be allotted in severalty to any Indian.

*Indian affairs.*
*Future allotment in severalty prohibited.*

SEC. 2. The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress.

*Existing trust periods extended.*

SEC. 3. The Secretary of the Interior, if he shall find it to be in the public interest, is hereby authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States: *Provided, however,* That valid rights or claims of any persons to any lands so withdrawn existing on the date of the withdrawal shall not be affected by this Act: *Provided further,* That this section shall not apply to lands within any reclamation project heretofore authorized in any Indian reservation: *Provided further,* That the order of the Department of the Interior signed, dated, and approved by Honorable Ray Lyman Wilbur, as Secretary of the Interior, on October 28, 1932, temporarily withdrawing lands of the Papago Indian Reservation in Arizona from all forms of mineral entry or claim under the public land mining laws, is hereby revoked and rescinded, and the lands of the said Papago Indian Reservation are hereby restored to exploration and location, under the existing mining laws of the United States, in accordance with the express terms and provisions declared and set forth in the Executive orders establishing said Papago Indian Reservation: *Provided further,* That damages shall be paid to the Papago Tribe for loss of any improvements on any land located for mining in such a sum as may be determined by the Secretary of the Interior but not to exceed the cost of said improvements: *Provided further,* That a yearly rental not to exceed five cents per acre shall be paid to the Papago Tribe for loss of the use or occupancy of any land withdrawn by the requirements of mining operations, and payments derived from damages or rentals shall be deposited in the Treasury of the United States to the credit of the Papago Tribe: *Provided further,* That in the event any person or persons, partnership, corporation, or association, desires a mineral patent, according to the mining laws of the United States, he or they shall first deposit in the Treasury of the United States to the credit of the Papago Tribe the sum of $1.00 per acre in lieu of annual rental, as hereinbefore provided, to compensate for the loss or occupancy of the lands withdrawn by the requirements of mining operations: *Provided further,*

*Restoration of lands to tribal ownership.*

*Provisos.*
*Existing valid rights not affected.*

*Lands in reclamation projects.*

*Order temporarily withdrawing Papago Reservation lands from mineral entry, etc., revoked.*

*Resulting damages to be paid tribe; limitation.*

*Annual rental to be paid.*

*Applicant for mineral patent must first make deposit of rent.*

That patentee shall also pay into the Treasury of the United States to the credit of the Papago Tribe damages for the loss of improvements not heretofore paid in such a sum as may be determined by the Secretary of the Interior, but not to exceed the cost thereof; the payment of $1.00 per acre for surface use to be refunded to patentee in the event that patent is not acquired.

*Patentee to pay, to credit of Indians, damages, for loss of improvements.*

*Refund, if not acquired.*

Nothing herein contained shall restrict the granting or use of permits for easements or rights-of-way; or ingress or egress over the lands for all proper and lawful purposes; and nothing contained herein, except as expressly provided, shall be construed as authority for the Secretary of the Interior, or any other person, to issue or promulgate a rule or regulation in conflict with the Executive order of February 1, 1917, creating the Papago Indian Reservation in Arizona or the Act of February 21, 1931 (46 Stat. 1202).

*Rights of way, etc., not restricted.*

*Vol. 46, p. 1202*

SEC. 4. Except as herein provided, no sale, devise, gift, exchange or other transfer of restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized hereunder, shall be made or approved: *Provided, however,* That such lands or interests may, with the approval of the Secretary of the Interior, be sold, devised, or otherwise transferred to the Indian tribe in which the lands or shares are located or from which the shares were derived or to a successor corporation; and in all instances such lands or interests shall descend or be devised, in accordance with the then existing laws of the State, or Federal laws where applicable, in which said lands are located or in which the subject matter of the corporation is located, to any member of such tribe or of such corporation or any heirs of such member: *Provided further,* That the Secretary of the Interior may authorize voluntary exchanges of lands of equal value and the voluntary exchange of shares of equal value whenever such exchange, in his judgment, is expedient and beneficial for or compatible with the proper consolidation of Indian lands and for the benefit of cooperative organizations.

*No transfers of restricted Indian lands, etc.; exception.*

*Provisos.*
*Lands may descend only to Indian tribe or successor corporation.*

*Descent, etc., according to applicable laws.*

*Voluntary exchanges for proper consolidations.*

SEC. 5. The Secretary of the Interior is hereby authorized, in his discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians.

*Acquisitions, for providing lands for Indians.*

For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is hereby authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: *Provided,* That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona and New Mexico, in the event that the proposed Navajo boundary extension measures now pending in Congress and embodied in the bills (S. 2499 and H.R. 8927) to define the exterior boundaries of the Navajo Indian Reservation in Arizona, and for other purposes, and the bills (S. 2531 and H.R. 8982) to define the exterior boundaries of the Navajo Indian Reservation in New Mexico and for other purposes, or similar legislation, become law.

*Appropriation authorized.*

*Proviso.*
*Not to be used outside boundary lines of Navajo reservation.*

*Ante, p. 960.*

The unexpended balances of any appropriations made pursuant to this section shall remain available until expended.

*Balances available until expended.*

Title to any lands or rights acquired pursuant to this Act shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

*Title vested in United States in trust* *Lands exempt from taxation.*

A-94

Indian forestry units Regulations governing.

SEC. 6. The Secretary of the Interior is directed to make rules and regulations for the operation and management of Indian forestry units on the principle of sustained-yield management, to restrict the number of livestock grazed on Indian range units to the estimated carrying capacity of such ranges, and to promulgate such other rules and regulations as may be necessary to protect the range from deterioration, to prevent soil erosion, to assure full utilization of the range, and like purposes.

New Indian reservations on lands acquired by proclamation.

SEC. 7. The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations: *Provided,* That lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations.

*Proviso.* Additions, for exclusive use of Indians.

Holdings for homesteads outside of reservations.

SEC. 8. Nothing contained in this Act shall be construed to relate to Indian holdings of allotments or homesteads upon the public domain outside of the geographic boundaries of any Indian reservation now existing or established hereafter.

Sum for defraying expenses of tribal organization herein created.

SEC. 9. There is hereby authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, such sums as may be necessary, but not to exceed $250,000 in any fiscal year, to be expended at the order of the Secretary of the Interior, in defraying the expenses of organizing Indian chartered corporations or other organizations created under this Act.

Establishment of revolving fund, to make loans for economic development.

SEC. 10. There is hereby authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, the sum of $10,000,000 to be established as a revolving fund from which the Secretary of the Interior, under such rules and regulations as he may prescribe, may make loans to Indian chartered corporations for the purpose of promoting the economic development of such tribes and of their members, and may defray the expenses of administering such loans. Repayment of amounts loaned under this authorization shall be credited to the revolving fund and shall be available for the purposes for which the fund is established. A report shall be made annually to Congress of transactions under this authorization.

Repayments to be credited to revolving fund
Report to Congress.

Vocational and trade school.
Annual appropriation for loans, to provide payment for tuition, etc.

SEC. 11. There is hereby authorized to be appropriated, out of any funds in the United States Treasury not otherwise appropriated, a sum not to exceed $250,000 annually, together with any unexpended balances of previous appropriations made pursuant to this section, for loans to Indians for the payment of tuition and other expenses in recognized vocational and trade schools: *Provided,* That not more than $50,000 of such sum shall be available for loans to Indian students in high schools and colleges. Such loans shall be reimbursable under rules established by the Commissioner of Indian Affairs.

*Proviso.* Indian students in secondary, etc., schools

Reimbursable.

Standards of health, ability, etc., to be established.

SEC. 12. The Secretary of the Interior is directed to establish standards of health, age, character, experience, knowledge, and ability for Indians who may be appointed, without regard to civil-service laws, to the various positions maintained, now or hereafter, by the Indian Office, in the administration of functions or services affecting any Indian tribe. Such qualified Indians shall hereafter have the preference to appointment to vacancies in any such positions.

Appointments.

Provisions dealing with Indian corporations, education, etc., applicable to Alaska.

SEC. 13. The provisions of this Act shall not apply to any of the Territories, colonies, or insular possessions of the United States, except that sections 9, 10, 11, 12, and 16, shall apply to the Territory of Alaska: *Provided,* That Sections 2, 4, 7, 16, 17, and 18 of this Act shall not apply to the following-named Indian tribes, the members of

Designated sections inapplicable to various tribes.

such Indian tribes, together with members of other tribes affiliated with such named tribes located in the State of Oklahoma, as follows: Cheyenne, Arapaho, Apache, Comanche, Kiowa, Caddo, Delaware, Wichita, Osage, Kaw, Otoe, Tonkawa, Pawnee, Ponca, Shawnee, Ottawa, Quapaw, Seneca, Wyandotte, Iowa, Sac and Fox, Kickapoo, Pottawatomi, Cherokee, Chickasaw, Choctaw, Creek, and Seminole. Section 4 of this Act shall not apply to the Indians of the Klamath Reservation in Oregon.

SEC. 14. The Secretary of the Interior is hereby directed to continue the allowance of the articles enumerated in section 17 of the Act of March 2, 1889 (23 Stat.L. 894), or their commuted cash value under the Act of June 10, 1896 (29 Stat.L. 334), to all Sioux Indians who would be eligible, but for the provisions of this Act, to receive allotments of lands in severalty under section 19 of the Act of May 29, 1908 (25 Stat.L. 451), or under any prior Act, and who have the prescribed status of the head of a family or single person over the age of eighteen years, and his approval shall be final and conclusive, claims therefor to be paid as formerly from the permanent appropriation made by said section 17 and carried on the books of the Treasury for this purpose. No person shall receive in his own right more than one allowance of the benefits, and application must be made and approved during the lifetime of the allottee or the right shall lapse. Such benefits shall continue to be paid upon such reservation until such time as the lands available therein for allotment at the time of the passage of this Act would have been exhausted by the award to each person receiving such benefits of an allotment of eighty acres of such land.

<em>Protecting treaty rights with Sioux Indians.<br>Continuation of allowances, etc.<br>Vol 23, p. 894; Vol. 29, p. 334; Vol. 25, p. 451.</em>

<em>No person to receive more than one allowance.</em>

SEC. 15. Nothing in this Act shall be construed to impair or prejudice any claim or suit of any Indian tribe against the United States. It is hereby declared to be the intent of Congress that no expenditures for the benefit of Indians made out of appropriations authorized by this Act shall be considered as offsets in any suit brought to recover upon any claim of such Indians against the United States.

<em>No Indian claim or suit impaired by this Act.</em>

SEC. 16. Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws when ratified as aforesaid and approved by the Secretary of the Interior shall be revocable by an election open to the same voters and conducted in the same manner as hereinabove provided. Amendments to the constitution and bylaws may be ratified and approved by the Secretary in the same manner as the original constitution and bylaws.

<em>Indians residing on same reservation may organize for common welfare.</em>

<em>Effective, when ratified.</em>

<em>Revocation, amendments, etc.</em>

In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments. The Secretary of the Interior shall advise such tribe or its tribal council of all appropriation estimates or Federal projects for the benefit of the tribe prior to the submission of such estimates to the Bureau of the Budget and the Congress.

<em>Additional powers vested in tribe.</em>

<em>Secretary to advise tribe of contemplated appropriation estimates.</em>

Charters.
Issue of, to each tribe, upon petition therefor.
Proviso.
Ratification condition precedent to operation.
Powers conferred.

SEC. 17. The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: *Provided*, That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

Revocation.

Inapplicable to reservation rejecting proposition.

SEC. 18. This Act shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application. It shall be the duty of the Secretary of the Interior, within one year after the passage and approval of this Act, to call such an election, which election shall be held by secret ballot upon thirty days' notice.

Term "Indian" defined.

"Tribe."

"Adult Indians."

SEC. 19. The term " Indian " as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term " tribe " wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words " adult Indians " wherever used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years.

Approved, June 18, 1934.

[CHAPTER 577.]

AN ACT

June 18, 1934.
[S. 3742.]
[Public, No. 384.]

Granting the consent of Congress to the State Board of Public Works of the State of Vermont to construct, maintain, and operate a toll bridge across Lake Champlain at or near West Swanton, Vermont.

Lake Champlain.
Vermont may bridge, at West Swanton.

Construction.
Vol. 34, p. 84.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the consent of Congress is hereby granted to the State Board of Public Works of the State of Vermont to construct, maintain, and operate a bridge and approaches thereto across Lake Champlain, at a point suitable to the interests of navigation, between a point at or near East Alburg, Vermont, and a point at or near West Swanton, Vermont, in accordance with the provisions of an Act entitled " An Act to regulate the construction of bridges over navigable waters ", approved March 23, 1906, and subject to the conditions and limitations contained in this Act.

Toll rates to be adjusted to provide cost of operation and sinking fund.

SEC. 2. If tolls are charged for the use of such bridge, the rates of tolls may be so adjusted as to provide a fund sufficient to pay (a) the reasonable cost of maintenance, repair, and operation of the said bridge and its approaches, and (b) the amortization within a reasonable time, and not exceeding twenty-five years from the

A-97